# EXHIBIT A

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): **FOR COURT USE ONLY**

Caleb Marker (SBN 269721)
Zimmerman Reed LLP, 6420 Wilshire Blvd, Suite 1080, Los Angeles, CA 90048

TELEPHONE NO.: 877-500-8780    FAX NO. (Optional): 877-500-8781
E-MAIL ADDRESS: caleb.marker@zimmreed.com
ATTORNEY FOR (Name): Plaintiffs John Doe 1 and John Doe 2

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Stanley Mosk Courthouse

**Electronically FILED by
Superior Court of California,
County of Los Angeles
4/03/2023 12:00 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Lozano, Deputy Clerk**

CASE NAME:
John Doe 1, et al. v. Fenix Internet LLC

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 23STCV07094 |
| | | JUDGE: |
| | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action (specify): Five (5)
5. This case [x] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 31, 2023
Caleb Marker
_____
(TYPE OR PRINT NAME)    ►    _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev.September 1, 2021]    **CIVIL CASE COVER SHEET**    Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

ZIMMERMAN REED LLP
Caleb Marker (SBN 269721)
Email: caleb.marker@zimmreed.com
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Fax: (877) 500-8781

*(Additional Counsel Identified Below)*

*Attorneys for Plaintiffs*

**Electronically FILED by
Superior Court of California,
County of Los Angeles
4/03/2023 12:00 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Lozano, Deputy Clerk**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| JOHN DOE 1 and JOHN DOE 2, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FENIX INTERNET LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive,<br><br>Defendant. | CASE NO.: 23STCV07094<br><br>*Assigned for All Purposes to*<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of California's Consumer Legal Remedies Act;<br>2. Conversion;<br>3. Violation of California Unfair Competition Law;<br>4. Violation of California False Advertising Law; and<br>5. Restitution/unjust enrichment<br><br>JURY TRIAL DEMANDED |

Plaintiffs John Doe 1 and John Doe 2, bring this action on behalf of themselves and all others similarly situated against Defendant Fenix Internet LLC ("Defendant" or "Fenix") and allege, upon personal knowledge as to their own actions and their counsels' investigations, and on information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      This is a lawsuit against Defendant for engaging in an unlawful "automatic renewal" scheme for OnlyFans "subscriptions." OnlyFans is a popular social media and creation platform through which consumers "subscribe" to original content uploaded by creators ("OnlyFans Creator Content") and sold by Defendant on the OnlyFans Platform. OnlyFans Creator Content is marketed, advertised, made available, and sold through the website www.onlyfans.com (the "OnlyFans Platform"). When consumers sign-up for an OnlyFans account and follow paid-for OnlyFans Creator Content Defendant enrolls them into a program that automatically renews their initial purchase on a monthly basis (the "OnlyFans Subscription(s)") resulting in monthly charges ranging from $1.99 up to $49.99 on their credit card, debit card, or third-party payment account ("Billing Information") unless and until the consumer cancels their OnlyFans Subscription. In so doing, OnlyFans consumers are not given the pre- and post-purchase OnlyFans Subscription offer terms in a clear and conspicuous manner, and in visual proximity to, Defendant's request for consent to the OnlyFans Subscription offer nor do OnlyFans consumers provide affirmative consent to the automatically renewing OnlyFans Subscriptions before Defendant charges their Billing Information as is required under California's Automatic Renewal Law (the "ARL"). Cal. Bus. & Prof. Code § 17602(a). Furthermore, the online method to cancel OnlyFans Subscriptions does not incorporate a one-step "prominently located" cancellation button or link available to OnlyFans customers on their profile or account settings, nor are OnlyFans consumers given an "immediately accessible" pre-written cancellation email, in further violation of the ALR. *Id.* § 17602(d)(1)(A)–(B). Instead, the OnlyFans Subscription cancellation process is a multi-step and counter-intuitive procedure that results in additional, unwanted, and unauthorized charges to consumers' Billing Information by Defendant.

2.      Defendant is a wholly owned subsidiary of and is entirely controlled by Fenix International, the owner of the OnlyFans Platform, of which Leonid Radvinsky is the majority owner

and director.[1] Before consumers can enroll into an OnlyFans Subscription they must provide Defendant with their Billing Information. Then, because Defendant possesses consumer Billing Information, Defendant unilaterally and automatically charges consumer Billing Information for the OnlyFans Subscription as payments become due. Put differently, Defendant fully controls the sale and billing for OnlyFans Subscriptions by and from its offices in Florida or other states located within the United States. As the selling and charging entity, Defendant is responsible for providing the ARL's pre- and post-purchase information and disclosures in the manner prescribed by the statute, Defendant is responsible for obtaining consumers' affirmative consent to the automatically renewing OnlyFans Subscription, and Defendant is responsible for providing a cancellation mechanism in compliance with the ARL. Simply, Defendant controls the entire OnlyFans Subscription offer and is therefore responsible for ARL compliance before charging consumer Billing Information. Alternatively, as the agent of Fenix International, Defendant unlawfully charged Plaintiffs', and unlawfully charges consumers', Billing Information in violation of the ARL, conduct for which it alone can be held liable. *See Peredia v. HR Mobile Services, Inc.*, 25 Cal.App.5th 680, 692 (2018) ("... an agent is liable for his or her own torts, whether the principal is liable or not, and in spite of the fact that the agent acted in accordance with the principal's directions.") (citation omitted). But for Defendant's violations of the ARL, as detailed further herein, Plaintiffs, and the Class, would not have spent the amount of money that they did. As a result, Plaintiffs suffered out-of-pocket loss and financial injury as a result of the practices complained of herein for which both monetary and injunctive relief are sought.

3.     Defendant's failure to comply with the requirements of the ARL, or otherwise unlawful charging of consumer Billing Information, resulted in exorbitant revenues to Defendant, Fenix International, and Leonid Radvinsky. The OnlyFans Subscription is the method by which Defendant and Fenix International generate revenue. As of November 30, 2021, OnlyFans has generated over 187

---

[1] Fenix International Limited Annual Report and Financial Statements for the Year Ended 30 November 2021, 2 (Nov. 30, 2021), available at: https://find-and-update.company-information.service.gov.uk/company/10354575/filing-history (hereinafter "Fenix Annual Report"); *see also Leonid Radvinsky*, Forbes, https://www.forbes.com/profile/leonid-radvinsky/?sh=1466a71d35bd (last accessed Feb. 24, 2023).

CLASS ACTION COMPLAINT

million fans.[2] Online subscription enrollments by customers drive the growth of Fenix International's business model with over 50 percent of its annual revenue being derived from the OnlyFans Subscription.[3] Last year alone, OnlyFans users spent $4.8 billion on the OnlyFans Platform,[4] which generated $932 million in net revenue;[5] a substantial increase over the estimated $358 million in net revenue OnlyFans generated in 2020.[6] Additionally, Fenix International reported that $648 million, or 70 percent, of its 2021 revenue was generated in the United States.[7] Fenix International, as well as its owner Leonid Radvinsky, a resident of Florida, obtains these eye-popping revenues through Defendant's unlawful charging of consumer Billing Information.

4.      Pursuant to the ARL, online businesses that offer automatic renewal agreements or continuous service agreements to California consumers must: (a) provide the complete automatic renewal terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase, Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain affirmative consent prior to the consumer's purchase, *id.* § 17602(a)(2); (c) provide an acknowledgement that includes the automatic renewal agreement's offer terms, describes the cancellation policy, and explains how to cancel, *id.* § 17602(a)(3); and (d) for offers made available online, as is the OnlyFans Subscription, an "exclusively online, at will, and without engaging any further steps" mechanism for immediate cancellation via either a "prominently located direct link or button" located on the consumer's account, profile, or devise, or an "immediately accessible termination email formatted and provided by the business that a consumer" can used to cancel their continuous service agreement "without additional information." *Id.* § 17602(d)(1)(A)–(B). Defendant unlawfully charged Plaintiffs', and illegally charges similarly situated California consumers', Billing Information in violation of the core requirements of the ARL.

---

[2] Fenix Annual Report, *supra* note 1 at 2.
[3] *Id.* at 23.
[4] *Id.* at 2. It has been reported that OnlyFans has paid more than $500 million to its owner, Leonid Radvinsky, in the last two years alone. Jim Waterson, *OnlyFans Profits Boom as Users Spent $4.8bn on Platform Last Year*, THE GUARDIAN (Sept. 1, 2022), https://www.theguardian.com/business/2022/sep/01/onlyfans-profits-boom-as-users-spent-48bn-on-platform-last-year.
[5] Fenix Annual Report, *supra* note 1.
[6] *Id.*
[7] *Id.* at 23, 30.

5.      Specifically, Plaintiffs, and Class members, were not provided with the OnlyFans Subscription offer terms in a "clear and conspicuous" manner and within "visual proximity" to Defendant's request for consent to offer before the purchase was, and is, fulfilled in violation of ARL section 17602(a)(1). Further, Defendant did not obtain Plaintiffs', and Class members', affirmative consent before charging their Billing Information in violation of ARL section 17602(a)(2). Additionally, Plaintiffs, and Class members, were not provided with a post-purchase acknowledgement containing a description of the OnlyFans Subscription offer terms, the OnlyFans Subscription cancellation policy, or information explaining how Plaintiffs, and Class members, can cancel their OnlyFans Subscriptions in violation of ARL section 17602(a)(3). Finally, Plaintiffs, and the Class, were not given a "prominently located" one-step cancellation mechanism made available on their OnlyFans account or profile page nor were they provided with an "immediately accessible" cancellation email in violation of ARL section 17602(d)(1)(A)–(B).

6.      As a result, all goods, wares, merchandise, or products sent to Plaintiffs and the Class under the automatic renewal or continuous service agreements are deemed to be "unconditional gifts" under the ARL. Cal. Bus. & Prof. Code § 17603. Because the amounts charged and represented as due under Defendant's scheme, which violated the ARL, should not have been charged but were unconditional gifts and known to be such before the charges were imposed and collected, Defendant has been unjustly enriched and Plaintiffs were injured financially and suffered out of pocket loss for which restitution of the amounts paid is due. The amounts charged to Plaintiffs and Class members, by law, were unconditional gifts, and therefore, the amounts charged to their Billing Information, should never have been charged and collected by Defendant and Plaintiffs and the Class should not have parted with those sums but instead would have retained all such sums at all times. In addition, had Plaintiffs known about Defendant's conduct, which violated the ARL, in advance, they would not have parted with their money in the amounts they did but instead taken steps to protect their rights and avoid unlawful transactions, resulting in further out-of-pocket loss.

7.      Plaintiffs and the Class relied, to their detriment on Defendant's compliance with the ARL, and other applicable statutes, in all respects and not to market, sell, and charge their Billing Information in a manner that violated applicable law. Defendant's failure to do so, described further

herein, while collecting money from Plaintiffs and the Class, amounted to affirmative misrepresentations or omissions of material fact. Defendant represented as due and owing, amounts that were not due but instead were considered unconditional gifts that need not be paid for. Cal. Bus. & Prof. Code §17603. Plaintiffs and the Class were not provided the required pre- and post-purchase disclosures and information regarding the OnlyFans Subscription offer terms nor did the Plaintiffs and the Class give their affirmative consent to Defendant before it charged their Billing Information and collected revenue from Plaintiffs and the Class. Defendant's unlawful charging of Plaintiffs' and the Class's Billing Information in violation of the ARL amounted to an omission of material fact which reasonable consumers would have wanted to know before being charged and completing the transactions. Such violations continued on a recurring basis each time a periodic charge in relation to an automatic subscription was made and collected. Defendant's intentional conduct making these charges, when it already knew or should have known that any goods, services and/or merchandise provided in relation to the subscription was legally considered an unconditional gift under the ARL before the charges were imposed and collected was unlawful, unfair and fraudulent conduct under the Unfair Competition Law and other law.

8.     Plaintiffs and the Class would not have purchased the OnlyFans Subscription had they been provided with the ALR mandated pre- and post-purchase disclosures and information. Defendant's conduct caused Plaintiffs to part with money that they otherwise would not have. Defendant's unlawful conduct, misrepresentations, and/or omissions were an immediate cause of injury-producing conduct. Plaintiffs would not have purchased the OnlyFans Subscription, or paid as much for it, absent Defendant's unlawful conduct, misrepresentation, and/or omissions. Plaintiffs enrolled in OnlyFans Subscription through defective and misleading disclosures and omissions described herein and were subsequently charged by Defendant on a recurring basis. Had Plaintiffs known the terms of enrollment and that the cancellation features were more onerous than the ARL allowed they would not have purchased an OnlyFans Subscription or enrolled in recurring purchases in the manner they did. Such conduct injured Plaintiffs and resulted in out-of-pocket loss. In addition, Plaintiffs and the Class would not have paid Defendant for the subscriptions in the amounts that they did had they known that the goods, services and/or merchandise provided in relation to the subscriptions were already legally

considered an unconditional gift under the ARL for which at that point no further payment was necessary or legally imposed. This conduct also injured Plaintiffs and resulted in out-of-pocket loss.

9.       For the foregoing reasons, Plaintiffs bring this action individually and on behalf of all residents of California who, within the applicable statute of limitation period up to and including the date of judgment in this action, incurred fees for OnlyFans Subscriptions. Based on Defendant's unlawful conduct, Plaintiffs seek damages, restitution, declaratory relief, private injunctive relief, public injunctive relief on behalf of the general public to prevent Defendant from continuing to engage in its illegal practices (*see McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017)), reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws, and all other relief deemed just and equitable in the circumstances for: (1) Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) conversion; (3) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (4) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and (5) restitution/money had and received/ assumsit.

10.       Plaintiffs' request for public injunctive relief is not sought for the Class but rather the general public of California, *i.e.*, consumers who have yet to transact with Defendant but are at risk of doing so in the future.  *See McGill*, *supra*. The OnlyFans Platform continues to generate new customers and therefore, as time passes new members of the general public are at risk of new harms and injuries from the legal violations complained of herein, unless those practice are enjoined and corrected so that they fully comply with the ARL and UCL. Plaintiffs bring this action on behalf of such persons in their individual capacity and class certification is not necessary for this type of public injunctive relief. This action and the relief sought will provide a public benefit.

## THE PARTIES

11.       Plaintiff John Doe 1 is a citizen of California, residing in San Marcos, California. John Doe 1 has standing to assert the claims set forth herein.

12.       Plaintiff John Doe 2 is a citizen of California, residing in El Monte, California. John Doe 2 has standing to assert the claims set forth herein.

13.     Pursuant to the principles set forth in *Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F.Supp.3d 990, 997 (N.D. Cal. 2015) (granting exotic dancers' motion to proceed anonymously and permitting present and future plaintiffs to use pseudonyms) and  *Doe v. Ayers*, 789 F.3d 944, 944 (9th Cir. 2015) (finding Plaintiff inmate could proceed under a pseudonym because the severity of threatened harm, the reasonableness of his fears, and his vulnerability to retaliation weighed in favor of anonymity), Plaintiffs file this action under fictitious names and seek to proceed anonymously, because: (a) they wish to preserve their right to privacy; (b) there is a significant social stigma attached to use of the OnlyFans website due to the nature of the website's content which is often associated with that of a sexual nature;[8] (c) there is risk of retaliation; and (d) Plaintiffs would be hesitant to maintain this action if their name was permanently associated with Defendant.

14.     There is no prejudice to Defendant if Plaintiffs file this action under fictitious names and proceed anonymously. In the ordinary course of business, a significant percentage of persons who post content on the OnlyFans Platform and help drive Defendant's subscription revenue use pseudonyms and fictitious names in order to maintain their own privacy. *See N.W. Enters. v. City of Houston*, 27 F.Supp.2d 754, 842 (S.D. Tex. 1998)[9] ("Adult entertainers may anonymously (or through stage names) put their bodies on display in front of strangers, but these actions do not imply a willingness to publicize their entertainers' personal information . . . [nor does it] mean that adult entertainers . . . have voluntarily sacrificed all privacy rights . . ."). As such, the use of these names allays any reasonable fear that proceeding anonymously would offend the customary and constitutionally embedded presumption of openness in judicial proceedings. Further, there are no due process concerns if Plaintiffs proceed

---

[8] Even if the customer does not regularly access or subscribe to adult content, public perception of users of the OnlyFans site is that adult content dominates. *See generally* Charlotte Shane, *Only Fans Isn't Just Porn ;) Despite all assertions that the site isn't powered by its sexual content, the platform is synonymous with porn. What is it really?*, NEW YORK TIMES MAGAZINE (May 18, 2021), https://www.nytimes.com/2021/05/18/magazine/onlyfans-porn.html. ("Celebrities use the site because they know that regardless of a creator's stated career (chef, fitness trainer and influencer are popular), OnlyFans' draw is the promise of seeing that which is normally unseen. Plenty of bios warn subscribers that the attached account is non-explicit yet pepper in teasing cues to the contrary. "This is what we don't show you," says one locked post by Rebecca Minkoff, a fashion designer known for her handbags; the caption is followed with the wide-eyed red-cheeked emoji that one might use to punctuate, say, a texted confession of a sex dream. Every assertion that the site isn't powered by porn is accompanied by an onslaught of winks and nods to the contrary. Sometimes the denials and winks come from the same person.").

[9] Reversed in part *N.W. Enters. v. City of Houston*, 352 F.3d 162, 198 (5th Cir. 2003).

CLASS ACTION COMPLAINT

anonymously because Plaintiffs will privately disclose their identities to Defendant to allow Defendant to assess and defend their claims.

15.     Defendant Fenix Internet LLC ("Fenix") is a Delaware limited liability company that is headquartered at 2598 E. Sunrise Blvd, Suite 2104, Fort Lauderdale, FL 33304 and has a registered office located at 345 North Canal Street, Chicago, IL 60606.[10] Fenix is a wholly owned subsidiary of and is entirely controlled by Fenix International and Leonid Radvinsky, who is the majority owner and director of Fenix International, and is himself a United States resident,[11] from Defendant's United States offices. Upon information and belief, Radvinsky maintains residences in Florida.  Fenix charged Plaintiffs' and the Class's Billing Information for their OnlyFans Subscriptions. Accordingly, Fenix is, or has been, continuously in possession of money wrongfully taken from Plaintiffs and the Class they seek to represent, and which is to be restored to those consumers.

16.     Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, distributor, or parent of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and unlawful conduct alleged herein.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to California Business and Professions Code §§ 17203, 17204, and 17535, and Civil Code § 1780.

18.     The Court has personal jurisdiction over the parties because Plaintiffs reside in California and submit to the jurisdiction of the Court.

19.     Defendant has sufficient minimum contacts with California to be subject to this Court's personal jurisdiction. Fenix intentionally avails itself to Californian markets through the promotion, sale, marketing, and distribution of the OnlyFans Subscription in this district, which renders this Court's exercise of jurisdiction necessary and proper. At all relevant times hereto, Defendant has systematically and continually conducted, and continues to conduct, business in this State by charging Plaintiffs', the

---

[10] Fenix Annual Report, *supra* note 1 at 27.
[11] *Id.* (noting that FIL own 100 percent of Fenix shares).

CLASS ACTION COMPLAINT

Class's, and Californian consumers' Billing Information for OnlyFans Subscriptions. Defendant also reaches California markets through various means including, but not limited to, social media cites including Twitter and Facebook. For example, Fenix International's, on behalf of whom Defendant charged Plaintiffs' and the Class's Billing Information, Terms of Service for all OnlyFans Platform Users (the "OnlyFans Platform Terms of Service") Section 11 encourages OnlyFans users to connect their OnlyFans account to their active Twitter account to share content but explains that consumers using this feature must comply with Twitter's terms of service of which provide for the application of California law and that any dispute be brought in California.[12] Furthermore, 70 percent of revenue generated by OnlyFans Subscription originated from United States markets,[13] particularly from California which is the center the general and adult entertainment industry. Additionally, Defendant maintains a principal/agent relationship with OnlyFans Content Creators,[14] and, upon information and belief, has an active registered agent located at 11050 Hartsook Street, Los Angeles, CA 91601.[15]

20.     Venue is proper in this Court pursuant to Civil Code § 1780(d). Defendant conducts business in this County and throughout the State of California by charging OnlyFans consumers' Billing Information for OnlyFans Subscriptions. Defendant is not a party to the OnlyFans Platform Terms of Service. Further, to the extent that Defendant is capable of enforcing the OnlyFans Platform Terms of Service, Plaintiffs did not see and did not affirmatively agree to the OnlyFans Platform Terms of Service when they created their OnlyFans account nor were the OnlyFans Platform Terms of Service presented in a sufficiently clear and conspicuous manner to give Plaintiffs, or the Class, adequate notice of the choice of law and forum selection clauses. As such, the choice of law and forum selection clauses are unenforceable as there was no assent by Plaintiffs. Additionally, as alleged below, the California ARL represents a substantial fundamental policy of the state of California that cannot be waived by contract. As such, to the extent Defendant is capable of seeking the of enforcement of the choice of law and forum selection clauses, those provisions are procedurally and substantively unconscionable in that they

---

[12] "General," Terms of Service § 6, TWITTER (June 10, 2022), https://twitter.com/en/tos#update.
[13] *Supra* note 1 at 23, 30.
[14] *See id.* at 16.
[15] Cindy Zheng, ONLYFANS, https://onlyfans.com/cindyyyzg (last accessed Feb. 15, 2023).

10

effectively waive the protections afforded to Californians pursuant to the ARL and require California consumers to engage in cost-prohibitive litigation in a foreign country, with foreign counsel, and under foreign substantive and/or procedural law. Plaintiffs and their transactions have no meaningful contacts with foreign jurisdictions, including the United Kingdom as all events pertinent to the transaction and billings took place, and continues to occur, in California and the United States. Those terms are both procedurally and substantively unconscionable and are a transparent attempt to deny Plaintiffs any meaningful forum to resolve disputes without substantial and disproportionate burden.

21.     As alleged above and below, California law applies to these claims as the ARL represents a substantial fundamental policy of the state of California which cannot be waived by contract.

## FACTUAL ALLEGATIONS

## I.     Background on the Subscription and Automatic Renewal e-Commerce Industry.

22.     The e-commerce subscription business model centers on retailers providing goods or services "in exchange for regular payment from the customer."[16] Subscription e-commerce has grown rapidly in recent years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100 percent a year over the past five years, which the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[17] This tremendous growth of subscription e-commerce shows no signs of slowing. Over the last 8.5 years, the subscription economy has grown more than 400 percent.[18] The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity. UBS analysts predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $50 billion in 2020,[19] implying an 18 percent annual growth rate and making the subscription economy "one of the fastest-growing industries

---

[16] Sam Saltis, *How to Run an eCommerce Subscription Service: The Ultimate Guide*, CORE DNA (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.
[17] Louis Columbus, *The State of the Subscription Economy, 2018*, FORBES (Mar. 4, 2018, 5:02PM EST), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/?sh=49eadd8653ef.
[18] Mary Meisenzahl, *Taco Bell's Taco Subscription is Rolling out Nationwide – Here's How to Get it*, BUSINESS INSIDER (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1.
[19] Sundeep Gantori et al., *Investing in Digital Subscriptions,* UBS, 4–5 (Mar. 10, 2021), available at https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

CLASS ACTION COMPLAINT

globally."[20] The dramatic growth was experienced "across many areas, including e-commerce, video, streaming, gaming, [and] cloud-based applications[.]"[21] Indeed, in 2021, consumers, on average, spent $273 per month on subscription services, up from $237 in 2018.[22]

23.     As with the OnlyFans Platform, subscriptions have become so prevalent, in no small measure, because they provide companies with stable and enormous profits. Companies with subscriptions have seen their financial positions dramatically improve because of the stability and strong cash flow generated from their subscribers.[23] Many subscribers are unaware of ongoing periodic charges and therefore the subscription model allows for the generation of additional revenues that would not be possible if the consumer had to complete a distinct transaction each month. Simply put, subscriptions generate additional money for the vendor imposing the charges. According to Intuit, subscriptions are "217% more profitable for businesses than a one-time payment model."[24]

24.     The OnlyFans Subscription has generated incredible revenue. In 2021 alone, the OnlyFans Platform had over 187 million customers who generated $932 million in net revenue and $433 million in profit.[25] It has been estimated that OnlyFans is on pace to make $2.5 billion in revenue for 2022.[26] Further, over 50 percent of OnlyFans revenue was generated by the OnlyFans Subscription with over 70 percent of that revenue originating from United States consumers.[27]

25.     And the expansion of the subscription e-commerce model "is just getting started."[28] As USB analysts explained: "We're now in the subscription era, and the pandemic [has] accelerat[ed] its

---

[20] *Id.* at 5.
[21] *Id.* at 3.
[22] WEST MONROE, *The State of Subscription Services Spending* (Aug. 2021), https://www.westmonroe.com/perspectives/report/the-state-of-subscription-services-spending.
[23] *Supra* note 19.
[24] Intuit QuickBooks Blog, *Subscription Model or One-Time Sale: Which Should you Choose?* (Jan. 31, 2017), https://quickbooks.intuit.com/in/resources/running-a-business/subscription-model-one-time-sale/.
[25] Fenix Annual Report, *supra* note 1 at 2.
[26] Ingrid Lunden, *OnlyFans CEO Says Adult Content Will Still Have a Home on the Site in 5 Years*, TECHCRUNCH (Oct. 19, 2022, 6:13 PM CDT), https://techcrunch.com/2022/10/19/onlyfans-ceo-says-adult-content-will-still-have-a-home-on-the-site-in-5-years/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAABiV5wdX9XL9SSd03uj5QtTiMSQpLDXcgerWdELFoZIY6fWlu9R35m1Fw2m3epGJiKSdiWgkpLCVaQh10f_Zeoedf0n7Sp8B_bL9V7svclT7xReVyaEC8lYdmGLAzTJZ9Sl9lczIFVihUG5QDleeRX0L99T8kwtKhhtS5gfR2s3J/.
[27] Fenix Annual Report, *supra* note 1 at 23, 30.
[28] *Supra* note 19 at 5.

CLASS ACTION COMPLAINT

takeover. During the COVD-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[29] The *Washington Post* reported that "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[30]

26.    Although the subscription model is easy to enter, and can produce high profits for the vendor imposing the charges, it is incredibly difficult to dominate the e-commerce subscription market because of the "highly competitive prices and broad similarities among the leading players."[31] In particular, businesses struggle with high churn rates and consumer cancellation when "services don't deliver superior end-to-end experiences."[32] Consumers, however, when confronted with the recurring nature of the service, billing practices, or, more significantly, unclear or complicated cancellation policies, "lose interest" but "may be too harried to take the extra step of cancelling their membership[s]."[33] In other words, businesses realized, as did Defendant, that the "real money is in the inertia."[34] To facilitate consumer inertia, subscription-based e-commerce companies "work with third-party vendors to implement more manipulative designs."[35] That is, companies engaging in subscription-based e-commerce "are now taking advantage of subscriptions in order to trick users into signing up for

---

[29] *Id.*

[30] Heather Long & Andrew Van Dam, *Everything's Becoming a Subscription, and the Pandemic is Partly to Blame*, THE WASHINGTON POST (June 1, 2021, 1:12 PM), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth.").

[31] Tony Chen et al., *Thinking Inside the Subscription Box: New Research on E-Commerce Consumers*, MCKINSEY & COMPANY (Feb. 9, 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers.

[32] *Id.*

[33] Amrita Jayakumar, *Little-Box Retailing: Subscription Services Offer New Possibilities to Consumers, Major Outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[34] *Id.*

[35] Zoe Schiffer, *A New Study from Princeton Reveals how Shopping Websites use 'Dark Patterns' to Trick you into Buying Things you Didn't Actually Want*, BUSINESS INSIDER: INDIA (June 26, 2019, 4:46 IST), https://www.businessinsider.in/tech/a-new-study-from-princeton-reveals-how-shopping-websites-use-dark-patterns-to-trick-you-into-buying-things-you-didnt-actually-want/articleshow/69950666.cms.

CLASS ACTION COMPLAINT

expensive or recurring plans. They do this by [among other things] intentionally confusing users with their [website or] app's design and flow, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of the automatic renewal or continuous service programs.[36]

27.     Making matters worse is the deliberate design by subscription e-commerce business to make consumer cancellation confusing and onerous. Tactics and business models which delay a consumer's cancellation results in additional revenues to the vendor imposing the charges. Once enrolled, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[37] As such, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly[.]"[38] Thus, although federal regulators have sought to make it harder for companies to trap consumers in subscriptions, draining their bank accounts, and have attempted to respond to the proliferation of abuses,[39] widespread utilization of dark patterns and deliberate attempts to obfuscate cancellation persist. Indeed, as the Consumer Financial Protection Bureau recently reported, consumers across the country have submitted complaints "about being repeatedly charged for services they did not intend to buy or no longer want[ed] to continue purchasing" and "about the difficulty of cancelling subscription-based services and about charges made to their credit card or bank account after they requested cancellation."[40]

## II.     California's Automatic Renewal Law.

28.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL") with the express intent to "end the practice of ongoing charging of consumer credit or debit cards or third-

---

[36] Sarah Perez, *Sneaky Subscriptions Are Plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018, 3:21 PM), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.
[37] Rich Meyer, *The Problem with Subscription Marketing*, NEW MEDIA AND MARKETING (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/; *supra* note 22 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'").
[38] *Supra* note 31.
[39] *Id.*
[40] Consumer Financial Protection Circular 2023-01, *Unlawful Negative Option Marketing Practices*, 2 (Jan. 19, 2023), Circular 2023-01 Unlawful negative option marketing practices (consumerfinance.gov).

CLASS ACTION COMPLAINT

party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600.

29.     The ARL makes it "unlawful for any business that makes an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or, in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

> (3) Fail to provide an acknowledgement that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgement how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code §§ 17602(a)(1)–(3).

30.     In 2022, California Assembly Bill 390 amended Section 17602 of the ARL requiring businesses offering services or products online to provide a one-step and "exclusively online" method of immediate cancellation without the need to take additional steps. Following the enactment of AB 390, the ARL now requires e-commerce sellers, doing businesses in California, to provide one of two specific "exclusively online" mechanisms of immediately cancelling an automatic renewal or continuous service agreement offered online. Section 17602(d) provides in relevant part:

> . . . a business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service *exclusively online, at will, and without engaging any further steps that obstruct or delay* the consumer's ability to terminate the automatic renewal or continuous service immediately.

> The business shall provide a method of termination that is online in either form of either of the following:

(A) A ***prominently located*** direct link or button which may be located within either a customer account or profile, or within either device or user settings.

(B) By an immediately accessible termination email formatted and provided by the business without additional information.

*Id.* §§ 17602(d)(1)(A)–(B) (emphasis supplied). AB 390's legislative history confirms that the public policy of the State of California is to provide an immediate, one-step mechanism to cancel online automatic renewals and continuous service agreements and prohibit mechanisms designed to hinder or otherwise delay that process. The purpose of AB 390 was to "protect consumers from unexpected and unwanted charges for automatic renewal or continuous services . . . by allowing a consumer to cancel an automatic renewal or continuous service online, at will, and without onerous cancellation requirements."[41] In support of the AB 309, its author, assemblymember Marc Berman, stated: "Unfortunately, many businesses use a variety of tactics to make cancelling subscriptions inconvenient, confusing, time consuming, or otherwise difficult. . . . AB 390 would ensure that if consumers can subscribe online, they can cancel online, and that they can do so without delay or having to jump through hoops."[42] For example, some of the cancellation mechanisms AB 390 intended to eliminate were the use of online chat boxes "or the filling out of surveys as a prerequisite to effectuate a cancellation."[43]

31.    An "automatic renewal" means any "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." *Id.* § 17601(a). Additionally, the phrase "automatic renewal offer terms" is defined as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a

---

[41] Assembly Committee on Privacy and Consumer Protection, Assembly Bill Policy Committee Analysis AB 390, 3 (Apr. 12, 2021), available at:
file:///C:/Users/ZFreese/Downloads/202120220AB390_Assembly%20Privacy%20And%20Consumer%20Protection%20(2).pdf.
[42] *Id.* at 4.
[43] Supporting statement from the Office of the District Attorney of Santa Cruz County. *Id.* at 8–9.

third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount of which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) the minimum purchase obligation, if any." *Id.* § 17601(b)(1)–(5).

32. A "continuous service" means any "plan or arrangement in which a subscription or purchasing agreement continues until the consumer cancels the service." *Id.* § 17601(e).

33. The ARL defines "clear and conspicuous" or "clearly and conspicuously" to mean "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *Id.* § 17601(c).

34. Finally, where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the product is "deemed an unconditional gift to the consumer[.]" *Id.* § 17603.

35. As alleged below, the OnlyFans Subscription systematically violates Section 17602(a)(1), 17602(a)(2), 17602(a)(3), and 17602(d) of the ARL.

36. The content sold to Plaintiffs and the Class in the OnlyFans Subscription constitute goods, services, merchandise and tangible products for personal or household use. The content including images, videos, audio, instructions and text, for which Defendant unlawfully charged Plaintiffs' and the Class's Billing Information, provides consumers access to by way of a license or otherwise, are all able to be downloaded, printed out, retained and/or used in physical, tangible form by the consumer.

**III.    The OnlyFans Subscription Enrollment Process.**

37. As the entity and vendor imposing the subscription charges on Plaintiffs' and other consumers' Billing Information on an automatic recurring basis, Defendant is responsible for compliance with the ACL, UCL, and other applicable laws before imposing such charges.  Defendant knew or should have known that by the failure to comply with the ARL's requirements prior to any sale or periodic billing, the periodic charges should never have been imposed and collected as the goods and

1  services provided through the subscription were considered unconditional gifts, by law, before such
2  charges were imposed.

3     38. At all relevant times, via the OnlyFans Platform, Defendant offered, and continues to
4  offer, the OnlyFans Subscription to exclusive OnlyFans Creator Content on an automatically renewing
5  basis. The OnlyFans Subscriptions are offered on a recurring basis for monthly renewal terms, and all
6  subscriptions, regardless of price, automatically renew at the end of the defined renewal terms unless
7  and until the consumer cancels. The OnlyFans Subscription constitutes an "automatic renewal" and/or
8  "continuous service" agreement under the ARL. *See* Cal. Bus. & Prof. Code §§ 17601(a), (e).

9     39. The OnlyFans Subscription enrollment process is substantially the same, regardless of
10 the medium used and location of the consumer. To sign up for and create an OnlyFans account, the
11 consumer goes to onlyfans.com and selects the "Sign up for OnlyFans" hyperlink after which the
12 onlyfans.com website directs the consumer to create an account by entering their name, email, and a
13 password in the designated fields. As shown below, when those identification and data fields are
14 completed, the OnlyFans "SIGN UP" button activates, allowing consumers to click the button and to
15 turn on their OnlyFans account.



CLASS ACTION COMPLAINT

40.     Regardless of how the consumer creates an OnlyFans account, at no point throughout the account creation process, are consumers required to read or affirmatively agree to, *i.e.*, by requiring consumers to click or select a checkbox before they complete their OnlyFans account creation, the OnlyFans Platform Terms of Service. To the contrary, the OnlyFans sign-up page incorporates dark patterns to distract consumers from even noticing the OnlyFans Platform Terms of Service. The OnlyFans Platform Terms of Service hyperlink is shown in tiny font *below* the "SIGN UP" button and is also surrounded by other activated buttons as well as "[l]attests featured posts" images, which in the image above is an enticing photograph. In other words, the visual aesthetic of the OnlyFans sign-up page is a classic example of the dark pattern commonly referred to as "misdirection."[44] At no point throughout the OnlyFans account creation process, are consumers put on notice of the OnlyFans Platform Terms of Service nor are consumers required to affirmatively agree to those terms.

41.     After selecting the "SIGN UP" button, the OnlyFans consumer *has not yet made any purchase* of OnlyFans Creator Content or otherwise purchased an OnlyFans Subscription but merely activated an OnlyFans account. Following their clicking of the "SIGN UP" button, the consumer is sent to a "Home" screen and directed to verify the email address they supplied. The OnlyFans account "Home" screen has a menu on the left-hand side, a middle section with a selection of "posts" made by users and creators, a search tool for finding creators, and a list of "suggestions" on the right, which highlights certain content creators whose profiles the user can peruse.

42.     Before any OnlyFans consumer can subscribe to OnlyFans Creator Content, they must provide Defendant their Billing Information on the "ADD CARD" webpage.[45] As shown below, at no point on the "ADD CARD" webpage is the OnlyFans Subscription offer terms presented in a clear and conspicuous manner. Further, there is no link to the OnlyFans Platform Terms of Service.

---

[44] "Misdirection" is a type of "dark practice" wherein the website's "design purposefully focuses [customers'] attention on one thing in order to distract [their] attention from another." *Misdirection*, DECEPTIVE DESIGN, https://www.deceptive.design/types/misdirection (last accessed Feb. 8, 2023).

[45] Upon information and belief, the consumer can input their credit or debit card information either before perusing OnlyFans Creator Content, or after they have selected an OnlyFans creator to whom they subscribe. Regardless of when they input their credit or debit card information, the consumer is directed to the same page.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15        43.     When a consumer navigates to an OnlyFans Creator Content, *e.g.,* Grandmasterchefjojo,

16   the following screen is presented:

17
18
19
20
21
22
23
24
25
26
27
28



20

44.     By selecting "SUBSCRIBE," the OnlyFans consumer is advised of certain "benefits" and that they can cancel the OnlyFans Subscription "at any time" but the OnlyFans Subscription automatic renewal offer terms, as defined under the ARL, is absent from the screen and remains undisclosed. After selecting "SUBSCRIBE," as shown below, a webpage window appears containing the consumer's Billing Information and giving the customer a prompt to "PAY" for the OnlyFans Creator Content (the "PAY Window"). Defendant's PAY Window is the point at which Defendant requests the consumer's consent to the automatically renewing OnlyFans Subscription and where the Defendant must provide the OnlyFans Subscription offer terms in a clear and conspicuous manner and in visual proximity to the "PAY" button pursuant to the ARL. As shown below, the OnlyFans Subscription offer terms are nowhere to be found.



45.     After selecting "PAY," the OnlyFans consumer is returned to the creator's profile page, where a box in the middle of the screen notes that the user is "SUBSCRIBED" in bold blue font. Even after completing the initial transaction, any type of notice that the consumer's purchase will automatically renew, the consumer's Billing Information will automatically be charged on a recurring basis, the precise renewal period, and an explanation of the Defendant's cancellation policy and procedure is absent from the creator's home screen.[46] The OnlyFans Subscription offer terms never

---

[46] Upon information and belief, some content creators may have the word "Renews" along with the date of renewal in small, lower-case, light-gray font. Even if this is the case, Defendant's notice here is equally violative because it only occurs until *after the initial transaction has been completed*, Cal. Bus. & Prof. Code § 17602(f) and fails to fully disclose and describe the complete OnlyFans Subscription offer terms, cancellation policy, and how to cancel as is required under ARL sections 17602(a)(1), (3).

CLASS ACTION COMPLAINT

appear in a clear and conspicuous manner and in visual proximity to the request to purchase the OnlyFans Subscription—*i.e.*, the PAY Window. Because there are several different webpages between the OnlyFans account activation page, where the inconspicuous hyperlink to the OnlyFans Platform Terms of Service is located, and the PAY Window, the point at which Defendant seeks consumer consent to purchase an OnlyFans Subscription, to the extent that the OnlyFans Platform Terms of Service contain the OnlyFans Subscription offer terms those terms are not presented within "visual proximity" to the request for purchase of OnlyFans Subscriptions—*i.e.*, the PAY Window. Regardless, even if the OnlyFans Platform Terms of Service contain the OnlyFans Subscription offer terms, as defined under the ARL, those terms appear elsewhere on the OnlyFans Platform and not on the PAY Window, which is insufficient under the ARL.

**IV.     The OnlyFans Subscription Cancellation Process.**

46.     Under AB 390, the ARL now requires e-commerce sellers, doing business in California, to provide an immediately available and "exclusively online" cancellation mechanism either in the form of a "prominently located" button or link on the consumers account or profile, or an "immediately accessible" pre-written termination email provided by the business. Cal. Bus. & Prof. Code §§ 17602(d)(1)(A)–(B). The legislative history confirms that AB 390 was intended to require a one-step online method of subscription cancellation to eliminate the use of online chat boxes "or the filling out of surveys as a prerequisite to effectuate a cancellation."[47]

47.     The OnlyFans Subscription cancellation process, which does not include an immediately accessible pre-written termination email, fails to satisfy that basic statutory requirement. In order to cancel an OnlyFans Subscription, consumers must engage in a counterintuitive, confusing, and multistep process, that includes the use of a survey, in violation of ARL section 17602(d), before they are able to effectuate cancellation.

48.     When a consumer navigates to their account page there is a menu on the left-hand side with clickable buttons for the "Home" screen, "Notifications," "Messages," "Lists," "Subscriptions,"

---

[47] *Supra* note 43.

"My Profile," "More," and for a "NEW POST." A "prominently located" cancellation button or link is absent from this left-hand side menu screen. By selecting the "Subscriptions" button, consumers can navigate to a "CURRENT SUBSCRIPTION" screen on which the list of the consumer's subscriptions can be seen. While within the "Active" subscription menu, an OnlyFans creator webpage tile displays all active OnlyFans Subscriptions. As shown below, nowhere is a "prominently located" cancellation button or link of any kind displayed.



49.     Further, as shown below, the inconspicuous vertical ellipsis menu located at the top right corner of the OnlyFans Creator webpage tile—a location that particularly attentive consumers may intuitively look for such a cancellation mechanism—does not contain a "prominently located" cancellation link or button of any kind.



23

50.     Rather, in order to begin the process of cancelling an OnlyFans Subscription, consumers must, counterintuitively and confusingly, select the "SUBSCRIBED" button displayed at the bottom of the OnlyFans creator webpage tile. And even when consumers select the "SUBSCRIBED" button they must complete a survey before they can cancel or "UNSUBSCRIBE."

51.     Nowhere within consumers' account page, or within the OnlyFans "Home" page, is there a "prominently located direct link or button" to cancel OnlyFans Subscriptions in plain violation of AB 390. Cal. Bus. & Prof. Code § 17602(d)(1)(A) ("The business shall provide a method of termination that is online in the form of . . . A prominently located direct link or button . . ."). Additionally, Defendant does not provide an "immediately accessible" pre-written cancellation email as is permitted under AB 390. *Id.* § 17602(d)(1)(B). Rather, the OnlyFans Subscription cancellation process is a classic example of another dark patterned known as "obstruction"[48] wherein Defendant makes the OnlyFans Subscription cancellation process needlessly confusing and counterintuitive.

## V.     Defendant Unlawfully Charges OnlyFans Consumers' Billing Information in Violation of the ARL.

52.     At all relevant times, Defendant failed to comply with the ARL by charging Plaintiffs', and the Class's, Billing Information because the Plaintiffs and the Class: (i) were not presented the OnlyFans Subscription offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the purchase is fulfilled, in violation of ARL section 17602(a)(1); (ii) were charged for OnlyFans Subscription fees without first giving their affirmative consent to Defendant, in violation of ARL section 17602(a)(2); and (iii) were not provided an acknowledgement that includes the continuous service offer terms, cancellation policy, and information explaining how consumers can cancel the OnlyFans Subscription in a manner that is capable of being retained by the consumer, in direct violation of ARL section 17602(a)(3). Furthermore, Plaintiffs and the Class were

---

[48] "Obstruction" is the dark pattern of making cancellation confusing or otherwise making cancellation more difficult than the sign-up process. *The Dark Side of UX Design*, UXP[2] DARK PATTERNS, https://darkpatterns.uxp2.com/ (last accessed Feb. 14, 2023); *see also* Sidney Fussell, *The Endless, Invisible Persuasion Tactics of the Internet*, THE ATLANTIC (Aug. 2, 2019), https://www.theatlantic.com/technology/archive/2019/08/how-dark-patterns-online-manipulate-shoppers/595360/ ("The cancellation process is often far more complicated than registration, a dark pattern called obstruction.").

not given a one-step "prominently located" cancellation button or link on their OnlyFans account or profile page nor were they provided with an "immediately accessible" cancellation email, in violation of ARL section 17602(d)(1)(A)–(B), resulting in additional unwanted and unauthorized charges of their Billing Information by Defendant.

**i.  Defendant charges consumers' Billing Information when OnlyFans consumers are not given the OnlyFans Subscription offer terms "clearly and conspicuously" and in "visual proximity" to the request for consent before the purchase of an OnlyFans Subscription.**

53.     The relevant portion of the PAY Window does not present the "automatic renewal offer terms," as defined by ARL section 17601(b), in violation of ARL section 17602(a)(1). Nowhere on the PAY Window are OnlyFans consumers notified, in a clear and conspicuous manner, that the OnlyFans Subscription will "continue until [they] cancel[]," that recurring charges will automatically be charged to the consumer's Billing Information each billing cycle, of "[t]he length of the automatic renewal terms" nor are they given a "description of the cancellation policy that applies to the offer," *see* Cal. Bus. & Prof. Code §§ 17601(b)(1)–(4), in violation of ARL section 17602(a)(1). Simply, Defendant's OnlyFans Subscription offers terms do not appear at all on the PAY Window in the manner prescribed under the ARL.

54.     Although the OnlyFans sign-up page includes a link to the OnlyFans Platform Terms of Service, that hyperlink does not satisfy the ARL's mandate. The ARL requires that the pre-purchase disclosures be made "*before* the subscription or purchase agreement is fulfilled, and in visual proximity . . . to the request for consent to the offer[.]" Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis supplied); *see also id.* § 17602(f) ("The requirements of the [ARL section 17602(a)(1)] . . . apply only *prior* to the completion of the initial order for the automatic renewal or continuous service[.]") (emphasis supplied). In the context of a vertical online offer, as is Defendant's PAY Window, the required pre-purchase disclosures must be presented *above* the request for consent to the automatic renewal offer terms, *i.e.*, *before* the "PAY" button and on the PAY Window, as reasonable consumers would believe and expect that all material terms and noteworthy information would appear on the PAY Window before, or in this case *above*, that button which finalizes the transaction. But all of Defendant's OnlyFans Subscription offer terms are absent from the PAY Window. Moreover, the placement of the tiny text of the OnlyFans Platform Terms of Service hyperlink, which is buried between distracting images, is quintessential fine

and does not satisfy the statute. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F.Supp.3d 1132, 1140 n. 6 (S.D. Cal. 2021) (noting that the practice of including "autorenewal terms in fine print" was "the practice that led to [the] ARL"). It is insufficient under the ARL that Defendant's OnlyFans Subscription offer terms appear elsewhere on the OnlyFans Platform, via an inconspicuous hyperlink to the OnlyFans Platform Terms of Service, which is located at the sign-up page and is at least six distinct webpages from the PAY Window, and not on the PAY Window itself—the point at which Defendant requests consumers consent to the automatically renewing OnlyFans Subscription. *See id.* at 1140 ("But the [automatic renewal] terms themselves—not the access point to them—need to be in visual proximity to the request.").

55.     Moreover, although the background of the PAY Window, in the example provided above, states "SUBSCRIBE $4.99 per month," that darkened background statement is not clear and conspicuous under the ARL. Further, that lone, inconspicuous statement does not satisfy the ARL's pre-purchase disclosure requirements. First, that statement does not provide that the consumer's Billing Information will in fact be automatically charged until the consumer cancels nor does Defendant describe its cancellation policy and how to cancel as is required under the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(1), (2), (3); 17602(a)(1). Second, the precise date of when consumers' Billing Information will be charged is not provided as is required under the ARL. *Id.* §§ 17601(b)(4); 17602(a)(1). For example, it is not clear whether "$4.99 per month" refers to the precise calendar date of the consumer's initial enrollment, in which case the OnlyFans Subscription would renew every 28-31 days depending on the given month, or refers to four-week intervals, in which case the OnlyFans Subscription would renew every 28 days without regard to the calendar date or exception. This information is necessary for consumers to successfully affect cancellation. As noted above, Defendant does not clearly and conspicuously disclose its cancellation policy or when consumers must cancel their OnlyFans Subscription to avoid charges for the following month, in violation of *id.* §§ 17601(b)(2); 17602(a)(1), of which may be tied to the precise renewal date. Accordingly, reasonable consumers would want to know, and must know, Defendant's precise length of automatic renewal term and reasonable consumers would thus find Defendant's stated length unclear especially when OnlyFans consumers must affirmatively cancel their OnlyFans Subscription to avoid further charges to their Billing Information.

For example, if consumers are not on notice of the precise date at which their OnlyFans Subscription will renew and exactly when their Billing Information will be charged each month, they cannot, as a practical matter, affect cancellation before that date. As such, Defendant fails to disclose "[t]he length of the automatic renewal term" in the manner required by the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(4); 17602(a)(1).

56. Before Defendant charges consumers' Billing Information for OnlyFans Subscriptions the OnlyFans Subscription offer terms must be presented clearly and conspicuously, and in visual proximity, to the offer of consent. Because the OnlyFans Subscription offer terms are not presented in a satisfactory manner under the statute, Defendant's charging of consumers' Billing Information violates ARL section 17602(a)(1).

ii. **Defendant charges consumers' Billing Information without the affirmative consent of OnlyFans consumers.**

57. The ARL itself provides a checklist e-commerce sellers, such as Defendant, must follow in order to obtain consumer consent, *id*. §§ 17601(b); 17602(a)(1), that if violated results in the return of charges for failure to obtain affirmative consumer consent to the automatic renewal. *Id*. § 17603. As alleged herein, Defendant has failed to follow the ARL's mandatory checklist and has thus failed to obtain consumers' affirmative consent to the automatically renewing OnlyFans Subscription before charging their Billing Information in violation of ARL section 17602(a)(2).

58. Further, at no point during the enrollment or checkout process do OnlyFans consumers give their affirmative consent to the OnlyFans Subscription offer terms. Throughout the entire OnlyFans account creation process and the OnlyFans Subscription PAY Window, OnlyFans consumers are never required to read or affirmatively agree to the OnlyFans Subscription offer terms, *i.e.*, by requiring consumers to select or click a "checkbox" affirming their consent to the OnlyFans Subscription offer terms to complete the enrollment into an OnlyFans Subscription. As such, Defendant charges consumer Billing Information without first obtaining consumers' affirmative consent to the agreement containing the automatic renewal in violation of ARL section 17602(a)(2).

/

/

iii. **Defendant charges consumers' Billing Information when OnlyFans consumers are not provided with a post-purchase acknowledgment that includes clear and conspicuous disclosures of OnlyFans Subscription offer terms, cancellation policy, and how consumers can cancel their OnlyFans Subscription.**

59.     After enrolling into an OnlyFans Subscription, consumers receive an email confirming the purchase (the "Confirmation Email"). This Confirmation Email does not 1) provide that the OnlyFans Subscription will continue unless and until it is cancelled, 2) describe the cancellation policy and how to cancel the OnlyFans Subscription, 3) explain that recurring charges will be charged to the consumer's Billing Information as part of the OnlyFans Subscription, or 4) the length of the OnlyFans Subscription as required by the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(1)–(4); 17602(a)(3). Accordingly, the Confirmation Email fails to "include[] the automatic renewal offer terms . . . , cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer" in violation of ARL section 17602(a)(3).

iv. **Defendant charges consumers' Billing Information when OnlyFans consumers are not provided with a one-step cancellation mechanism as is required by the ARL.**

60.     Nowhere within consumers' account page, or within the OnlyFans "Home" page, is there a "prominently located direct link or button" to cancel OnlyFans Subscriptions in plain violation of AB 390. Cal. Bus. & Prof. Code § 17602(d)(1)(A) ("The business shall provide a method of termination that is online in the form of . . . A prominently located direct link or button . . ."). Rather, consumers must counterintuitively select the "SUBSCRIBED" button on the OnlyFans creator webpage tile. Furthermore, even if they make it to the "UNSUBSCRIBE" button, consumers must answer survey questions before the cancellation. Finally, Defendant does not provide consumers with an immediately accessible pre-written termination email. *See id.* § 17602(d)(1)(B).

61.     As alleged below, Plaintiffs, as with the Class, tried but failed to affect cancellation because of Defendant's counterintuitive, confusing, and unlawful cancellation procedure. As a result, OnlyFans consumers, as with Plaintiffs and the Class, have been, and are, billed for additional, but unwanted, monthly charges by Defendant because consumers were unable to successfully cancel their OnlyFans Subscriptions, or were otherwise unaware that their attempted cancellation failed, before incurring unauthorized charges to their Billing Information. And despite Defendant's knowledge, as the wholly own and entirely controlled subsidiary of Fenix International, that the cancellation process is

noncompliant with the ARL's mandate, it nevertheless continues to deny refunds to OnlyFans consumers, and Plaintiffs. Thus, Plaintiffs and the Class were charged money by Defendant that Plaintiffs and the Class would not have incurred had the OnlyFans Subscription cancellation process complied with ARL section 17602(d)(1)(A)–(B).

62.    In sum, the OnlyFans Subscription pre-purchase and post-purchase disclosures fail to comply with the ARL. Nowhere in the foregoing enrollment process are OnlyFans consumers presented with the terms of the OnlyFans Subscription in a clear and conspicuous manner and in visual proximity to the offer before the purchase is completed in violation of ARL section 17602(a)(1). Consumers do not give their affirmative consent to Defendant to charge their Billing Information for the OnlyFans Subscriptions in violation of ARL section 17602(a)(2). The Confirmation Email does not provide the OnlyFans Subscription offer terms, cancellation policy, and information regarding cancellation policies in a manner that is capable of being retained by the consumer, in direct violation of ARL section 17602(a)(3). And OnlyFans consumers are not given a one-step "prominently located" cancellation button or link on their account or profile page nor are they given an "immediately accessible" cancellation email in violation of ARL section 17602(d)(1)(A)–(B).

63.    At all relevant times, Defendant was, and remains, a wholly owned subsidiary of and is entirely controlled by Fenix International and Leonid Radvinsky, who is the majority owner and director of Fenix International, and is himself a United States resident,[49] from Defendant's United States offices. And, as such, Defendant cannot feign ignorance of its unlawful charges of consumers' Billing Information. Because Defendant collects, possesses, and charges consumer Billing Information, Defendant is the entity making the OnlyFans Subscription offer and is thus responsible for ARL compliance. Alternatively, as the agent of Fenix International and Leonid Radvinsky, Defendant can be held independently liable for its unlawful charging of consumers' Billing Information in violation of the ARL. *See Peredia*, 25 Cal.App.5th at 692 (". . . an agent is liable for his or her own torts, whether the

---

[49] *Id.* (noting that FIL own 100 percent of Fenix shares).

CLASS ACTION COMPLAINT

1  principal is liable or not, and in spite of the fact that the agent acted in accordance with the principal's

2  directions.") (citation omitted).

3      64.     By and through these actions, Defendant has charged Plaintiffs' and the Class's Billing

4  Information in direct violation of the ARL under Cal. Bus & Prof. Code §§ 17602(a)(1)–(3); (d)(1)(A)–

5  (B). Had Plaintiffs known about Defendant's conduct, which violated the ARL, in advance, they would

6  not have parted with their money in the amounts they did but instead would have taken steps to protect

7  their rights and avoid unlawful transactions, resulting in out-of-pocket loss. As a result, pursuant to ARL

8  section 17603, all goods, wares, merchandise and/or products sent to Plaintiffs and the Class in violation

9  of the statute are considered unconditional gifts for which Defendant unlawfully charged their Billing

10  Information, Plaintiffs and the Class are entitled to restitution.

11      65.     Defendant's violations of the ARL systematically occur every time a prospective

12  consumer creates an account and subscripts to the OnlyFans Subscription. Every OnlyFans consumer

13  receives the exact same legally inadequate disclosures on the front and back end of their transaction.

14  **VI.   The Forum Selection and Choice of Law Provisions are Unconscionable.**

15      66.     As alleged above and below, the forum selection and choice of law provisions, to the

16  extent that Defendant can enforce either, since Defendant is not a party to the OnlyFans Platform Terms

17  of Service and they are otherwise unenforceable for lack of Plaintiffs' consent and notice, are also

18  unconscionable because those terms are tantamount to Plaintiffs' and Californian consumers' waiving

19  the fundamental protections afforded to them under the ARL.

20      67.     When disputes between Defendant and California consumers arise, rather than create a

21  fair and balance procedural system, the OnlyFans Platform Terms of Service incorporate a forum

22  selection clause and choice of law provision, which require Californian consumers to litigate their claims

23  in a court located in the United Kingdom (England or Wales) and under English law. Both the forum

24  selection clause and choice of law provision are intended to distort the process and create a system in

25  which California consumers, like Plaintiffs and the Class, are completely hamstrung and frustrated in

26  their ability to enforce their consumer protection rights under the ARL, UCL, and other applicable laws

27  and obtain relief against the far more powerful Defendant on an equal playing field. The OnlyFans

28  Platform Terms of Service, through the forum selection and choice of law clauses, attempt to insulate

Defendant from being held responsible in California courts and under California law for its unlawful charging of Plaintiffs', and the Class's, Billing Information in violation of the ARL by prohibiting California consumers, like Plaintiffs and the Class, from bringing a lawsuit, collective or otherwise, in California courts under California law to obtain restitution for Defendant's unlawful usurpation of consumers' money. The forum selection clause and choice of law provisions were intended to serve as a procedural barrier and deterrent for Plaintiffs, as with all California consumers, to assert ARL claims in Californian court, if at all, by requiring them to litigate their claims in a foreign court, with foreign counsel, and under foreign law. This intent is laid bare because European consumers are under no such restriction as they can seek protection from Defendant's predatory conduct in their home country and under the laws of their home country.

68.     The ARL is a fundamental policy of the State of California that cannot be waived by contract, but that is exactly what the forum selection and choice of law clauses force Plaintiffs, the Class, and all Californian consumers to do. The unconscionable forum selection clause and choice of law provision are aimed to: 1) frustrate Californian consumers' ability to seek relief for Defendant's violation of California law, 2) insulate the Defendant from being held responsible for its violation of California law, and 3) prevent any attempt by California consumers to enjoin ongoing unlawful conduct that violates California law for the benefit of the general public of California.

69.     As alleged below, Plaintiffs, as with the Class, were not provided with the ARL's required pre- and post-purchase disclosures and information for the OnlyFans Subscription, did not give their affirmative consent to the automatically renewing OnlyFans Subscription, and tried but failed to affect the cancellation of their OnlyFans Subscriptions because they were not provided a "prominently located" one-step cancellation button or an "immediately accessible" cancellation email. Nevertheless, Defendant charged Plaintiffs' and the Class's Billing Information in direct violation of the ARL.

70.     Plaintiffs and the Class have not waived, and cannot waive, the protections afforded to them under the California ARL for Defendant's unlawful charging of their Billing Information. The ARL is a fundamental policy of the State of California that cannot be waived by contract. Pursuant to the ARL, Defendant's conduct is not to be judged in a foreign court and under foreign law, but in California courts and under California law. And, as such, the forum selection and choice of law

provisions within the OnlyFans Platform Terms of Service, to the extend Defendant, as a non-party and without Plaintiffs' consent or notice, is capable of enforcing either, are procedurally and substantively unconscionable and are independently unenforceable on that basis.

### PLAINTIFFS' INDIVIDUAL ALLEGATIONS

**A.      Plaintiff John Doe 1.**

71.      John Doe 1 is an individual consumer who signed up for an OnlyFans account and purchased OnlyFans Creator Content from the OnlyFans Platform while in California in or around spring 2022. However, as discussed below, John Doe 1 did not actually learn that his purchase of OnlyFans Creator Content was an automatic renewal until after his initial purchase.

72.      John Doe 1 subscribed to follow OnlyFans Creator 1 on or around March 5, 2022 for an initial fee of $3.89, exclusive of any applicable taxes. Before John Doe 1 activated his OnlyFans account and made his initial purchase of OnlyFans Creator 1 content, products, and/or services, Defendant failed to disclose to John Doe 1 all required automatic renewal offer terms associated with the OnlyFans Subscription. Additionally, Defendant never disclosed the terms of its OnlyFans Subscription when John Doe 1 provided his Billing Information, when John Doe 1 selected to follow OnlyFans Creator 1, or when he consummated his initial purchase of OnlyFans Creator 1's content, products, and/or services. Finally, John Doe 1 did not see, nor did he affirmatively agree to the OnlyFans Platform Terms of Service.

73.      Pursuant to ARL section 17602(a)(1), Defendant was required to present the terms of its OnlyFans Subscriptions 1) clearly and conspicuously, and 2) *within visual proximity* of John Doe 1's initial purchase. Defendant failed on both. As shown above, the offer terms of Defendant's OnlyFans Subscription are nowhere to be found on the OnlyFans Platform sign-up page nor do they appear anywhere throughout the OnlyFans Subscription enrollment process or on the PAY Window. Additionally, John Doe 1 was never required to affirmatively agree to either the OnlyFans Platform Terms of Service or the OnlyFans Subscription offer terms by, for example, by requiring him to select or click a "checkbox" affirming his consent to either.

74.      Regardless of the consumers' experience with onlyfans.com, it is Defendant's burden to put John Doe 1, and all consumers, on notice of the OnlyFans Subscription offer terms in the manner

prescribed by the ARL but Defendant failed. As such, throughout John Doe 1's entire OnlyFans account creation and activation, and purchase of an OnlyFans Subscription did Defendant have John Doe 1's affirmative consent to an agreement containing the automatic renewal offer terms associated with the OnlyFans Subscription in violation of ARL section 17602(a)(2).

75.     After John Doe 1 completed his initial order, he received a Confirmation Email. However, his Confirmation Email failed to provide him with the complete terms of the automatic renewal offer that applied to Defendant's OnlyFans Subscription (including the mere fact that John Doe 1's purchases would automatically renew every month unless and until he chose to cancel), a description of Defendant's cancellation policy, and information regarding how John Doe 1 could cancel his OnlyFans Subscriptions in a manner capable of being retained by him as required under the ARL. Cal. Bus. & Prof. Code § 17602(a)(3).

76.     As a result of Defendant's missing and otherwise deficient disclosures, when John Doe 1 made his initial purchase of OnlyFans Creator 1 content, products, and/or services in or around March 5, 2022, he was entirely unaware that Defendant enrolled him in an "automatic renewal" program under which the subscription would renew each month resulting in automatic charges to his Billing Information unless and until he cancelled.

77.     Nevertheless, Defendant charged John Doe 1's Billing Information for OnlyFans Creator 1 for approximately four months, including his initial purchase, at $3.89 per month, exclusive of any applicable taxes, without John Doe 1's knowledge or affirmative consent to the automatic renewal. Because Defendant automatically renewed John Doe 1's OnlyFans Subscription to OnlyFans Creator 1, Defendant charged his Billing Information approximately $15.56 in total, including his initial purchase and exclusive of any applicable taxes. John Doe 1 did not understand that his initial OnlyFans purchase would become an "automatic renewal" for which he would incur recurring charges on an ongoing, monthly basis.

78.     Yet, thereafter, Defendant continued to automatically renew John Doe 1's OnlyFans purchase at the same rate listed for OnlyFans Creator 1 for three months, for a total of three unauthorized charges to John Doe 1's Billing Information without his knowledge and affirmative consent. From April

through July 2022, Defendant charged John Doe 1's Billing Information $3.89, exclusive of any applicable taxes.

79.     The monthly fees that Defendant charged to John Doe 1's Billing Information in connection with his OnlyFans purchase came as a complete surprise to John Doe 1 because, up until the time he discovered the charged, John Doe 1 had believed his OnlyFans purchase was a single transaction that would not automatically renew. As a result, John Doe 1 did not expect to incur any charges in connection with his purchase of OnlyFans Creator 1 beyond his first, initial transaction. In sum, John Doe 1 did not know and did not expect that his initial purchase of OnlyFans Creator 1 would automatically convert into an automatic renewal in which his Billing Information would continue to be charged on a recurring monthly basis because Defendant failed to provide the pre-purchase disclosures required by the ARL.

80.     Once John Doe 1 learned that his initial OnlyFans purchase did, in fact, automatically renew and would continue to do so without his intervention, John Doe 1 had no idea how to cancel his OnlyFans Subscriptions but did not expect it to be a difficult process. John Doe 1, however, struggled to cancel the OnlyFans Subscription because Defendant failed to provide John Doe 1 with the post-purchase acknowledgement. Furthermore, as shown above, Defendant never provided a pre-written "immediately accessible" termination email or, most egregiously, did not provide a "prominently located" cancellation button or link anywhere on John Doe 1's "Home" page or account page as required by the ARL. Cal. Bus. & Prof. Code §§ 17602(d)(1)(A)–(B). As such, when John Doe 1 first attempted to cancel, he contacted OnlyFans Creator 1 to no avail. Had Defendant complied with ARL section 17602(d)(1)(A)–(B), John Doe 1 would have cancelled his subscription to OnlyFans Creator 1 before being charged, at minimum, an additional monthly fee of $3.89, exclusive of any applicable taxes. Eventually, John Doe 1 did cancel his OnlyFans Subscription, but he was never provided with a refund for any of Defendant's unauthorized charges.

81.     Had John Doe 1 received clear and conspicuous disclosures in visual proximity to Defendant's request for purchase, as required under the ARL, at the time he made his initial purchase of OnlyFans Creator 1 content, products, and/or services John Doe 1 would not have consented to his initial purchase to follow OnlyFans Creator 1. In other words, John Doe 1 would not have made his

purchase of OnlyFans Creator 1 had he known that his purchase was, in fact, an automatic renewal agreement. Furthermore, had Defendant provided John Doe 1 with the post-purchase acknowledgment and complied with the ARL's statutorily mandated cancellation mechanisms, John Doe 1 would have cancelled his automatic renewal to OnlyFans Creator 1 earlier than he did which caused John Doe 1 to be charged with, at minimum, an additional, and unwanted, monthly fee of $3.89, exclusive of any applicable taxes, associated with OnlyFans Creator 1.

82.     As a result of the forgoing conduct of Defendant, Plaintiff John Doe 1 was injured and incurred out-of-pocket loss of $15.56 in total, and at minimum of $3.89, exclusive of any applicable taxes, for which he now seeks relief.

83.     Apart from any individual and class relief, Plaintiff John Doe 1 seeks public injunctive relief on behalf of the general public in California. Members of the general public of California, who have not transacted with OnlyFans, but are likely to in the future, given the website's growth, should be protected from Defendant's current and ongoing violations of the ARL and other laws described herein, for which injunctive relief is necessary and appropriate to correct at this time for their protection. Such relief will create a public benefit.

**B.     Plaintiff John Doe 2.**

84.     Plaintiff John Doe 2 was subject to this same pattern of violation of the ARL when he subscribed to follow the account of OnlyFans Creator 2. On or around December 8, 2022, John Doe 2 made an initial purchase of $12.99 to OnlyFans Creator 2 content, products, and/or service. As with John Doe 1, before John Doe 2 activated his OnlyFans account and made his initial purchase of OnlyFans Creator 2 content, products, and/or services, Defendant failed to disclose to John Doe 2 all required automatic renewal offer terms associated with the OnlyFans Subscription. Additionally, Defendant never disclosed the terms of their OnlyFans Subscription when John Doe 2 provided his Billing Information, when John Doe 2 selected to follow OnlyFans Creator 2, or when he consummated his initial purchase of OnlyFans Creator 2's content, products, and/or services. Finally, John Doe 2 did not see, nor did he affirmatively agree to the OnlyFans Platform Terms of Service.

85.     Pursuant to ARL section 17602(a)(1), Defendant was required to present the terms of its OnlyFans Subscriptions 1) clearly and conspicuously, and 2) *within visual proximity* of John Doe 2's

initial purchase. Defendant failed on both. As shown above, the offer terms of Defendant's OnlyFans Subscription are nowhere to be found on the OnlyFans Platform sign-up page nor do they appear anywhere throughout the OnlyFans Subscription enrollment process or on the PAY Window. Additionally, John Doe 2 was never required to affirmatively agree to either the OnlyFans Platform Terms of Service or the OnlyFans Subscription offer terms by, for example, by requiring him to select or click a "checkbox" affirming his consent to either.

86. Regardless of the consumers' experience with onlyfans.com, it is Defendant's burden to put John Doe 2, and all consumers, on notice of the OnlyFans Subscription offer terms in the manner prescribed by the ARL but Defendant failed. As such, throughout John Doe 2's entire OnlyFans account creation and activation, and purchase of an OnlyFans Subscription did Defendant have John Doe 2's affirmative consent to an agreement containing the automatic renewal offer terms associated with the OnlyFans Subscription in violation of ARL section 17602(a)(2).

87. After John Doe 2 completed his initial order, he received a Confirmation Email. However, his Confirmation Email failed to provide John Doe 2 with the complete terms of the automatic renewal offer that applied to Defendant's OnlyFans Subscription (including the mere fact that John Doe 2's purchase would automatically renew every month unless and until he chose to cancel), a description of Defendant's cancellation policy, and information regarding how John Doe 2 could cancel his OnlyFans Subscriptions in a manner capable of being retained by him as required under the ARL. Cal. Bus. & Prof. Code § 17602(a)(3).

88. As a result of Defendant's missing and otherwise deficient disclosures, when John Doe 2 made his initial purchases of OnlyFans Creator 2 content, products, and/or services in or around December 8, 2022, he was entirely unaware that Defendant enrolled him in an "automatic renewal" program under which the subscription would renew each month resulting in automatic charges to his Billing Information unless and until he cancelled.

89. Nevertheless, Defendant charged John Doe 2's Billing Information for OnlyFans Creator 2 for two months, including his initial purchase, at $12.99 per month, exclusive of any applicable taxes, without John Doe 2's knowledge or affirmative consent to the automatic renewal. Because Defendant automatically renewed John Doe 2's OnlyFans Subscription to OnlyFans Creator 2, Defendant charged

his Billing Information approximately $24.98 in total, including his initial purchase and exclusive of any applicable taxes. John Doe 2 became aware of Defendant's unauthorized charging of his Billing Information around Defendant's second withdrawal. Prior to that point, John Doe 2 did not understand that his initial OnlyFans purchase would become an "automatic renewal" for which he would incur recurring charges on an ongoing, monthly basis.

90.     Yet, thereafter, Defendant automatically renewed John Doe 2's OnlyFans purchase at the same rate listed for OnlyFans Creator 2 for another month, for a total of one unauthorized charge to John Doe 2's Billing Information without his knowledge and affirmative consent. In or around January 8, 2023, Defendant charged John Doe 2's Billing Information $12.99, exclusive of any applicable taxes.

91.     The monthly fee that Defendant charged to John Doe 2's Billing Information in connection with his OnlyFans purchase came as a complete surprise to John Doe 2 because, up until the time he discovered the charged, John Doe 2 believed his OnlyFans purchase was a single transaction that would not automatically renew. As a result, John Doe 2 did not expect to incur any charges in connection with his purchase of OnlyFans Creator 2 beyond his first, initial transaction. In sum, John Doe 2 did not know and did not expect that his initial purchase of OnlyFans Creator 2 would automatically convert into an automatic renewal in which his Billing Information would continue to be charged on a recurring monthly basis because Defendant failed to provide the pre-purchase disclosures required by the ARL.

92.     Once John Doe 2 learned that his initial OnlyFans purchase of OnlyFans Creator 2 did, in fact, automatically renew and would continue to do so without his intervention, John Doe 2 had no idea how to cancel his OnlyFans Subscription but did not expect it to be a difficult process. John Doe 2, however, struggled to cancel the OnlyFans Subscription because Defendant failed to provide John Doe 2 with the post-purchase acknowledgement.

93.     Furthermore, as shown above, Defendant never provided a pre-written immediately accessible termination email or, most egregiously, did not provide a "prominently located" cancellation button or link anywhere on John Doe 2's "Home" page or account page as required by the ARL. Cal. Bus. & Prof. Code §§ 17602(d)(1)(A)–(B). As such, when John Doe 2 first attempted to cancel, he contacted OnlyFans Creator 2 to no avail. Following that, John Doe 2 notified his third-party account

holder to charge back Defendant's December 2022 withdrawal and stop Defendant's January 2023 charge, which John Doe 2's third-party account holder obliged. Almost immediately thereafter, however, Defendant locked John Doe 2's OnlyFans account. In order to unlock his OnlyFans account, John Doe 2 had to go through great lengths including sending Defendant a photograph of this face and, importantly, pay Defendant at least $24.98, exclusive of all applicable taxes, for his unwanted subscription to OnlyFans Creator 2. Eventually, John Doe 2 did cancel his OnlyFans Subscription, but he was never provided with a refund for any of Defendant's unauthorized charges.

94.     Had John Doe 2 received clear and conspicuous disclosures in visual proximity to Defendant's request for purchase, as required under the ARL, at the time he made his initial purchase of OnlyFans Creator 2 content, products, and/or services John Doe 2 would not have consented to that initial purchase. In other words, John Doe 2 would not have made his purchase of OnlyFans Creator 2 content, products, and/or services had he known that his purchase was, in fact, an automatic renewal agreement. Furthermore, had Defendant provided John Doe 2 with the post-purchase acknowledgment and complied with the ARL's statutorily mandated cancellation mechanisms, John Doe 2 would have cancelled his automatic renewal to OnlyFans Creator 2 earlier than he did which caused John Doe 2 to be charged with, at minimum, an additional, and unwanted, monthly fee of $12.99, exclusive of any applicable taxes, associated with OnlyFans Creator 2.

95.     As a result of the forgoing conduct of Defendant, Plaintiff John Doe 2 was injured and incurred out-of-pocket loss of $24.98 in total, and at minimum of $12.99, exclusive of any applicable taxes, for which he now seeks relief.

96.     Apart from any individual and class relief, Plaintiff John Doe 2, as with Plaintiff John Doe 1, seeks public injunctive relief on behalf of the general public in California. Members of the general public of California, who have not transacted with Defendant, but are likely to in the future given the website's growth, should be protected from Defendant's current and ongoing violations of the ARL and other laws described herein, for which injunctive relief is necessary and appropriate to correct at this time for their protection. Such relief will create a public benefit.

## **CLASS ALLEGATIONS**

97.     Plaintiffs' experience with Defendant's deceptive and unlawful OnlyFans Subscription scheme are far from unique. Indeed, every California consumer who subscribed to any OnlyFans Creator Content within the relevant statute of limitations period failed to receive the requisite disclosures prior to their purchase and post-purchase acknowledgments as required by the ARL, Cal. Bus. & Prof. Code §§ 17602(a)(1)–(3), in exactly the same manner that Plaintiffs' failed to receive them. Because all of the automatic renewal fees Defendant assessed against Plaintiffs and California consumers were unlawful, Plaintiffs and all members of the class they seek to represent are entitled to restitution of the fees they paid, in every successive month for which they were assess.

98.     **Class Definition**: Plaintiffs bring this action pursuant to Code of Civil Procedure § 382 and Civil Code § 1781 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals in California who subscribed to any OnlyFans Subscription in the applicable statute of limitations preceding the filing of this complaint, and who were subsequently assessed an automatic renewal fee associated with those accounts(s). And all individuals in California who Defendant, without authorization, charged Billing Information additional and unwanted payments as a result of Defendant's noncompliant OnlyFans Subscription cancellation mechanism.

99.     Excluded from the Class are Defendant and any entities in which Fenix has controlling interest, Defendant's officers, employees, and agents, and the judicial officers and staff.

100.     Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

101.     **Numerosity**: Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, the Class comprises at least tens of thousands of Californian consumers.[50] The precise number of the Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by email and/or publication through the distribution and billing records of Defendant.

---

[50] Fenix Annual Report, *supra* note 1 at 2 (reporting that there were over 187,000,000 OnlyFans consumers as of November 30, 2021).

Defendant possesses and/or has access to each class members' email address and/or other contact information.

102. **Commonality and Predominance**: Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (1) whether Defendant presented all statutorily-required automatic renewal offer terms in a manner that is clear and conspicuous within the meaning of the ARL and in visual proximity to a request for consent to the offer; (2) whether Defendant provided the post-transaction acknowledgment disclosures required by section 17602(a)(3) of the ARL; (3) Defendant's policies, practices and procedures for obtaining affirmative consent from their California consumers before charging their credit or debit card; (4) whether Defendant provided a "prominently located" one-step online cancellation method under section 17602(d)(1)(A)–(B); and (5) the appropriate remedies for Defendant's unlawful conduct.

103. **Typicality**: Plaintiffs' claims are typical of the claims of the class members in that he received they registered for OnlyFans using a common online process, received the exact same inadequate pre-transaction disclosures as received by all members of the class, and similarly received an inadequate post-transaction acknowledgement that included the contents require under section 17602(a)(3). Plaintiffs' claims are further typical in that their Billing Information was charged for automatic renewal fees without Defendant having first obtaining their affirmative consent to an agreement containing clear and conspicuous disclosures of all OnlyFans Subscription offer terms and without providing a one-step immediate cancellation process.

104. **Adequacy**: Plaintiffs will fairly and adequately protect Class Members' interests. Plaintiffs have no interest antagonistic to Class Members' interest, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class-action and consumer-protection cases.

105. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecution of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserve

1  judicial resources, and ensures uniformity of decisions; and prosecutions as a class action permits claims

2  to be handled in an orderly and expeditious manner.

3      106.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby

4  making appropriate final injunctive relief with respect to the Class as a whole.

5      107.    Without class action, Defendant will continue a course of action that will result in further

6  damages to Plaintiffs and members of the Class and will likely retain the benefits of their wrongdoing.

7      108.    Based on the foregoing, Plaintiffs' claims for relief include those set forth below.

8      109.    As noted above, apart from relief for the Class, Plaintiffs separately seek public

9  injunctive relief on behalf of the general public of California to stop the ongoing and continuing

10  violations of California law described above. Members of the general public in California who have not

11  transacted with Defendant but may in the future are at risk of new harms, injuries and financial losses

12  from the ongoing and continuing conduct complained of unless enjoined and corrected. Such claims for

13  public injunctive relief are not required to be certified as class actions and the above elements are not

14  required to be satisfied for such relief.

### FIRST CAUSE OF ACTION

**For Violation of the California Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

18      110.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the

19  preceding paragraphs.

20      111.    Plaintiffs bring this claim individually and on behalf of the members of the proposed

21  Class against Defendant.

22      112.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent

23  business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus.

24  & Prof. Code § 17200. The UCL allows "a person who has suffered injury in fact and has lost money

25  or property" to prosecute a civil action for violation of the UCL. *Id.* § 17204. Such a person may bring

26  such action on behalf of her- or himself and other similarly situated who are affected by the unlawful

27  and/or unfair business practice or act.

28

113.    At all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL. Cal. Bus. & Prof. Code §§ 17600, *et seq*. Specifically, Defendant failed, and continues to fail, to: (a) provide the terms of Defendant's OnlyFans Subscription "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiffs and the Class to those terms before charging their Billing Information, in violation of *id.* § 17602(a)(2); (c) provide an acknowledgment that includes the OnlyFans Subscription offer terms, Defendant's cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by OnlyFans consumers, in violation of *id.* § 17602(a)(3); and (d) fails to provide a one-step method of online cancellation pursuant to ARL section 17602(d)(1)(A)–(B).

114.    Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

115.    All products received from Defendant in violation of the ARL constitute "unconditional gifts." *See* Cal. Bus. & Prof. Code § 17603. As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiffs and the Class in the form of payments made by Plaintiffs and the Class for their purchase of OnlyFans Creator Content. Due to the violations of the ARL referenced above, the goods and services provided by OnlyFans were considered unconditional gifts prior to the time their Billing Information was charged by Defendant and therefore, those amounts collected by Defendant should be restored to Plaintiffs and refunded in full. Defendant has greatly profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

116.    Further, as alleged below, Defendant has committed additional unlawful and/or unfair business practices under the UCL by: (a) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiffs and the Class; (b) representing that Defendant's goods and services have certain characteristics that they do not have, in violation of Cal. Civ. Code § 1770(a)(5); (c) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civ. Code §

1770(a)(9); (d) Defendant represented that a transaction in question conferred or involved rights, remedies, or obligations that it did not have or involve, or were otherwise prohibited by law, in violation of *id.* § 1770(a)(14); (e) the insertion of an unconscionable provision in the transaction at issue, *inter alia*, the choice of law and forum selection clauses within the OnlyFans Platform Terms of Service, in violation of *id.* § 1770(a)(19); and (f) falsely advertising that OnlyFans consumers can cancel their OnlyFans Subscription at any time, in violation of Cal. Bus. & Prof. Code § 17500. Defendant's conversion, violation of the CLRA, and violation of the FAL serve as an additional violation of the UCL.

117.    Defendant's acts and omissions as alleged herein violate obligations imposed by the ARL, and other California statutes, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

118.    There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described herein. Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

119.    Plaintiffs and the Class have suffered substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase OnlyFans Creator Content on the OnlyFans Platform. Had Defendant complied with its pre-transaction disclosure and post-transaction acknowledgment obligations under the ARL, neither the Plaintiffs nor the Class would have purchased their OnlyFans Creator Content or would have canceled their OnlyFans Subscriptions prior to the renewal of the subscriptions, so as not to incur additional fees. Thus, Plaintiffs and the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

120.    Defendant's violations are continuing and there is no indication that Defendant intends to cease its unlawful conduct. The public and the Class are subject to ongoing harm wrought by the statutory violations, unlawful conduct, and/or unfair business practices associated with Defendant's ongoing and active OnlyFans Subscriptions.

CLASS ACTION COMPLAINT

121.     As a direct and proximate cause of Defendant's unlawful, unfair, and fraudulent business practices, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

122.     Plaintiffs and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiffs' and the Class's Billing Information in connection with their OnlyFans Subscription during the four years preceding the filing of this Complaint. Defendant should be required to disgorge all the profits and gains they have reaped and restore such profits and gains to Plaintiffs and the Class, from whom they were unlawfully taken. Plaintiffs and the Class also seek private injunctive relief, declaratory relief, reasonable attorneys' fees and costs, and all other relief deemed appropriate in the circumstances.

123.     Additionally, pursuant to Cal. Bus. & Prof. Code § 17203 and *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), Plaintiffs on behalf of the general public of the State of California, seeks a court order for public injunctive relief, declaratory relief and all other relief deemed appropriate in the circumstances including that enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify Defendant's unlawful business practices and conduct. Such relief is appropriate and necessary to protect members of the general public who have not yet transacted with Defendant but may and therefore remain at risk of future harm and thus, need protection from ongoing and continuing violations of the ARL and UCL, as described above. Such relief will create a public benefit.

124.     Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

**SECOND CAUSE OF ACTION**

**Conversion**

125.     Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

126.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

127.     Due to the violations of the ARL referenced above, the goods and services provided by Defendant were considered unconditional gifts prior to the time their Billing Information was charged by Defendant and therefore, those amounts collected by Defendant should be restored to Plaintiffs and the Class refunded in full.

128.     As a result of charges made by Defendant to Plaintiffs' and the Class's Billing Information without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiffs and the Class.

129.     The amount of money wrongfully taken by Defendant is capable of identification.

130.     Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civ. Code § 3294(c).

131.     As a direct and proximate cause of Defendant's conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to recover damages, restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

132.     Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

/

/

/

**THIRD CAUSE OF ACTION**

**Violation of the California Consumer Legal Remedies Act ("CLRA")**

**Cal. Civ. Code §§ 1750, *et seq.***

133.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

134.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

135.    Plaintiffs and the Class are "consumers" within the meaning of the CLRA, *see* Cal. Civ. Code § 1761(d), in that Plaintiffs and the Class sought or acquired Defendant's goods and/or services for personal, family, and/or household purposes.

136.    Defendant's OnlyFans Subscription offers and the products and services pertaining to the OnlyFans Creator Content are "good" and/or "services" within the meaning of Cal. Civ. Code § 1761(a) and (b). The purchases by Plaintiffs and the Class are "transactions" within the meaning of Cal. Civ. Code § 1761(e).

137.    The acts and practices of Defendant as described herein were intended to deceive Plaintiffs and the Class and have resulted, and will continue to result, in damages to Plaintiffs and the Class. The actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations or omissions deceiving that its OnlyFans Subscription has characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civ. Code § 1770(a)(5); (b) Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised, in violation of *id.* § 1770(a)(9); (c) Defendant represented that a transaction in question conferred or involved rights, remedies, or obligations that it did not have or involve, or were otherwise prohibited by law, in violation of *id.* § 1770(a)(14); and (d) the insertion of an unconscionable provision in the transaction at issue, *inter alia*, the choice of law and forum selection clauses in the OnlyFans Platform Terms of Service in that those provisions effectively waive the protections afforded to Californians pursuant to the ARL, which is a substantial fundamental policy of the state of California that cannot be waived by contract, and require California consumers to engage

in cost-prohibitive litigation in a foreign country, with foreign counsel, and under foreign law in violation of *id.* § 1770(a)(19).

138. Plaintiffs and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase Defendant's OnlyFans Subscription and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendant fully and clearly disclosed the terms associated with the OnlyFans Subscription, Plaintiffs and the Class would not have subscribed to the OnlyFans creator profiles, or they would have cancelled their OnlyFans Subscription prior to the expiration of the initial purchase period.

139. Defendant knew, or should have known, that its representations and omissions were deceptive, false and misleading.

140. As a direct and proximate cause of Defendant's conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them, *inter alia*, injunctive and equitable relief, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

141. Damages on this Count alone are not sought at this time, only injunctive and declaratory relief and all other relief available at law or equity. Plaintiffs have complied with Civil Code § 1782(a) by notifying Defendant in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations. If Defendant fails to rectify or agree to rectify the problems detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to California Civil Code § 1782. Plaintiffs will amend this complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

142. Plaintiffs also bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under the CLRA, Cal. Code of Civ. P. § 1021.5 and/or other applicable law for bringing this action.

### **FOURTH CAUSE OF ACTION**

**Violation of California False Advertising Law ("FAL")**

**Cal. Bus. & Prof. Code §§ 17500,** *et seq.*

143.   Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

144.   Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

145.   California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable case should be known, to be untrue or misleading."

146.   Defendant committed acts of false advertising, as defined by FAL section 17500, by intentionally making and disseminating statements to California consumers and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading. Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

147.   Defendant's statements include but are not limited to representations and omissions made to Plaintiffs and California consumers before and after enrollment in the OnlyFans Subscription regarding the cancellation of the OnlyFans Subscription. For example, Defendant represents on the OnlyFans Platform, and throughout the OnlyFans Subscription pre-purchase enrollment and post-purchase checkout process, that consumers can cancel "at any time." As alleged and shown above, Defendant's statement that consumers can cancel "at any time" is contradicted by the fact that Plaintiffs, and the Class, were unable to cancel any time prior to incurring additional and unwanted charges to their

CLASS ACTION COMPLAINT

Billing Information. Defendant's representations and omissions throughout the OnlyFans Subscription enrollment webpages constitute false and deceptive advertising.

148.    Plaintiffs and the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their OnlyFans Subscription. Plaintiffs relied on Defendant's statements that they could cancel anytime to their detriment when they signed-up for an OnlyFans Subscription. Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions. Plaintiffs and the Class did not learn of Defendant's difficult, confusing, and unlawful cancellation policy and procedure until after they had already signed up and started paying for their OnlyFans Subscription. Plaintiffs and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the OnlyFans Subscription on the same terms had Defendant represented the true facts about the OnlyFans Subscription and cancellation thereof.

149.    Defendant continues to disseminate its false and misleading advertising to California consumers and, as such, the general public continues to be deceived by Defendant's untrue statements, misrepresentations, and omissions related to the OnlyFans Subscription cancellation policy and procedure. Because any reasonable consumer would be misled by Defendant's false and deceptive statements and material omissions that its consumers can cancel the OnlyFans Subscription "at any time," the general public is likely to rely on Defendant's untrue, misleading, and deceptive advertising to their detriment just as Plaintiffs.

150.    Plaintiffs and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase of an OnlyFans Subscription and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendant fully and clearly disclosed that the OnlyFans Subscription cancellation process was noncompliant with the ARL and that Plaintiffs, and the Class could not cancel "at any time" Plaintiffs and the Class would not have purchased an OnlyFans Subscription, or they would have cancelled their OnlyFans Subscription prior to the expiration of the initial purchase period and incurring additional and unwanted charges to the Billing Information by Defendant.

151.   As a direct and proximate cause of Defendant's conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to recover damages, restitution, injunctive relief and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

152.   Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under the FAL, Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment// Money Had and Received/ Assumsit

153.   Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

154.   Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

155.   Plaintiffs and the Class conferred benefits to Defendant by purchasing subscriptions to OnlyFans Creator Content.

156.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Class's purchase of OnlyFans Subscription. Retention of those moneys under the circumstances is unjust and inequitable because of Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiffs and the Class to purchase the OnlyFans Subscription. These omissions caused injuries to Plaintiffs and the Class because they would not have purchased OnlyFans Subscription at all, or on the same terms, if the true facts were known.

157.   Because Defendant's retention of the non-gratuitous benefits conferred to them by Plaintiffs and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class for their unjust enrichment, as ordered by the Court.

158.   As a direct and proximate cause of Defendant's conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to

recover damages, restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

159.    Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request relief as follows on all counts:

1.    For an order certifying the Class and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

2.    For an order declaring that Defendant's conduct violates the statutes and common law referenced herein;

3.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury, on all counts that may allow such relief;

4.    For prejudgment interest on all amounts awarded;

5.    For an order of restitution and all other forms of equitable monetary relief;

6.    For private injunctive relief as plead or as the Court may deem proper;

7.    For public injunctive relief as plead or as the Court may deem proper;

8.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, expenses, and costs of suit pursuant to all applicable laws that allow such relief; and

9.    For all other relief that is just and equitable in the circumstances, whether in law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

[Signature page follows]

1

2  Date: March 31, 2023                    By:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZIMMERMAN REED, LLP

Caleb Marker
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Fax: (877) 500-8781
caleb.marker@zimmreed.com

Hart L. Robinovitch
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Tel: (480) 348-6400
Fax: (480) 348-6415
hart.robinvotich@zimmreed.com

Zachary J. Freese
80 S. South 8th Street, Suite 1100
Minneapolis, MN 55402
(612) 341-0400
zachary.freese@zimmreed.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>04/03/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ R. Lozano _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>23STCV07094 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Carolyn B. Kuhl | 12 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 04/03/2023
    (Date)

David W. Slayton, Executive Officer / Clerk of Court

By R. Lozano_____, Deputy Clerk

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FENIX INTERNET LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOHN DOE 1 and JOHN DOE 2, individually and on behalf of all others similarly situated

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/03/2023 12:00 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Lozano, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles County Superior Court

111 North Hill Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
23STCV07094

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Caleb Marker, Zimmerman Reed LLP, 6420 Wilshire Blvd, Suite 1080, Los Angeles, CA 90048, Tel: 877-500-8780

DATE:
*(Fecha)* 04/03/2023

David W. Slayton, Executive Officer/Clerk of Court

Clerk, by
*(Secretario)* R. Lozano
, Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?
ADR helps people find solutions to their legal disputes without going to trial.  The main types of ADR are negotiation, mediation, arbitration, and settlement conferences.  When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR).  These alternatives to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:**  ADR is faster than going to trial.
- **Saves Money:**  Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties):  Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:**  ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:**  If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:**  ADR does not provide a public trial or decision by a judge or jury.

### Main Types of ADR
1. **Negotiation:**  Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial.  If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:**  In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome.  Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to Arrange Mediation in Los Angeles County**

Mediation for **civil cases** is voluntary and parties may select any mediator they wish.  Options include:

    a.  **The Civil Mediation Vendor Resource List**
        If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

        • **ADR Services, Inc.** Assistant Case Manager Janet Solis, janet@adrservices.com (213) 683-1600
        • **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

        **These organizations cannot accept every case and they may decline cases at their discretion.**
        They may offer online mediation by video conference for cases they accept.  Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

        **NOTE:  The Civil Mediation Vendor Resource List program does not accept family law, probate, or small claims cases.**

    b.  **Los Angeles County Dispute Resolution Programs.**  Los Angeles County-funded agencies provide mediation services on the day of hearings in small claims, unlawful detainer (eviction), civil harassment, and limited civil (collections and non-collection) cases.
        https://dcba.lacounty.gov/countywidedrp/

        **Online Dispute Resolution (ODR).**  Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.  https://my.lacourt.org/odr/

    c.  Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3.  **Arbitration:**  Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome.  In "binding" arbitration, the arbitrator's decision is final; there is no right to trial.  In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.  For more information about arbitration, visit https://www.courts.ca.gov/programs-adr.htm

4.  **Mandatory Settlement Conferences (MSC):**  MSCs are ordered by the Court and are often held close to the trial date or on the day of trial.  The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement.  For information about the Court's MSC programs for civil cases, visit https://www.lacourt.org/division/civil/CI0047.aspx

Los Angeles Superior Court ADR website:  https://www.lacourt.org/division/civil/CI0109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )      FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING )
FOR CIVIL )
)
)
)
_____)

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**   A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**   The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**   A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**   Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

   i)   Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii)  Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv)  Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v)   Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

   i)    Depositions;

   ii)    Declarations;

   iii)    Exhibits (including exhibits to declarations);

   iv)    Transcripts (including excerpts within transcripts);

   v)    Points and Authorities;

   vi)    Citations; and

   vii)    Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.    (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b)  Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9)  PRINTED COURTESY COPIES

a)  For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b)  Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i)    Any printed document required pursuant to a Standing or General Order;

   ii)   Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii)  Pleadings and motions that include points and authorities;

   iv)   Demurrers;

   v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi)   Motions for Summary Judgment/Adjudication; and

   vii)  Motions to Compel Further Discovery.

c)  Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10)  WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a)  Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b)  Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

1    11) SIGNATURES ON ELECTRONIC FILING

2        For purposes of this General Order, all electronic filings must be in compliance with California

3        Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4        Division of the Los Angeles County Superior Court.

5

6            This First Amended General Order supersedes any previous order related to electronic filing,

7        and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8        Supervising Judge and/or Presiding Judge.

9

10   DATED:  May 3, 2019                                         KEVIN C. BRAZILE
11                                                                                                          Presiding Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:        FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                                        (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

LACIV 229 (Rev 02/15)
LASC Approved 04/11

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

Print    Save    Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

     iii.    Be filed within two (2) court days of receipt of the Request; and

     iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

⮞ _____
(TYPE OR PRINT NAME)                        (ATTORNEY FOR PLAINTIFF)

Date: _____

⮞ _____
(TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)

Date: _____

⮞ _____
(TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)

Date: _____

⮞ _____
(TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)

Date: _____

⮞ _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR _____)

Date: _____

⮞ _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR _____)

Date: _____

⮞ _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR _____)

[ Print ]   [ Save ]                                    [ Clear ]

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐   Request for Informal Discovery Conference
   ☐   Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

Print     Save     Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine.  Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine.  In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions.  If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues.  For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference.  Each side's portion of the short joint statement of issues may not exceed three pages.  The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

## The following parties stipulate:

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

➢ _____

(ATTORNEY FOR PLAINTIFF)

➢ _____

(ATTORNEY FOR DEFENDANT)

➢ _____

(ATTORNEY FOR DEFENDANT)

➢ _____

(ATTORNEY FOR DEFENDANT)

➢ _____

(ATTORNEY FOR _____)

➢ _____

(ATTORNEY FOR _____)

➢ _____

(ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____

JUDICIAL OFFICER

| Print | Save | | Clear |
|---|---|---|---|

1

2

3

4

5

6

# FILED
LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

7 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8 **FOR THE COUNTY OF LOS ANGELES**

9

10  General Order Re                    )   ORDER PURSUANT TO CCP 1054(a),
    Use of Voluntary Efficient Litigation )  EXTENDING TIME TO RESPOND BY
11  Stipulations                        )   30 DAYS WHEN PARTIES AGREE
                                        )   TO EARLY ORGANIZATIONAL
12                                      )   MEETING STIPULATION
                                        )
13  ────────────────────────────────────)

14

15          Whereas the Los Angeles Superior Court and the Executive Committee of the

16  Litigation Section of the Los Angeles County Bar Association have cooperated in

17  drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for

18  use in general jurisdiction civil litigation in Los Angeles County;

19          Whereas the Los Angeles County Bar Association Litigation Section; the Los

20  Angeles County Bar Association Labor and Employment Law Section; the Consumer

21  Attorneys Association of Los Angeles; the Association of Southern California Defense

22  Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California

23
    Employment Lawyers Association all "endorse the goal of promoting efficiency in
24
    litigation, and ask that counsel consider using these stipulations as a voluntary way to
25
    promote communications and procedures among counsel and with the court to fairly
26
27  resolve issues in their cases;"

28

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

by Code of Civil Procedure section 1054(a) without further need of a specific court order.

DATED: _May 11, 2011_

Carolyn B. Kuhl, Supervising Judge of the
Civil Departments, Los Angeles Superior Court

-3-

ORDER PURSUANT TO CCP 1054(a)

Electronically Received 04/12/2023 06:12 PM

ZIMMERMAN REED LLP
Caleb Marker (SBN 269721)
Email: caleb.marker@zimmreed.com
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Fax: (877) 500-8781

*(Additional Counsel Identified Below)*

*Attorneys for Plaintiffs*

**FILED**
Superior Court of California
County of Los Angeles

**04/12/2023**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ M. Arellanes _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF LOS ANGELES

| | |
|---|---|
| JOHN DOE 1 and JOHN DOE 2, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FENIX INTERNET LLC, a Delaware limited liability company; FENIX INTERNATIONAL, LIMITED, and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO.: 23STCV07094<br><br>*Assigned for All Purposes to the Honorable Carolyn B. Kuhl*<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1. Violation of California's Consumer Legal Remedies Act;<br>2. Conversion;<br>3. Violation of California Unfair Competition Law;<br>4. Violation of California False Advertising Law; and<br>5. Restitution/unjust enrichment<br><br>JURY TRIAL DEMANDED |

Plaintiffs John Doe 1 and John Doe 2 (collectively "Plaintiffs"), bring this action on behalf of themselves and all others similarly situated against Defendants Fenix Internet LLC ("Fenix Internet"), Fenix International Limited ("Fenix International"), and Does 1–20 ("DOE Defendants") (Fenix Internet, Fenix International, and the DOE Defendants are collectively referred to herein as "Defendants") and allege, upon personal knowledge as to their own actions and their counsels' investigations, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This is a lawsuit against Defendants for engaging in an unlawful "automatic renewal" scheme for OnlyFans "subscriptions" with consumers in California. OnlyFans is a popular social media and creation platform through which consumers in California "subscribe" to original content uploaded by creators ("OnlyFans Creator Content") and sold by Defendants on the OnlyFans Platform. OnlyFans Creator Content is marketed, advertised, made available, and sold to consumers in California through the website www.onlyfans.com (the "OnlyFans Platform"). When consumers sign-up for an OnlyFans account and follow paid-for OnlyFans Creator Content Defendants enroll them into a program that automatically renews their initial purchase on a monthly basis (the "OnlyFans Subscription(s)") resulting in monthly charges ranging from $1.99 up to $49.99 on their credit card, debit card, or third-party payment account ("Billing Information") unless and until the consumer cancels their OnlyFans Subscription. In so doing, OnlyFans consumers are not given the pre- and post-purchase OnlyFans Subscription offer terms in a clear and conspicuous manner, and in visual proximity to, Defendants' request for consent to the OnlyFans Subscription offer terms nor do OnlyFans consumers provide affirmative consent to the automatically renewing OnlyFans Subscriptions before Defendant Fenix Internet charges their Billing Information as is required under California's Automatic Renewal Law (the "ARL"). Cal. Bus. & Prof. Code § 17602(a). Furthermore, the online method to cancel OnlyFans Subscriptions does not incorporate a one-step "prominently located" cancellation button or link available to OnlyFans customers on their profile or account settings, nor are OnlyFans consumers given an "immediately accessible" pre-written cancellation email, in further violation of the ALR. *Id.* § 17602(d)(1)(A)–(B). Instead, the OnlyFans Subscription cancellation process is a multi-step and

counter-intuitive procedure that results in additional, unwanted, and unauthorized charges to consumers' Billing Information by Defendants.

2.    Defendants Fenix Internet and Fenix International jointly engage in the practices challenged herein. In the alternative, Defendants Fenix Internet and Fenix International are alter-egos and/or agents of each other operating under common control and direction.

3.    Defendant Fenix Internet is a wholly owned subsidiary of and is entirely controlled by Fenix International, the owner/operator of the OnlyFans Platform, of which Leonid Radvinsky is the majority owner and director.[1] Before consumers can enroll into an OnlyFans Subscription they must provide Defendant Fenix Internet with their Billing Information. Then, because Defendant Fenix Internet possesses consumer Billing Information, Defendant Fenix Internet unilaterally and automatically charges consumer Billing Information for the OnlyFans Subscription as payments become due. Put differently, at relevant times Defendant Fenix Internet has fully controlled, and continues to control, the sale and billing for OnlyFans Subscriptions by and from its offices in Florida, Illinois and/or other locations within the United States. As a selling and charging entity before imposing any new or continuing charges, Defendant Fenix Internet is responsible for providing the ARL's pre- and post-purchase information and disclosures in the manner prescribed by the statute; Defendant Fenix Internet is responsible for obtaining consumers' affirmative consent to the automatically renewing OnlyFans Subscription; and Defendant Fenix Internet is responsible for providing an immediate one-step cancellation mechanism in compliance with the ARL. Simply, Defendant Fenix Internet controls the entire OnlyFans Subscription offer and is therefore responsible for ARL compliance before charging consumer Billing Information. As the agent of Fenix International, Defendant Fenix Internet unlawfully charged Plaintiffs', and unlawfully charges consumers', Billing Information in violation of the ARL, conduct for which it alone can be held liable. *See Peredia v. HR Mobile Services, Inc.*, 25 Cal.App.5th

---

[1] FENIX INTERNATIONAL LIMITED ANNUAL REPORT AND FINANCIAL STATEMENTS FOR THE YEAR ENDED 30 NOVEMBER 2021, 2 (Nov. 30, 2021), available at: https://find-and-update.company-information.service.gov.uk/company/10354575/filing-history (hereinafter "Fenix Annual Report"); *see also Leonid Radvinsky*, FORBES, https://www.forbes.com/profile/leonid-radvinsky/?sh=1466a71d35bd (last accessed Feb. 24, 2023).

680, 692 (2018) (". . . an agent is liable for his or her own torts, whether the principal is liable or not, and in spite of the fact that the agent acted in accordance with the principal's directions.") (citation omitted). In the alternative, Defendants Fenix International and Fenix Internet jointly and by agreement committed the acts complained of herein. But for Defendants' violations of the ARL, as detailed further herein, Plaintiffs, and the Class, would not have spent the amount of money that they did. As a result, Plaintiffs suffered out-of-pocket loss and financial injury because of the practices complained of herein for which both monetary and injunctive relief are sought.

4.      Defendants' failure to comply with the requirements of the ARL, or otherwise unlawful charging of consumer Billing Information, resulted in excessive revenues to Defendant Fenix Internet, Defendant Fenix International, and their principals including Leonid Radvinsky, that would not have been realized but for the violations set forth herein. The OnlyFans Subscription is the method by which Defendants generate revenue. As of November 30, 2021, OnlyFans has generated over 187 million fans.[2] Online subscription enrollments by customers drive the growth of Fenix International's business model with over 50 percent of its annual revenue being derived from the OnlyFans Subscription.[3] Last year alone, OnlyFans users spent $4.8 billion on the OnlyFans Platform,[4] which generated $932 million in net revenue;[5] a substantial increase over the estimated $358 million in net revenue OnlyFans generated in 2020.[6] Additionally, Fenix International reported that $648 million, or 70 percent, of its 2021 revenue was generated in the United States.[7] Fenix International, as well as its owner/principal Leonid Radvinsky, a resident of Florida and/or Illinois, obtains these eye-popping revenues through Defendant Fenix Internet's unlawful charging of consumer Billing Information.

---

[2] Fenix Annual Report, *supra* note 1 at 2.
[3] *Id.* at 23.
[4] *Id.* at 2. It has been reported that OnlyFans has paid more than $500 million to its owner, Leonid Radvinsky, in the last two years alone. Jim Waterson, *OnlyFans Profits Boom as Users Spent $4.8bn on Platform Last Year*, THE GUARDIAN (Sept. 1, 2022), https://www.theguardian.com/business/2022/sep/01/onlyfans-profits-boom-as-users-spent-48bn-on-platform-last-year.
[5] Fenix Annual Report, *supra* note 1.
[6] *Id.*
[7] *Id.* at 23, 30.

5.    Pursuant to the ARL, online businesses that offer automatic renewal agreements or continuous service agreements to California consumers must: (a) provide the complete automatic renewal terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase, Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain affirmative consent prior to the consumer's purchase, *id.* § 17602(a)(2); (c) provide an acknowledgement that includes the automatic renewal agreement's offer terms, describes the cancellation policy, and explains how to cancel, *id.* § 17602(a)(3); and (d) for offers made available online, as is the OnlyFans Subscription, an "exclusively online, at will, and without engaging any further steps" mechanism for immediate cancellation via either a "prominently located direct link or button" located on the consumer's account, profile, or device, or an "immediately accessible termination email formatted and provided by the business that a consumer" can used to cancel their automatic renewal or continuous service agreement "without additional information." *Id.* § 17602(d)(1)(A)–(B). Defendants failed to comply with these legal requirements and unlawfully charged Plaintiffs', and continues to illegally charge similarly situated California consumers', Billing Information in violation of the core requirements of the ARL.

6.    Specifically, Plaintiffs, and Class members, were not provided with the OnlyFans Subscription offer terms in a "clear and conspicuous" manner and within "visual proximity" to Defendants' request for consent to the offer before the purchase was, and is, fulfilled in violation of ARL section 17602(a)(1). Further, Defendants did not obtain Plaintiffs', and Class members', affirmative consent before charging their Billing Information in violation of ARL section 17602(a)(2). Additionally, Plaintiffs, and Class members, were not provided with a post-purchase acknowledgement containing a description of the OnlyFans Subscription offer terms, the OnlyFans Subscription cancellation policy, or information explaining how Plaintiffs, and Class members, can cancel their OnlyFans Subscriptions in violation of ARL section 17602(a)(3). Finally, Plaintiffs, and the Class, were not given a "prominently located" one-step cancellation mechanism made available on their OnlyFans account or profile page nor were they provided with an "immediately accessible" cancellation email in violation of ARL section 17602(d)(1)(A)–(B).

7.    As a result, all goods, wares, merchandise, or products sent to Plaintiffs and the Class under the automatic renewal or continuous service agreements are deemed to be "unconditional gifts"

under the ARL. Cal. Bus. & Prof. Code § 17603. Because the amounts charged and represented as due under Defendants' scheme, which violated the ARL, should not have been charged but were unconditional gifts and known to be such before the charges were imposed and collected, Defendants have been unjustly enriched and Plaintiffs were injured financially and suffered out of pocket loss for which restitution of the amounts paid is due. The amounts charged to Plaintiffs and Class members, by law, were unconditional gifts, and therefore, the amounts charged to their Billing Information, should never have been charged and collected by any Defendant and Plaintiffs and the Class should not have parted with those sums but instead would have retained all such sums at all times. In addition, had Plaintiffs known about Defendants' above-described conduct, which violated the ARL, in advance, they would not have parted with their money in the amounts they did but instead taken steps to protect their rights and avoid unlawful transactions, resulting in further out-of-pocket loss. Plaintiffs would still possess certain sums that they were charged and paid to Defendants.

8. Plaintiffs and the Class relied, to their detriment, on Defendants' compliance with the ARL, and other applicable statutes, in all respects and not to market, sell, and charge their Billing Information in a manner that violated applicable law. Defendants' failure to do so, described further herein, while collecting money from Plaintiffs and the Class, amounted to affirmative misrepresentations or omissions of material fact. Defendants represented as due and owing amounts that were not due but instead were already considered unconditional gifts that need not be paid for. Cal. Bus. & Prof. Code §17603. Plaintiffs and the Class were not provided the required pre- and post-purchase disclosures and information regarding the OnlyFans Subscription offer terms nor did the Plaintiffs and the Class give their affirmative consent to Defendants before charging their Billing Information and collecting revenue from Plaintiffs and the Class. Defendants' unlawful charging of Plaintiffs' and the Class's Billing Information in violation of the ARL amounted to an omission of material fact which reasonable consumers would have wanted to know before being charged and completing the transactions. Such violations continued on a recurring basis each time a periodic charge in relation to an automatic subscription was made and collected. Defendants' intentional conduct making these charges, when they already knew or should have known that any goods, services, and/or merchandise provided in relation to the subscription was legally considered an unconditional gift under the ARL before the

charges were imposed and collected was unlawful, unfair, and fraudulent conduct under the Unfair Competition Law and other law.

9.    Plaintiffs and the Class would not have purchased the OnlyFans Subscription in the quantities and at the prices they did had they been provided with the ALR mandated pre- and post-purchase disclosures and information. Defendants' conduct caused Plaintiffs to part with money that they otherwise would not have. Defendants' unlawful conduct, misrepresentations, and/or omissions were an immediate cause of injury-producing conduct. Plaintiffs would not have purchased the OnlyFans Subscription, or paid as much for it, absent Defendants' unlawful conduct, misrepresentation, and/or omissions. Plaintiffs enrolled in OnlyFans Subscription through defective and misleading disclosures and omissions described herein and were subsequently charged by Defendants on a recurring basis. Had Plaintiffs been made aware of the terms of enrollment and that the cancellation features were more onerous than the ARL allowed they would not have purchased an OnlyFans Subscription or enrolled in recurring purchases in the manner they did. Such conduct injured Plaintiffs and resulted in out-of-pocket loss. In addition, Plaintiffs and the Class would not have paid Defendants for the subscriptions in the amounts that they did had they known that the goods, services, and/or merchandise provided in relation to the subscriptions were already legally considered an unconditional gift under the ARL for which at that point no further payment was necessary or legally imposed. This conduct also injured Plaintiffs and resulted in out-of-pocket loss.

10.    For the foregoing reasons, Plaintiffs bring this action individually and on behalf of all residents of California who, within the applicable statute of limitation period up to and including the date of judgment in this action, incurred fees for OnlyFans Subscriptions. Based on Defendants' unlawful conduct, Plaintiffs seek monetary relief, declaratory relief, private injunctive relief, public injunctive relief on behalf of the general public in California to prevent Defendants from continuing to engage in their illegal practices (*see McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017)), reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws, and all other relief deemed just and equitable in the circumstances for: (1) Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) conversion; (3) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (4) violation of California's

1   False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and (5) unjust enrichment/

2   restitution.

3        11.     Plaintiffs' separate request for public injunctive relief is not sought for the Class but

4   rather on behalf of the general public of California, *i.e.*, consumers in California who have yet to transact

5   with Defendants but are at risk of doing so in the future. *See McGill*, *supra*. The OnlyFans Platform

6   continues to generate new customers and therefore, as time passes new members of the general public

7   are at risk of new harms and injuries from the legal violations complained of herein, unless those practice

8   are enjoined and corrected so that they fully comply with the ARL, UCL, and other applicable law.

9   Plaintiffs bring this action on behalf of such persons in their individual capacities and class certification

10  is not necessary for this type of public injunctive relief. This action and the relief sought for the general

11  public will provide a public benefit.

12                     **THE PARTIES**

13       12.     Plaintiff John Doe 1 is a citizen of California, residing in San Marcos, California. John

14  Doe 1 has standing to assert the claims set forth herein. By way of the acts and conduct of Defendants

15  described herein, Plaintiff John Doe 1 was harmed, injured, and suffered out-of-pocket loss.

16       13.     Plaintiff John Doe 2 is a citizen of California, residing in El Monte, California. John Doe

17  2 has standing to assert the claims set forth herein. By way of the acts and conduct of Defendants

18  described herein, Plaintiff John Doe 2 was harmed, injured, and suffered out-of-pocket loss.

19       14.     The members of the Class, defined below, are residents of California.

20       15.     Pursuant to the principles set forth in *Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F.Supp.3d

21  990, 997 (N.D. Cal. 2015) (granting exotic dancers' motion to proceed anonymously and permitting

22  present and future plaintiffs to use pseudonyms) and  *Doe v. Ayers*, 789 F.3d 944, 944 (9th Cir. 2015)

23  (finding Plaintiff inmate could proceed under a pseudonym because the severity of threatened harm, the

24  reasonableness of his fears, and his vulnerability to retaliation weighed in favor of anonymity), Plaintiffs

25  file this action under fictitious names and seek to proceed anonymously, because: (a) they wish to

26  preserve their right to privacy; (b) there is a significant social stigma attached to use of the OnlyFans

27

28

website due to the nature of the website's content which is often associated with that of a sexual nature;[8] (c) there is risk of retaliation; and (d) Plaintiffs would be hesitant to maintain this action if their name was permanently associated with Defendants.

16.     There is no prejudice to Defendants if Plaintiffs file this action under fictitious names and proceed anonymously. In the ordinary course of business, a significant percentage of persons who post content on the OnlyFans Platform and help drive Defendants' subscription revenue use pseudonyms and fictitious names in order to maintain their own privacy. *See N.W. Enters. v. City of Houston*, 27 F.Supp.2d 754, 842 (S.D. Tex. 1998)[9] ("Adult entertainers may anonymously (or through stage names) put their bodies on display in front of strangers, but these actions do not imply a willingness to publicize their entertainers' personal information . . . [nor does it] mean that adult entertainers . . . have voluntarily sacrificed all privacy rights . . ."). As such, the use of these names allays any reasonable fear that proceeding anonymously would offend the customary and constitutionally embedded presumption of openness in judicial proceedings. Further, there are no due process concerns if Plaintiffs proceed anonymously because Plaintiffs will privately disclose their identities to Defendants to allow Defendants to assess and defend their claims.

17.     Defendant Fenix Internet LLC ("Fenix Internet") is a Delaware limited liability company that is headquartered at 2598 E. Sunrise Blvd, Suite 2104, Fort Lauderdale, FL 33304 and

---

[8] Even if the customer does not regularly access or subscribe to adult content, public perception of users of the OnlyFans site is that adult content dominates. *See generally* Charlotte Shane, *Only Fans Isn't Just Porn ;) Despite all assertions that the site isn't powered by its sexual content, the platform is synonymous with porn. What is it really?*, New York Times Magazine (May 18, 2021), https://www.nytimes.com/2021/05/18/magazine/onlyfans-porn.html. ("Celebrities use the site because they know that regardless of a creator's stated career (chef, fitness trainer and influencer are popular), OnlyFans' draw is the promise of seeing that which is normally unseen. Plenty of bios warn subscribers that the attached account is non-explicit yet pepper in teasing cues to the contrary. "This is what we don't show you," says one locked post by Rebecca Minkoff, a fashion designer known for her handbags; the caption is followed with the wide-eyed red-cheeked emoji that one might use to punctuate, say, a texted confession of a sex dream. Every assertion that the site isn't powered by porn is accompanied by an onslaught of winks and nods to the contrary. Sometimes the denials and winks come from the same person.").

[9] Reversed in part *N.W. Enters. v. City of Houston*, 352 F.3d 162, 198 (5th Cir. 2003).

FIRST AMENDED CLASS ACTION COMPLAINT

has a registered office located at 345 North Canal Street, Chicago, IL 60606.[10] Fenix Internet is a wholly owned subsidiary of and is entirely controlled by Defendant Fenix International and/or Leonid Radvinsky, who is the majority owner and director of Defendant Fenix International, and is himself a United States resident,[11] from Fenix Internet's U.S. based offices, facilities, and workplaces. Upon information and belief, Radvinsky maintains residences in Florida and/or Illinois. Fenix Internet charged Plaintiffs' and the Class's Billing Information for their OnlyFans Subscriptions. Like other consumers, when a payment is made for a subscription on the OnlyFans Platform the charge is made and collected by Fenix Internet and appears on the consumer's credit card statements as a charge imposed and made to Fenix Internet and/or a dba or other trade name so designed by Fenix Internet, such as "OF" or "ONLYFANS.COM" bearing a Florida address (*e.g.*, "2/25  ONLYFANS.COM 8886880458 FL  $3.19."). Accordingly, Fenix Internet is, or has been, continuously in possession of money wrongfully taken from Plaintiffs and the Class they seek to represent, and which is to be restored to those consumers. Fenix Internet knew or should have known prior to making any charge, that due to the conduct described herein, charges to Plaintiffs and the Class for Only Fans subscriptions should have been considered unconditional gifts for which no payment was due and therefore, the charges should not have been made, resulting in overcharges to Plaintiffs and the Class.

18.    Defendant Fenix International Limited ("Fenix International") is a private, limited company registered under the laws of the United Kingdom and Hong Kong, with its principal place of business at 4th Floor Imperial House, 8 Kean Street, London, WC2B 4AS United Kingdom. Based on public information, Fenix International also conducts business or has operations and facilities (directly or through subsidiaries or affiliates) in the United States, Manila, Singapore, Tokyo, New Delhi, and Bangkok. Fenix International operates the OnlyFans Platform.

19.    Plaintiffs do not know the true names and capacities of the Defendants sued herein as Defendant DOES 1 through 20 ("DOE Defendants"), inclusive, and therefore sues said DOE

---

[10] Fenix Annual Report, s*upra* note 1 at 27.
[11] *Id.* (noting that FIL own 100% of Fenix shares).

Defendants by fictitious names. Plaintiffs are informed and based thereon alleges that each of the DOE Defendants is contractually, strictly, negligently, intentionally, vicariously liable, and/or otherwise legally responsible in some manner for the acts and omissions described herein. DOE Defendants may include other affiliated persons or entities of Defendants Fenix International and/or Fenix Internet. Plaintiffs will amend this Complaint to set forth the true names and capacities of each DOE Defendant when the same are ascertained.

20.    Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, distributor, or parent of Defendants who have knowingly and willfully aided, abetted, and/or conspired in the false and unlawful conduct alleged herein.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to California Business and Professions Code §§ 17203, 17204, and 17535, and Civil Code § 1780.

22.    The Court has personal jurisdiction over the parties because Plaintiffs reside in California and submit to the jurisdiction of the Court.

23.    Defendants are subject to the personal jurisdiction of this Court because (i) they operate, conduct, engage in, and carry on business in California and (ii) they caused injury to Plaintiffs and to Class Members in California arising out of activities in California. Defendants are subject to the personal jurisdiction of this Court because they engaged in substantial and not isolated activity within this district.

24.    Acting in concert, as described further herein, Defendants engage in millions of dollars of business in California, with connections to California that are extensive and compromise a significant portion of Defendants' business. Subscription sales to consumers in California is integral to Defendants' financial success. Defendants' contacts with California primarily relate to their continuing interactions with OnlyFans Content Creators and with consumers in the Class (including Plaintiffs) who pay Defendants for access to that content through the auto-renewing subscriptions at issue.

25.     Defendants purposefully availed themselves of California laws, directed their activities at California and its residents, availed themselves of, and have a substantial connection to California. Defendants generated significant income from Plaintiffs and the Class in California as a result of the activities they conducted in and/or directed to California residents. Fenix Internet processed significant revenue generated by its California based content creators, much of it deriving from subscription payments subject to auto-renewal activities. The laws which Defendants violated (including the ARL) are fundamental policies of the State of California which cannot be waived by contract.

26.     The Court's exercise of personal jurisdiction is reasonable and comports with fair play and substantial justice.

27.     Defendants have sufficient minimum contacts with California to be subject to this Court's personal jurisdiction. Defendants intentionally avail themselves to California markets through the promotion, sale, marketing, and distribution of the OnlyFans Subscription in this country (and throughout the State of California), which renders this Court's exercise of jurisdiction necessary and proper. Defendants regularly market their products to California consumers, sell their products to California consumers, and charge and collect funds from California consumers, including Plaintiffs and the Class. Further, Defendants intend to continue such activities, therefore affecting members of the general public in California who are in a position to become customers of Defendants in the future and thus, are vulnerable and in need of the public injunctive relief sought to ensure that their transactions comply with the law.

28.     At all relevant times hereto, Defendants have systematically and continually conducted, and continue to conduct, business in this State by charging Plaintiffs', the Class', and California consumers' Billing Information for OnlyFans Subscriptions. Defendants also reach California markets through various means including, but not limited to, social media cites including Twitter and Facebook (at relevant times based in California), through which Defendants specifically target California consumers including Plaintiffs and the Class. For example, Defendants charged Plaintiffs' and the Class's Billing Information. Additionally, the Terms of Service for all OnlyFans Platform Users (the "OnlyFans Platform Terms of Service") Section 11 encourages OnlyFans users to connect their OnlyFans account to their active Twitter account to share content but explains that consumers using this

feature must comply with Twitter's terms of service of which provide for the application of California law and that any dispute be brought in California.[12]

29.     Defendants engage in millions of dollars of business in California, with connections to California that are extensive and comprise a substantial portion of Defendants' business. Upon information and belief, approximately seventy (70%) percent of revenue generated by OnlyFans Subscriptions originated from United States markets,[13] particularly from California which is the largest U.S. state by population and center of the general and adult entertainment industry. Based on population, approximately 12 percent of Defendants U.S. revenues would be derived from consumers in California. Upon information and belief, funds collected from the Class are deposited by Defendants into U.S. based banks and financial institutions. Defendants' sales revenues show that Defendants purposefully directed their activities at California and availed themselves of California laws. Additionally, Defendants maintain a principal/agent relationship with OnlyFans Content Creators,[14] many of whom are based in California. Upon information and belief, Fenix Internet has an active registered agent located at 11050 Hartsook Street, Los Angeles, CA 91601.[15]

30.     Defendants conduct transactions with Class members and OnlyFans Content Creators only in U.S. Dollars.[16]

31.     Fenix International's California-directed activities go beyond operation of a nationally accessible website. Fenix International collects the data of California-users (subscribers in the Class and content creators) such as identification information and includes California-specific sections within its privacy policy.[17] Fenix International performs age-verification for all its California Content Creators which involves collecting hundreds of California identification documents and w-9's.

---

[12] "General," Terms of Service § 6, TWITTER (June 10, 2022), https://twitter.com/en/tos#update.
[13] *Supra* note 1 at 23, 30.
[14] *See id.* at 16.
[15] *See* Cindy Zheng, ONLYFANS, https://onlyfans.com/cindyyyzg (last accessed Feb. 15, 2023).
[16] *See* Terms of Use for Creators §12.f, ONLYFANS (Dec. 2021), https://onlyfans.com/terms#acceptable-use-policy ("All Fan Payments and Creator Earnings are transacted in USD only.").
[17] Privacy Policy §§ 1, 2.a.2 (referencing the personal information categories identified in the California Customer Records ("CCR") statute (Cal. Civ. Code § 1798.80(e)), 2.a.3, 2.f (referring to the CCR), 3.b

32.     Plaintiffs' claims relate to Defendants' forum related activities in California, including subscription sales and auto-renewals. Defendants contacts with California relate to their continuing interactions with OnlyFans Content Creators and consumers in the Class, including Plaintiffs, at relevant times who paid for access to that content through subscription services offered and designed by Defendants.

33.     Defendants continuously and deliberately directed their business activities towards California and exploited the California market, deriving significant profits as a result of those activities. Defendants could reasonably anticipate being sued in California as a result of their connections.

34.     Upon information and belief, certain principals, officers, and/or employees of Defendants conduct and manage the business operations of Fenix International and Fenix Internet in and from their workplaces in the United States and direct those activities towards consumers in California with the intention of increasing and maintaining subscription sales and automatic renewals thereof, and in turn, increasing Defendants' revenues. A primary source of Defendants' revenues is subscription sales of the type at issue in this matter for which Defendants' principals, officers, directors, employees, contractors and agents all seek to maximize, including those which derived from California consumers in the Class and which result from Defendants purposeful attempts to conduct business with them in the California marketplace. In furtherance of this, Leonid Radvinsky maintains his primary workplaces in Florida and/or Illinois where he pursues such strategies and activities aimed at maximizing subscription sales and renewals from California consumers. Fenix International's current Chief Executive Officer (and former Chief Marketing and Communications Officer), Amrapali Gan ("Gan"), resides in the United States, maintaining her current primary workplace in the United States (currently Miami), and previously in California,[18]  where she pursues strategies and activities

(devoting   a   section   to   "Your   California   Privacy   Rights"),   ONLYFANS   (Dec.   2020),
https://onlyfans.com/privacy.
[18]   *See* Amrapali Gan, LINKEDIN, https://www.linkedin.com/in/amigan (listing residence of Miami, FL, and noting "Gan currently splits her time between Miami and London …") (last accessed Apr. 11, 2023); Marielle Descalsota, *Meet Amrapali Gan, the 37 Year Old CEO of OnlyFans*, ENTREPRENEUR (Feb. 3, 2023),   https://www.entrepreneur.com/business-news/meet-the-37-year-old-ceo-of-onlyfans-amrapali-

14

aimed at maximizing subscription sales and renewals from California consumers. Upon information and belief Gan began her employment with Defendant Fenix International in 2020 while residing and working in California.

35.   Upon information and belief, at relevant times Leonid Radvinsky, Amrapali Gan, and other employees of Defendants have conducted work related to sales operations of Defendants and the marketing of the OnlyFans Platform and online subscription sales practices at issue in this matter in and from their workplaces in the United States, including those in California, Illinois, and/or Florida. At relevant times, Defendants have had United States based employees, including in California, that perform operations related to the sale and marketing of OnlyFans Subscriptions, automatic renewals, compliance, and other online subscription functions in and from their workplaces.[19] In conducting

_____

gan/444279 ("She is currently based in Miami, but was previously living in Los Angeles. After attending California State University, she graduated with a bachelor's degree in public relations and organizational communication."); *Who is Amrapali Gan, the new OnlyFans CEO?*, HT TECH (Aug. 21, 2022, 22:46 IST), https://tech.hindustantimes.com/tech/news/who-is-the-new-onlyfans-ceo-amrapali-gan-know-india-connection-71640167604474.html (". . . Amrapali is currently based out of California."); *The Education and Career of Amrapali Gan, the Mumbai-Born OnlyFans CEO*, STUDY INTERNATIONAL (Jan. 5, 2022), https://www.studyinternational.com/news/onlyfans-ceo/.

[19]   Upon information and belief, amongst others, all or some of the following persons work or have worked for Defendants in the United States and through their business roles and functions have, in whole or part, helped further Defendants' auto-renewing subscription sales business, including that in California:

Ana Ta, OnlyFans Digital Marketing Lead, Los Angeles, California. Ana Ta, LINKEDIN, https://www.linkedin.com/in/ana-ta (last accessed Apr. 11, 2023);

Julia Pomis, OnlyFans Marketing Project Manager, Chicago, Illinois. Julia Pomis, LINKEDIN, https://www.linkedin.com/in/julia-pomis-5760931a3 (last accessed Apr. 11, 2023);

Alex Goykhmam, OnlyFans Marketing, Chicago, Illinois. Alex Goykhman, LINKEDIN, https://www.linkedin.com/in/algoykhman (last visited Apr. 11, 2023). Alex Goykhmam also maintains a business, Goyk Productions, Inc., that operates out of the same address (345 N. Canal Street, Chicago, IL, 60606) identified for Defendant Fenix Internet. *Compare* GOYKPRO, http://goykpro.com/#contact (last accessed Apr. 12, 2023) *with* Fenix Annual Report, *supra* note 1 at 27.

Rajesh Ramsaram, OnlyFans Strategy and Corporation Development, New York, New York. Rajesh Ramsaram, LINKEDIN, https://www.linkedin.com/in/rajesh-ramsaram-30460a1b2 (last accessed Apr. 11, 2023);

their business activities, these employees of Defendants collectively sought to increase their subscription sales and revenues from consumers in California, including those in the Class.

36.     In furtherance of their efforts to expand Defendants' sales, revenues, business activities and the OnlyFans Platform and brand in the United States, including California, Defendants: (a) advertise the OnlyFans brand and OnlyFans Platform themselves (including but not limited to, https://twitter.com/OnlyFans and https://www.facebook.com/onlyfans); (b) enter into athletic or other event sponsorships and promotions aimed at advertising the OnlyFans brand and OnlyFans Platform,[20] and; (c) also encourage OnlyFans Content Creators to separately advertise using the OnlyFans name,

---

Jamie Sharp, OnlyFans Executive Vice President, Business Development, Miami, Florida. Jamie Sharp, LINKEDIN, https://www.linkedin.com/in/sharp-jamie/ (last accessed Apr. 10, 2023);

Alex Cluxton, OnlyFans Creative Project Manager, Chicago, Illinois. Alex Cluxton, LINKEDIN, https://www.linkedin.com/in/alex-cluxton-45508087/ (last accessed Apr. 10, 2023);

Matt Reeder, OnlyFans Deputy General Counsel, Pittsburgh, Pennsylvania. Matt Reeder, LINKEDIN, https://www.linkedin.com/in/matt-reeder/ (last accessed Apr. 10, 2023);

Cierra Ortega, OnlyFans Creator Experience Representative, Phoenix, Arizona. Cierra Ortega, LINKEDIN, https://www.linkedin.com/in/cierra-ortega-ab1b70181/ (last accessed Apr. 10, 2023);

Dylan Sosso, OnlyFans Marketing and Tech, Chicago, Illinois. *See* Dylan Sosso, LINKEDIN, https://www.linkedin.com/in/dylan-sosso/ (last accessed Apr. 10, 2023).

Donald Wyatt, OnlyFans Customer Support Specialist, United States. *See* Donald Wyatt, LINKEDIN, https://www.linkedin.com/in/donald-wyatt-a82483194 (last accessed Apr. 12, 2023).

[20]  *Boxing Icon Floyd Mayweather Jr. Launches OnlyFans Profile Ahead Of Exhibition Fight*, CISION PR NEWSWIRE (June 5, 2021, 9:28 ET), https://www.prnewswire.com/news-releases/boxing-icon-floyd-mayweather-jr-launches-onlyfans-profile-ahead-of-exhibition-fight-301306346.html ("Floyd "Money" Mayweather Jr. and OnlyFans announce their partnership, which includes exclusive content and a fight sponsorship."); *Jace Kessler announces Only Fans as title sponsor for 2023!*, DIRT BIKE LOVER (Jan. 23, 2023), https://dirtbikelover.com/jace-kessler-announce-onlyfans-as-title-sponsor-in-2023/#:~:text=Jace%20Kessler%20announce; Kellen Brauer, *Logan Karnow Signs With OnlyFans As Title Sponsor For 2023*, RACER X ONLINE (Oct. 22, 2022, 11:30 AM) https://racerxonline.com/2022/10/23/logan-karnow-signs-with-onlyfans-as-title-sponsor-for-2023 (referencing participation in Anaheim race); Fernando Quiles Jr., *Kevin Holland Talks OnlyFans Sponsorship & When His First Fight In 2022 Will Be*, MIDDLE EASY (Dec. 31, 2021), https://middleeasy.com/mma-news/kevin-holland-onlyfans-sponsorship.

16

logos and trademarks as well.[21] Such advertising activities are intended by Defendants to increase subscription revenues from consumers in California.

37.    In furtherance of their efforts to expand Defendants' sales, revenues, business activities and the OnlyFans Platform and brand in California, Defendants' officers have physically appeared at conferences and other meetings in California. For instance, on October 19, 2022, Amrapali Gan and Chief Strategy & Operations Officer Keily Blair entered California and addressed the TechCrunch Disrupt 2022 in San Francisco, promoting OnlyFans.[22] Upon information and belief, Defendants deal regularly with other business contacts in California for these same purposes.

38.    In furtherance of their efforts to expand Defendants' sales, revenues, business activities and the OnlyFans Platform and brand in California, Defendant Fenix International has registered trademarks related to the OnlyFans name and OnlyFans Platform with the U.S. Patent and Trademark Office.

39.    In furtherance of their efforts to expand Defendants' sales, revenues, business activities and the OnlyFans Platform and brand in California, Defendants have entered into contracts with third party Contractors in the United States.  Certain contracts indicate that the contract is "between Fenix Internet LLC (subsidiary of Fenix International Limited "the Company")" and a third-party "Contractor"; provide for application of U.S. laws; describe the obligations of "the Company"; and provide for notices to "the Company" at 345N. Canal St., Chicago, IL 60606.

40.    Defendants engage in marketing sales and commercial activity that is targeted at consumers in California. The activities and functions that Fenix International and Fenix Internet

---

[21] *Brand Resources*, ONLYFANS, https://onlyfans.com/brand ("Brand Resources: Logos, special icons and templates that will help you use our brand. Brand Guidelines: We love that you love OnlyFans. We want to make it easy for you to use our brand in the right way. Explore this quick guide to our basic design elements to see how to do it.") (last accessed Apr. 12, 2023).

[22] Lauren Simonds, *OnlyFans's Ami Gan and Keily Blair Join us at Disrupt for a SFW Fireside Chat*, TECHCRUNCH (Aug. 26, 2022, 10:00 AM CDT), https://techcrunch.com/2022/08/26/onlyfanss-ami-gan-and-keily-blair-join-us-at-disrupt-for-an-sfw-fireside-chat/; *see also* Money 20/20 Conference in Las Vegas, NV, October 22-25, 2023, MONEY 20/20, https://us.money2020.com ("A snapshot of our 2022 Rockstar speakers ….Amrapali Gan, CEO OnlyFans") (last accessed Apr. 12, 2023); *see also Our 2022 Speakers*, MONEY 20/20, https://us.money2020.com/agenda/speakers (last accessed Apr. 12, 2023).

perform in and from the United States, which are purposefully directed towards the California consumer market and are intended to increase Defendants' sales, revenues, and market share and are more extensive that Defendants want the public to perceive. While Defendants attempt to imply that all Defendants' company operations take place in England and/or other countries outside of the United States (except for payment/credit card processing by Fenix Internet), that does not appear to be accurate. Rather, Fenix International, Fenix Internet, and/or their affiliates (Doe Defendants) employ and contract with numerous persons working in the United States, including personnel in California, to help it market, sell, promote, and maintain auto-renewing subscription offerings to consumers in California, including to persons in the Class.

41.     Fenix International offered contracts to California residents in the Class that were performed in California and under which the Class members were charged auto-renewing subscription fees.

42.     Fenix Internet collects payments from consumers in California from subscription sales via automatic renewal fees. Fenix Internet assists Fenix International in processing payments from consumers in California in relation to subscription sales. Fenix Internet distributes a portion of the money it collected from California consumers in relation to subscription sales to OnlyFans Content Creators in California. By electing to enter into transactions and charge California consumers' (persons in the Class) Billing Information on a monthly or periodic basis, Defendants entered into continuing relationships with Class members in California and purposely availed themselves of the benefit of conducting business in California. In doing so Defendants purposely created continuing relationships and obligations with citizens of California.

43.     Fenix Internet and Fenix International also sell "OnlyFans" branded merchandise (clothing, towels, household goods, keychains, signs, stickers, other accessories, etc.) on the Onlyfans.com website "store"[23] to California residents, collect payments from California residents and ship merchandise via domestic courier to consumers in California (for additional shipping fees for

---

[23] *See* ONLYFANS, https://store.onlyfans.com/ (last accessed Apr. 12, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT

which Defendants further profit) from their facilities and fulfillment/distribution centers in the United States (in Illinois and/or other states). Such "OnlyFans store" sales compliment the subscription sales made. In doing so, Defendants further engage in marketing, sales and commercial activity that is targeted at consumers in California and which demonstrates that they purposely avail themselves of the privilege of conducting business with California residents and thus, are subject to specific jurisdiction in California.

44.     Defendants acknowledge the applicability of certain U.S. laws to their business activities aimed at U.S. markets, including California. Defendants' websites specifically reference such statutes.[24] This also demonstrates that Defendants purposely avail themselves of the California market.

45.     Defendants acknowledge their responsibility to comply with state laws and collect sales taxes in U.S. states, such as California,[25] on subscription sales to Class members:

> USA Sales Tax Information *Please note:* This notice covers our sales tax requirements of Fan payments from within the USA. . . .
>
> Beginning January 4, 2021, OnlyFans will add sales tax to some Fan Payments made in the USA.
>
> Recently, many states have passed laws that require "online marketplaces" to apply sales tax to transactions. Originally aimed at larger streaming services, the way these laws were written and the way they are being interpreted means that they are impacting many different types of companies, including OnlyFans.

---

[24] *See* 2257 Disclosure Statement – OnlyFans, ONLYFANS, https://onlyfans.com/usc2257 (last accessed Apr. 12, 2023); DMCA Takedown Policy, ONLYFANS, https://onlyfans.com/dmca (last accessed Apr. 12, 2023); *see also* Anti-Slavery and Anti-Trafficking Statement 2022, ONLYFANS, https://onlyfans.com/antitraffickingstatement (last accessed Apr. 12, 2023).

[25] To the extent that Defendants do not pay state sales taxes in any state (including California) it is because Defendants have made the conscious decision regarding any such requirement after analyzing laws applicable of the states that they conduct substantial sales (including California). As shown *supra*, in 2021, Defendant Fenix International generated $648 million in revenue from the United States. Fenix Annual Report, *supra* note 1 at 23, 30. The population of California is approximately twelve (12%) percent of that of the United States. Therefore, in 2021 alone, if its annual revenue generation by state is proportionate to population, Defendant Fenix International would have generated approximately $54 million in revenue from California.

> Whether or not sales tax is applied to your Fan Payment depends on where you are located and the type of Payment being made. Not all states requires sales tax to be charged on transactions, and not all Payment types will be taxable.
>
> If Sales tax is charged in your location, you will see an additional line item on your receipt for sales tax. Each state which requires Sales Tax to be charged will apply their own rate. The Sales Tax collected by OnlyFans will be paid directly to your local government.[26]

Defendants further acknowledge that they monitor each states' laws for changes (including California's) and are subject to state law requirements where they make subscription sales.[27] This also demonstrates that Defendants purposely avail themselves of the California market.

      46.    Defendants also recognize their obligations to comply with California privacy laws with regard to California based consumers that they deal with regard to subscription sales.[28]

      47.    By way of the foregoing activities and conduct, Defendants have purposely availed themselves of the privilege of conducting business in California thereby invoking the benefits and protections of its laws and thus, are subject to specific jurisdiction in California. Defendants performed affirmative conduct which allows and/or promotes the transaction of business within California, including that related to the sales and subscription auto-renewal practices at issue in this case. The claims of Plaintiffs and the Class relate to Defendants' California-related activities described herein.

---

[26] USA Sales Tax Information, ONLYFANS, https://onlyfans.com/help/2/135/136 (last accessed Apr. 12, 2023); *see also* Publication 109, Internet Sales, CAL. DEP'T OF TAX AND FEE ADMIN. (Dec. 2021), https://www.cdtfa.ca.gov/formspubs/pub109/ ("Who is responsible for collecting and paying tax on Internet sales? If you actively sell merchandise in California or are a retailer engaged in business in California, you are responsible for collecting and paying tax on your Internet sales. These include sales you make through Internet shopping platforms, Internet auction sites, and your own website").

[27] If my state doesn't charge tax, could this change?, ONLYFANS, https://onlyfans.com/help/2/135/140 (last accessed Apr. 12, 2023) ("If my state doesn't charge tax, could this change? Yes. Tax on digital content is steadily being implemented globally and it is likely that states which currently do not charge tax on digital content, will commence doing so in the future. OnlyFans will constantly review rate changes and keep our Fans updated.").

[28] *Supra* note 17 at § 3.b ("California's "Shine the Light" law, permits our users who are California residents to request and obtain from us a list of what personal data (if any) we disclosed to third parties for their own direct marketing purposes in the previous calendar year and the names and addresses of those third parties. . . . The California Consumer Privacy Act ("CCPA") provides our users who are California residents the following additional rights:").

The exercise of this Court's jurisdiction comports with fair pay and substantial justice and is reasonable.

48.     Venue is proper in this Court pursuant to Civil Code § 1780(d). Defendants conduct business in this County and throughout the State of California, including by charging OnlyFans consumers' Billing Information for OnlyFans Subscriptions.

49.     Defendant Fenix Internet is not a party to the OnlyFans Platform Terms of Service. Further, to the extent that Defendant Fenix Internet is capable of enforcing the OnlyFans Platform Terms of Service, Plaintiffs did not see and did not affirmatively agree to the OnlyFans Platform Terms of Service when they created their OnlyFans account nor were the OnlyFans Platform Terms of Service presented in a sufficiently clear and conspicuous manner to give Plaintiffs, or the Class, adequate notice of the choice of law and forum selection clauses. As such, the choice of law and forum selection clauses are unenforceable as there was no assent by Plaintiffs. Additionally, as alleged below, the California ARL (as well as the UCL, CLRA, and Plaintiffs' right to seek public injunctive relief) represents a substantial fundamental policy of the State of California that cannot be waived by contract. As such, to the extent Defendants seek enforcement of the choice of law and forum selection clauses, those provisions are procedurally and substantively unconscionable and unenforceable in that they effectively waive the protections afforded to Californians pursuant to the ARL, UCL, CLRA, and right to seek public injunctive relief and require California consumers to engage in cost-prohibitive litigation in a foreign country, with foreign counsel, and under foreign substantive and/or procedural law. Plaintiffs and their transactions have no meaningful contacts with foreign jurisdictions, including the United Kingdom as all events pertinent to the transaction and billings took place, and continues to occur, in California and the United States. Those terms are both procedurally and substantively unconscionable and are a transparent attempt to deny Plaintiffs any meaningful forum to resolve disputes without substantial and disproportionate burden.

50.     As alleged above and below, California law applies to these claims as the ARL, UCL and CLRA represent substantial fundamental policies of the State of California which cannot be waived by contract. Further, claims for public injunctive relief on behalf of the general public of California, as

sought here, cannot be waived. *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017); Cal. Civil Code § 3513.

**FACTUAL ALLEGATIONS**

**I.      Background on the Subscription and Automatic Renewal e-Commerce Industry.**

51.      The e-commerce subscription business model centers on retailers providing goods or services "in exchange for regular payment from the customer."[29] Subscription e-commerce has grown rapidly in recent years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100 percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[30] This tremendous growth of subscription e-commerce shows no signs of slowing. Over the last 8.5 years, the subscription economy has grown more than 400 percent.[31] The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity. UBS analysts predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $50 billion in 2020,[32] implying an 18 percent annual growth rate and making the subscription economy "one of the fastest-growing industries globally."[33] The dramatic growth was experienced "across many areas, including e-commerce, video, streaming, gaming, [and] cloud-based applications[.]"[34] Indeed, in 2021, consumers, on average, spent $273 per month on subscription services, up from $237 in 2018.[35]

---

[29] Sam Saltis, *How to Run an eCommerce Subscription Service: The Ultimate Guide*, CORE DNA (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[30] Louis Columbus, *The State of the Subscription Economy, 2018*, FORBES (Mar. 4, 2018, 5:02PM EST), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/?sh=49eadd8653ef.

[31] Mary Meisenzahl, *Taco Bell's Taco Subscription is Rolling out Nationwide – Here's How to Get it*, BUSINESS INSIDER (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1.

[32] Sundeep Gantori et al., *Investing in Digital Subscriptions,* UBS, 4–5 (Mar. 10, 2021), available at https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[33] *Id.* at 5.

[34] *Id.* at 3.

[35] WEST MONROE, *The State of Subscription Services Spending* (Aug. 2021), https://www.westmonroe.com/perspectives/report/the-state-of-subscription-services-spending.

52.     As with the OnlyFans Platform, subscriptions have become so prevalent, in no small measure, because they provide companies with stable and enormous profits. Companies with subscriptions have seen their financial positions dramatically improve because of the stability and strong cash flow generated from their subscribers. Many subscribers are unaware of ongoing periodic charges and therefore the subscription model allows for the generation of additional revenues that would not be possible if the consumer had to complete a distinct transaction each month. Simply put, subscriptions generate additional money for the vendor imposing the charges. According to Intuit, subscriptions are "217% more profitable for businesses than a one-time payment model."[36]

53.     The OnlyFans Subscription has generated incredible revenue. In 2021 alone, the OnlyFans Platform had over 187 million customers who generated $932 million in net revenue and $433 million in profit.[37] It has been estimated that OnlyFans is on pace to make $2.5 billion in revenue for 2022.[38] Further, over 50 percent of OnlyFans revenue was generated by the OnlyFans Subscription with over 70 percent of that revenue originating from United States consumers.[39]

54.     And the expansion of the subscription e-commerce model "is just getting started."[40] As USB analysts explained: "We're now in the subscription era, and the pandemic [has] accelerat[ed] its takeover. During the COVD-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[41] The *Washington Post* reported

---

[36] Intuit QuickBooks Blog, *Subscription Model or One-Time Sale: Which Should you Choose?* (Jan. 31, 2017), https://quickbooks.intuit.com/in/resources/running-a-business/subscription-model-one-time-sale/.
[37] Fenix Annual Report, *supra* note 1 at 2.
[38] Ingrid Lunden, *OnlyFans CEO Says Adult Content Will Still Have a Home on the Site in 5 Years*, TechCrunch (Oct. 19, 2022, 6:13 PM CDT), https://techcrunch.com/2022/10/19/onlyfans-ceo-says-adult-content-will-still-have-a-home-on-the-site-in-5-years/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAABiV5wdX9XL9SSd03uj5QtTiMSQpLDXcgerWdELFoZIY6fWlu9R35m1Fw2m3epGJiKSdiWgkpLCVaQh10f_Zeoedf0n7Sp8B_bL9V7svclT7xReVyaEC8lYdmGLAzTJZ9Sl9lczIFVihUG5QDleeRX0L99T8kwtKhhtS5gfR2s3J/.
[39] Fenix Annual Report, *supra* note 1 at 23, 30.
[40] *Supra* note 32 at 5.
[41] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

that "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[42]

55.     Although the subscription model is easy to enter, and can produce high profits for the vendor imposing the charges, it is incredibly difficult to dominate the e-commerce subscription market because of the "highly competitive prices and broad similarities among the leading players."[43] In particular, businesses struggle with high churn rates and consumer cancellation when "services don't deliver superior end-to-end experiences."[44] Consumers, however, when confronted with the recurring nature of the service, billing practices, or, more significantly, unclear or complicated cancellation policies, "lose interest" but "may be too harried to take the extra step of cancelling their membership[s]."[45] In other words, businesses realized, as did Defendant, that the "real money is in the inertia."[46] To facilitate consumer inertia, subscription-based e-commerce companies "work with third-party vendors to implement more manipulative designs."[47] That is, companies engaging in subscription-

---

[42] Heather Long & Andrew Van Dam, *Everything's Becoming a Subscription, and the Pandemic is Partly to Blame*, THE WASHINGTON POST (June 1, 2021, 1:12 PM), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth.").

[43] Tony Chen et al., *Thinking Inside the Subscription Box: New Research on E-Commerce Consumers*, MCKINSEY & COMPANY (Feb. 9, 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers.

[44] *Id.*

[45] Amrita Jayakumar, *Little-Box Retailing: Subscription Services Offer New Possibilities to Consumers, Major Outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[46] *Id.*

[47] Zoe Schiffer, *A New Study from Princeton Reveals how Shopping Websites use 'Dark Patterns' to Trick you into Buying Things you Didn't Actually Want*, BUSINESS INSIDER: INDIA (June 26, 2019, 4:46 IST), https://www.businessinsider.in/tech/a-new-study-from-princeton-reveals-how-shopping-websites-use-dark-patterns-to-trick-you-into-buying-things-you-didnt-actually-want/articleshow/69950666.cms.

based e-commerce "are now taking advantage of subscriptions in order to trick users into signing up for expensive or recurring plans. They do this by [among other things] intentionally confusing users with their [website or] app's design and flow, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of the automatic renewal or continuous service programs.[48]

56.     Making matters worse is the deliberate design by subscription e-commerce business to make consumer cancellation confusing and onerous. Tactics and business models which delay a consumer's cancellation results in additional revenues to the vendor imposing the charges. Once enrolled, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[49] As such, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly[.]"[50] Thus, although federal regulators have sought to make it harder for companies to trap consumers in subscriptions, draining their bank accounts, and have attempted to respond to the proliferation of abuses,[51] widespread utilization of dark patterns and deliberate attempts to obfuscate cancellation persist. Indeed, as the Consumer Financial Protection Bureau recently reported, consumers across the country have submitted complaints "about being repeatedly charged for services they did not intend to buy or no longer want[ed] to continue purchasing" and "about the difficulty of cancelling subscription-based services and about charges made to their credit card or bank account after they requested cancellation."[52]

---

[48] Sarah Perez, *Sneaky Subscriptions Are Plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018, 3:21 PM), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[49] Rich Meyer, *The Problem with Subscription Marketing*, NEW MEDIA AND MARKETING (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/; *supra* note 42 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'").

[50] *Supra* note 42.

[51] *Id.*

[52] Consumer Financial Protection Circular 2023-01, *Unlawful Negative Option Marketing Practices*, 2 (Jan. 19, 2023), Circular 2023-01 Unlawful negative option marketing practices (consumerfinance.gov).

**II.     California's Automatic Renewal Law.**

57.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL") with the express intent to "end the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600. More recently, in 2022, California Assembly Bill 390 amended Section 17602 of the ARL, adding new notice requirements meant to increase consumer protections for orders containing free trials or promotional pricing and, more importantly, requiring businesses offering services or products online to provide one of two "exclusively online" methods of immediate cancellation without the need to take additional steps such as having to answer any further questions, provide reasons for cancellation, take surveys or speak to a representative of the seller either directly or via an online chat feature.

58.     The ARL makes it "unlawful for any business that makes an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or, in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

> (3) Fail to provide an acknowledgement that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code §§ 17602(a)(1)–(3).

59.     Following the enactment of AB 390, the ARL now requires e-commerce sellers, doing businesses in California, to provide one of two specific, one-step "exclusively online" mechanisms to

immediately cancel an automatic renewal or continuous service agreement offered online. Section 17602(d) provides in relevant part:

> . . . a business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service ***exclusively online, at will, and without engaging any further steps that obstruct or delay*** the consumer's ability to terminate the automatic renewal or continuous service immediately.
>
> The business shall provide a method of termination that is online in either form of either of the following:
>
> (A) A ***prominently located*** direct link or button which may be located within either a customer account or profile, or within either device or user settings.
>
> (B) By an immediately accessible termination email formatted and provided by the business without additional information.

*Id.* §§ 17602(d)(1)(A)–(B) (emphasis supplied). AB 390's legislative history confirms that the public policy of the State of California is to provide an immediate, one-step mechanism to cancel online automatic renewals and continuous service agreements and prohibit mechanisms designed to hinder or otherwise delay that process. The purpose of AB 390 was to "protect consumers from unexpected and unwanted charges for automatic renewal or continuous services . . . by allowing a consumer to cancel an automatic renewal or continuous service online, at will, and without onerous cancellation requirements."[53] In support of the AB 309, its author, assemblymember Marc Berman, stated: "Unfortunately, many businesses use a variety of tactics to make cancelling subscriptions inconvenient, confusing, time consuming, or otherwise difficult. . . . AB 390 would ensure that if consumers can subscribe online, they can cancel online, and that they can do so without delay or having to jump through hoops."[54] For example, some of the cancellation mechanisms AB 390 intended to eliminate were the use of online chat boxes "or the filling out of surveys as a prerequisite to effectuate a cancellation."[55]

---

[53] Assembly Committee on Privacy and Consumer Protection, Assembly Bill Policy Committee Analysis AB 390, 3 (Apr. 12, 2021), available at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB390.
[54] *Id.* at 4.
[55] Supporting statement from the Office of the District Attorney of Santa Cruz County. *Id.* at 8–9.

27

60.     An "automatic renewal" means any "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." *Id.* § 17601(a). Additionally, the phrase "automatic renewal offer terms" is defined as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount of which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) the minimum purchase obligation, if any." *Id.* § 17601(b)(1)–(5).

61.     A "continuous service" means any "plan or arrangement in which a subscription or purchasing agreement continues until the consumer cancels the service." *Id.* § 17601(e).

62.     The ARL defines "clear and conspicuous" or "clearly and conspicuously" to mean "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *Id.* § 17601(c).

63.     Finally, where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the product is "deemed an unconditional gift to the consumer[.]" *Id.* § 17603.

64.     As alleged below, the OnlyFans Subscription systematically violates Section 17602(a)(1), 17602(a)(2), 17602(a)(3), and 17602(d) of the ARL.

65.     The content sold to Plaintiffs and the Class in the OnlyFans Subscription constitute goods, services, merchandise, and tangible products for personal or household use. The content including images, videos, audio, instructions and text, for which Defendants unlawfully charged Plaintiffs' and the Class's Billing Information, provides consumers access to by way of a license or otherwise, are all able to be downloaded, printed out, retained and/or used in physical, tangible form by the consumer.

**III.     The OnlyFans Subscription Enrollment Process.**

66.     As the entity and vendor imposing the subscription charges on Plaintiffs' and other consumers' Billing Information on an automatic recurring basis, Defendants are responsible for compliance with the ACL, UCL, and other applicable laws before imposing such charges. Defendants knew or should have known that by the failure to comply with the ARL's requirements prior to any sale or periodic billing, the periodic charges should never have been imposed and collected as the goods and services provided through the subscription were considered unconditional gifts, by law, before such charges were imposed.

67.     At all relevant times, via the OnlyFans Platform, Defendants offered, and continues to offer, the OnlyFans Subscription to exclusive OnlyFans Creator Content on an automatically renewing basis. The OnlyFans Subscriptions are offered on a recurring basis for monthly renewal terms, and all subscriptions, regardless of price, automatically renew at the end of the defined renewal terms unless and until the consumer cancels. The OnlyFans Subscription constitutes an "automatic renewal" and/or "continuous service" agreement under the ARL. *See* Cal. Bus. & Prof. Code §§ 17601(a), (e).

68.     The OnlyFans Subscription enrollment process is substantially the same, regardless of the medium used. To sign up for and create an OnlyFans account, the consumer goes to onlyfans.com and selects the "Sign up for OnlyFans" hyperlink after which the onlyfans.com website directs the consumer to create an account by entering their name, email, and a password in the designated fields. When those identification and data fields are completed, the OnlyFans "SIGN UP" button activates, allowing consumers to click the button and to turn on their OnlyFans account.

/

/

/

/

/

/

/

/

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    69.    Regardless of how the consumer creates an OnlyFans account, at no point throughout the

19 account creation process, are consumers required to read or affirmatively agree, *i.e.*, by requiring

20 consumers to click or select a checkbox before they complete their OnlyFans account creation, to the

21 OnlyFans Platform Terms of Service. To the contrary, the OnlyFans sign-up page incorporates dark

22 patterns to distract consumers from even noticing the OnlyFans Platform Terms of Service. As shown

23 above, the layout of the OnlyFans sign-up screen is designed to distract consumers from even noticing

24 the OnlyFans Platform Terms of Service. The OnlyFans Platform Terms of Service hyperlink is shown

25 in tiny font *below* the "SIGN UP" button and is also surrounded by other activated buttons as well as

26 "[l]attests featured posts" images, which in the image above is an enticing photograph. In other words,

27 the visual aesthetic of the OnlyFans sign-up page is a classic example of the dark pattern commonly

28

referred to as "misdirection."[56] At no point throughout the OnlyFans account creation process, are consumers put on notice of the OnlyFans Platform Terms of Service nor are consumers required to affirmatively agree to those terms.

70.    After selecting the "SIGN UP" button, the OnlyFans consumer *has not yet made any purchase* of OnlyFans Creator Content or otherwise purchased an OnlyFans Subscription but merely activated an OnlyFans account. Following their clicking of the "SIGN UP" button, the consumer is sent to a "Home" screen and directed to verify the email address they supplied. The OnlyFans account "Home" screen has a menu on the left-hand side, a middle section with a selection of "posts" made by users and creators, a search tool for finding creators, and a list of "suggestions" on the right, which highlights certain content creators whose profiles the user can peruse.

71.    Before any OnlyFans consumer can subscribe to OnlyFans Creator Content, they must provide Defendant Fenix Internet their Billing Information on the "ADD CARD" webpage.[57] As shown below, at no point on the "ADD CARD" webpage is the OnlyFans Subscription offer terms presented in a clear and conspicuous manner. Further, there is no link to the OnlyFans Platform Terms of Service.

/

/

/

/

/

/

/

---

[56] "Misdirection" is a type of "dark practice" wherein the website's "design purposefully focuses [customers'] attention on one thing in order to distract [their] attention from another." *Misdirection*, DECEPTIVE DESIGN, https://www.deceptive.design/types/misdirection (last accessed Feb. 8, 2023).

[57] Upon information and belief, the consumer can input their credit or debit card information either before perusing OnlyFans Creator Content, or after they have selected an OnlyFans creator to whom they subscribe. Regardless of when they input their credit or debit card information, the consumer is directed to the same page.

FIRST AMENDED CLASS ACTION COMPLAINT



72.     When a consumer navigates to an OnlyFans Creator Content, *e.g.,* Grandmasterchefjojo, the following screen is presented:



FIRST AMENDED CLASS ACTION COMPLAINT

73.     By selecting "SUBSCRIBE," the OnlyFans consumer is advised of certain "benefits" and that they can cancel the OnlyFans Subscription "at any time" but the OnlyFans Subscription automatic renewal offer terms, a description of the cancellation policy, and an explanation of how to cancel the OnlyFans Subscription is absent from the screen and remains undisclosed. After selecting "SUBSCRIBE," as shown below, a webpage window appears containing the consumer's Billing Information and giving the customer a prompt to "PAY" for the OnlyFans Creator Content (the "PAY Window"). Defendants' PAY Window is the point at which Defendants requests the consumer's consent to the automatically renewing OnlyFans Subscription and where the Defendants must provide the OnlyFans Subscription offer terms in a clear and conspicuous manner and in visual proximity to the "PAY" button pursuant to the ARL. As shown below, the OnlyFans Subscription offer terms are nowhere to be found.



74.     After selecting "PAY," the OnlyFans consumer is returned to the creator's profile page, where a box in the middle of the screen notes that the user is "SUBSCRIBED" in bold blue font. Even after completing the initial transaction, any type of notice that the consumer's purchase will automatically renew is absent from the creator's home screen.[58] What's more, other than appearing in an obfuscated and hidden manner at the OnlyFans sign-up page, the OnlyFans Platform Terms of Service

---

[58] Upon information and belief, some content creators may have the word "Renews" along with the date of renewal in small, lower-case, light-gray font. Even if this is the case, Defendants' notice here is equally violative because it only occurs until *after the initial transaction has been completed*, Cal. Bus. & Prof. Code § 17602(f), and fails to fully disclose and describe the complete OnlyFans Subscription offer terms, cancellation policy, and how to cancel as is required under ARL sections 17602(a)(1), (3).

appear nowhere throughout the OnlyFans Subscription process. The OnlyFans Subscription offer terms never appear in a clear and conspicuous manner to the request to purchase the OnlyFans Subscription—*i.e.*, the PAY Window. Additionally, because there are several different webpages between the OnlyFans account activation page and the PAY Window, the point at which Defendants seeks consumer consent to purchase an OnlyFans Subscription, to the extent that the OnlyFans Platform Terms of Service contain the OnlyFans Subscription offer terms those terms are not presented within "visual proximity" to the request for purchase of OnlyFans Subscriptions in further violation of the ARL.

**IV.     The OnlyFans Subscription Cancellation Process.**

75.     Under AB 390, the ARL now requires e-commerce sellers, doing business in California, to provide an immediately available and "exclusively online" cancellation mechanism either in the form of a "prominently located" button or link on the consumers account or profile, or an "immediately accessible" pre-written termination email provided by the business. Cal. Bus. & Prof. Code §§ 17602(d)(1)(A)–(B). The legislative history confirms that AB 390 was intended to require a one-step online method of subscription cancellation to eliminate the use of online chat boxes "or the filling out of surveys as a prerequisite to effectuate a cancellation."[59]

76.     The OnlyFans Subscription cancellation process, which does not include an immediately accessible pre-written termination email, fails to satisfy that basic statutory requirement. In order to cancel an OnlyFans Subscription, consumers must engage in a counterintuitive, confusing, and multistep process, that includes the use of a survey, in violation of ARL section 17602(d), before they are able to effectuate cancellation.

77.     When a consumer navigates to their account page there is a menu on the left-hand side with clickable buttons for the "Home" screen, "Notifications," "Messages," "Lists," "Subscriptions," "My Profile," "More," and for a "NEW POST." A "prominently located" cancellation button or link is absent from this left-hand side menu screen. By selecting the "Subscriptions" button, consumers can navigate to a "CURRENT SUBSCRIPTION" screen on which the list of the consumer's subscriptions

[59] *Supra* note 55.

can be seen. While within the "Active" subscription menu, an OnlyFans creator webpage tile displays all active OnlyFans Subscriptions. As shown below, nowhere is a "prominently located" cancellation button or link of any kind displayed.



78.      Further, as shown below, the inconspicuous vertical ellipsis menu located at the top right corner of the OnlyFans Creator webpage tile—a location that particularly attentive consumers may intuitively look for such a cancellation mechanism—does not contain a "prominently located" cancellation link or button of any kind.



79.      Rather, in order to begin the process of cancelling an OnlyFans Subscription, consumers must, counterintuitively and confusingly, select the "SUBSCRIBED" button displayed at the bottom of the OnlyFans creator webpage tile. And even when consumers select the "SUBSCRIBED" button they must complete a survey before they can cancel or "UNSUBSCRIBE."

80.     Nowhere within consumers' account page, or within the OnlyFans "Home" page, is there a "prominently located direct link or button" to cancel OnlyFans Subscriptions in plain violation of AB 390. Cal. Bus. & Prof. Code § 17602(d)(1)(A) ("The business shall provide a method of termination that is online in the form of . . . A prominently located direct link or button . . ."). Additionally, Defendants do not provide an "immediately accessible" pre-written cancellation email as is permitted under AB 390. *Id.* § 17602(d)(1)(B). Rather, the OnlyFans Subscription cancellation process is a classic example of another dark patterned known as "obstruction"[60] wherein Defendants make the OnlyFans Subscription process needlessly confusing and counterintuitive.

## V.     Defendants Unlawfully Charge OnlyFans Consumers' Billing Information in Violation of the ARL.

81.     At all relevant times, Defendants failed to comply with the ARL by charging Plaintiffs', and the Class's, Billing Information because the Plaintiffs and the Class: (i) were not presented the OnlyFans Subscription offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the purchase is fulfilled,  in violation of ARL section 17602(a)(1); (ii) were charged for OnlyFans Subscription fees without first giving their affirmative consent to Defendants, in violation of ARL section 17602(a)(2); and (iii) were not provided an acknowledgement that includes the continuous service offer terms, cancellation policy, and information explaining how consumers can cancel the OnlyFans Subscription in a manner that is capable of being retained by the consumer, in direct violation of ARL section 17602(a)(3). Furthermore, Plaintiffs and the Class were not given a one-step "prominently located" cancellation button or link on their OnlyFans account or profile page nor were they provided with an "immediately accessible" cancellation email, in violation

---

[60] "Obstruction" is the dark pattern of making cancellation confusing or otherwise making cancellation more difficult than the sign-up process. *The Dark Side of UX Design*, UXP[2] DARK PATTERNS, https://darkpatterns.uxp2.com/ (last accessed Feb. 14, 2023); *see also* Sidney Fussell, *The Endless, Invisible Persuasion Tactics of the Internet*, THE ATLANTIC (Aug. 2, 2019), https://www.theatlantic.com/technology/archive/2019/08/how-dark-patterns-online-manipulate-shoppers/595360/ ("The cancellation process is often far more complicated than registration, a dark pattern called obstruction.").

1   of ARL section 17602(d)(1)(A)–(B), resulting in additional unwanted and unauthorized charges of their

2   Billing Information by Defendants.

3        **i.   Defendants charge consumers' Billing Information when OnlyFans consumers are not given the OnlyFans Subscription offer terms "clearly and conspicuously" and in "visual proximity" to the request for consent before the purchase of an OnlyFans Subscription.**

4

5       82.    The relevant portion of the PAY Window does not present the "automatic renewal offer

6   terms," as defined by ARL section 17601(b), in violation of ARL section 17602(a)(1). Nowhere on the

7   PAY Window are OnlyFans consumers notified, in a clear and conspicuous manner, that the OnlyFans

8   Subscription will "continue until [they] cancel[]," that recurring charges will automatically be charged

9   to the consumer's Billing Information each billing cycle, of "[t]he length of the automatic renewal

10  terms" nor are they given a "description of the cancellation policy that applies to the offer," *see* Cal.

11  Bus. & Prof. Code §§ 17601(b)(1)–(4), in violation of ARL section 17602(a)(1). Simply, Defendants'

12  OnlyFans Subscription offers terms do not appear at all on the PAY Window in the manner prescribed

13  under the ARL.

14      83.    Although the OnlyFans sign-up page includes a link to the OnlyFans Platform Terms of

15  Service, that hyperlink does not satisfy the ARL's mandate. The ARL requires that the pre-purchase

16  disclosures be made "*before* the subscription or purchase agreement is fulfilled, and in visual proximity

17  . . . to the request for consent to the offer[.]" Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis supplied);

18  *see also id.* § 17602(f) ("The requirements of the [ARL section 17602(a)(1)] . . . apply only *prior* to the

19  completion of the initial order for the automatic renewal or continuous service[.]") (emphasis supplied).

20  In the context of a vertical online offer, as is Defendants' PAY Window, the required pre-purchase

21  disclosures must be presented *above* the request for consent to the automatic renewal offer terms, *i.e.*,

22  *before* the "PAY" button and on the PAY Window, as reasonable consumers would believe and expect

23  that all material terms and noteworthy information would appear on the PAY Window before, or in this

24  case *above*, that button which finalizes the transaction. But all of Defendants' OnlyFans Subscription

25  offer terms are absent from the PAY Window. Moreover, the placement of the tiny text of the OnlyFans

26  Platform Terms of Service hyperlink, which is buried between distracting images, is quintessential fine

27  print and does not satisfy the statute. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F.Supp.3d 1132, 1140

28  n. 6 (S.D. Cal. 2021) (noting that the practice of including "autorenewal terms in fine print" was "the

practice that led to [the] ARL"). It is insufficient under the ARL that Defendants' OnlyFans Subscription offer terms appear elsewhere on the OnlyFans Platform, via an inconspicuous hyperlink to the OnlyFans Platform Terms of Service, which is located at the sign-up page and is at least six distinct webpages from the PAY Window, and not on the PAY Window itself—the point at which Defendants request consumer consent to the automatically renewing OnlyFans Subscription. *See id.* at 1140 ("But the [automatic renewal] terms themselves—not the access point to them—need to be in visual proximity to the request.").

84.     Moreover, although the background of the PAY Window, in the example provided above, states "SUBSCRIBE $4.99 per month," that darkened background statement is not clear and conspicuous under the ARL. Further, that lone, inconspicuous statement does not satisfy the ARL's pre-purchase disclosure requirements. First, that statement does not provide that the consumer's Billing Information will in fact be automatically charged until the consumer cancels nor do Defendants describe their cancellation policy and how to cancel as is required under the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(1), (2), (3); 17602(a)(1). Second, the precise date of when consumers' Billing Information will be charged is not provided as is required under the ARL. *Id.* §§ 17601(b)(4); 17602(a)(1). For example, it is not clear whether "$4.99 per month" refers to the precise calendar date of the consumer's initial enrollment, in which case the OnlyFans Subscription would renew every 28-31 days depending on the given month, or refers to four-week intervals, in which case the OnlyFans Subscription would renew every 28 days without regard to the calendar date. This information is necessary for consumers to successfully affect cancellation. As noted above, Defendants do not clearly and conspicuously disclose their cancellation policy or when consumers must cancel their OnlyFans Subscription to avoid charges for the following month, in violation of *id.* §§ 17601(b)(2); 17602(a)(1), of which may be tied to the precise renewal date. Accordingly, reasonable consumers would want to know, and must know, Defendants' precise length of automatic renewal term and reasonable consumers would thus find Defendants' stated length unclear especially when OnlyFans consumers must affirmatively cancel their OnlyFans Subscription to avoid further charges to their Billing Information. For example, if consumers are not on notice of the precise date at which their OnlyFans Subscription will renew and exactly when their Billing Information will be charged each month, they cannot, as a practical matter, affect

cancellation before that date. As such, Defendants fail to disclose "[t]he length of the automatic renewal term" in the manner required by the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(4); 17602(a)(1).

85.     Before Defendants charge consumers' Billing Information for OnlyFans Subscriptions the OnlyFans Subscription offer terms must be presented clearly and conspicuously, and in visual proximity, to the offer of consent. Because the OnlyFans Subscription offer terms are not presented in a satisfactory manner under the statute, Defendants' charging of consumers' Billing Information violates ARL section 17602(a)(1).

**ii.     Defendants charge consumers' Billing Information without the affirmative consent of OnlyFans consumers.**

86.     The ARL itself provides a checklist e-commerce sellers, such as Defendants, must follow in order to obtain consumer consent, *id.* § 17602(a)(1), that if violated results in the return of charges for failure to obtain affirmative consumer consent to the automatic renewal. *Id.* § 17603. As alleged herein, Defendants have failed to follow the ARL's mandatory checklist and has thus failed to obtain consumers' affirmative consent to the automatically renewing OnlyFans Subscription before charging their Billing Information in violation of ARL section 17602(a)(2).

87.     Further, at no point during the enrollment or checkout process do OnlyFans consumers give their affirmative consent to the OnlyFans Subscription offer terms. Throughout the entire OnlyFans account creation process and the OnlyFans Subscription PAY Window, OnlyFans consumers are never required to read or affirmatively agree to the OnlyFans Platform Terms of Service associated with the OnlyFans Subscription, *i.e.*, by requiring consumers to select or click a "checkbox" affirming their consent to the OnlyFans Terms of Service or to the OnlyFans Subscription automatic renewal offer terms to complete the enrollment into an OnlyFans Subscription. As such, Defendants charge consumer Billing Information without first obtaining consumers' affirmative consent to the agreement containing the automatic renewal in violation of ARL section 17602(a)(2).

/

/

/

iii. **Defendants charge consumers' Billing Information when OnlyFans consumers are not provided with a post-purchase acknowledgment that includes clear and conspicuous disclosures of OnlyFans Subscription offer terms, cancellation policy, and how consumers can cancel their OnlyFans Subscription.**

88.    After enrolling into an OnlyFans Subscription, consumers receive an email confirming the purchase (the "Confirmation Email"). This Confirmation Email does not 1) provide that the OnlyFans Subscription will continue unless and until it is cancelled, 2) describe the cancellation policy and how to cancel the OnlyFans Subscription, 3) explain that recurring charges will be charged to the consumer's Billing Information as part of the OnlyFans Subscription, or 4) the length of the OnlyFans Subscription as required by the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(1)–(4); 17602(a)(3). Accordingly, the Confirmation Email fails to "include[] the automatic renewal offer terms  . . . , cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer" in violation of ARL section 17602(a)(3).

iv. **Defendants charge consumers' Billing Information when OnlyFans consumers are not provided with a one-step cancellation mechanism as is required by the ARL.**

89.    Nowhere within consumers' account page, or within the OnlyFans "Home" page, is there a "prominently located direct link or button" to cancel OnlyFans Subscriptions in plain violation of AB 390. Cal. Bus. & Prof. Code § 17602(d)(1)(A) ("The business shall provide a method of termination that is online in the form of . . . A prominently located direct link or button . . ."). Rather, consumers must counterintuitively select the "SUBSCRIBED" button on the OnlyFans creator webpage tile. Furthermore, even if they make it to the "UNSUBSCRIBE" button, consumers must answer survey questions before the cancellation. Finally, Defendants do not provide consumers with an immediately accessible pre-written termination email. *See id.* § 17602(d)(1)(B).

90.    As alleged below, Plaintiffs, as with the Class, tried but failed to affect cancellation because of Defendants' counterintuitive, confusing, and unlawful cancellation procedure. As a result, OnlyFans consumers, as with Plaintiffs and the Class, have been, and are, billed for additional, but unwanted, monthly charges by Defendants because consumers were unable to successfully cancel their OnlyFans Subscriptions, or were otherwise unaware that their attempted cancellation failed, before incurring unauthorized charges to their Billing Information. And despite Defendant Fenix Internet's knowledge, as the wholly own and entirely controlled subsidiary of Fenix International, that the

cancellation process is noncompliant with the ARL's mandate, it nevertheless continues to deny refunds to OnlyFans consumers, and Plaintiffs. Thus, Plaintiffs and the Class were charged money by Defendants that Plaintiffs and the Class would not have incurred had the OnlyFans Subscription cancellation process complied with ARL section 17602(d)(1)(A)–(B).

91.     In sum, the OnlyFans Subscription pre-purchase and post-purchase disclosures fail to comply with the ARL. Nowhere in the foregoing enrollment process are OnlyFans consumers presented with the terms of the OnlyFans Subscription in a clear and conspicuous manner and in visual proximity to the offer before the purchase is completed in violation of ARL section 17602(a)(1). Consumers do not give their affirmative consent to Defendants to charge their Billing Information for the OnlyFans Subscriptions in violation of ARL section 17602(a)(2). The Confirmation Email does not provide the OnlyFans Subscription offer terms, cancellation policy, and information regarding cancellation policies in a manner that is capable of being retained by the consumer, in direct violation of ARL section 17602(a)(3). And OnlyFans consumers are not given a one-step "prominently located" cancellation button or link on their account or profile page nor are they given an "immediately accessible" cancellation email in violation of ARL section 17602(d)(1)(A)–(B).

92.     At all relevant times, Defendant Fenix Internet was, and remains, a wholly owned subsidiary of and is entirely controlled by Fenix International and Leonid Radvinsky, who is the majority owner and director of Fenix International, and is himself a United States resident,[61] from Defendant Fenix Internet's United States offices. And, as such, Defendant Fenix Internet cannot feign ignorance of its unlawful charges of consumers' Billing Information. Because Defendant Fenix Internet collects, possesses, and charges consumer Billing Information, Defendant Fenix Internet is an entity making the OnlyFans Subscription offer and is thus responsible for ARL compliance. As the agent of Defendant Fenix International and Leonid Radvinsky, Defendant Fenix Internet can be held independently liable for its unlawful charging of consumers' Billing Information in violation of the ARL. *See Peredia*, 25 Cal.App.5th at 692 (". . . an agent is liable for his or her own torts, whether the principal is liable or not,

---

[61] Fenix Annual Report, *supra* note 1 at 27 (noting that FIL own 100% of Fenix shares).

and in spite of the fact that the agent acted in accordance with the principal's directions.") (citation omitted). Alternatively, both Defendants are jointly and severally liable for such conduct.

93.     By and through these actions, Defendants have charged Plaintiffs' and the Class's Billing Information in direct violation of the ARL under Cal. Bus & Prof. Code §§ 17602(a)(1)–(3); (d)(1)(A)–(B). Had Plaintiffs known about Defendants' conduct, which violated the ARL, in advance, they would not have parted with their money in the amounts they did but instead would have taken steps to protect their rights and avoid unlawful transactions, resulting in out-of-pocket loss. As a result, pursuant to ARL section 17603, all goods, wares, merchandise and/or products sent to Plaintiffs and the Class in violation of the statute are considered unconditional gifts for which Defendants unlawfully charged their Billing Information, Plaintiffs and the Class are entitled to restitution.

94.     Defendants' violations of the ARL systematically occur every time a prospective consumer creates an account and subscripts to the OnlyFans Subscription. Every OnlyFans consumer receives the exact same legally inadequate disclosures on the front and back end of their transaction.

**VI.     Any Forum Selection and Choice of Law Provisions Found in the OnlyFans Platform Terms of Service are Unconscionable and Unenforceable.**

95.     As alleged above and below, the forum selection and choice of law provisions, to the extent that Defendant Fenix Internet can enforce either, since Defendant Fenix Internet is not a party to the OnlyFans Platform Terms of Service and they are otherwise unenforceable for lack of Plaintiffs' consent and notice, are also unconscionable because those terms are tantamount to Plaintiffs' and Californian consumers' waiving the fundamental protections afforded to them under the ARL, UCL, and CLRA.

96.     When disputes between Defendants and California consumers arise, rather than create a fair and balance procedural system, the OnlyFans Platform Terms of Service incorporate a forum selection clause and choice of law provision, which require Californian consumers to litigate their claims in a court located in the United Kingdom (England or Wales) and under English law and purport to require Californian consumers to waive laws (the ARL, UCL, and CLRA) which are fundamental policies of this State that cannot be waived by contract. Both the forum selection clause and choice of law provision are intended to distort the process and create a system in which California consumers, like

Plaintiffs and the Class, are completely hamstrung and frustrated in their ability to enforce their consumer protection rights under the ARL, UCL, CLRA, and other applicable laws and obtain relief against the far more powerful Defendants on an equal playing field. The OnlyFans Platform Terms of Service, through the forum selection and choice of law clauses, attempt to insulate Defendants from being held responsible in California courts and under California law for their unlawful charging of Plaintiffs', and the Class's, Billing Information in violation of the ARL by prohibiting California consumers, like Plaintiffs and the Class, from bringing a lawsuit, collective or otherwise, in California courts under California law to obtain restitution for Defendants' unlawful usurpation of consumers' money. The forum selection clause and choice of law provisions were intended to serve as a procedural barrier and deterrent for Plaintiffs, as with all California consumers, to assert ARL, UCL, and CLRA claims in Californian court, if at all, by requiring them to litigate their claims in a foreign court, with foreign counsel, and under foreign law. This intent is laid bare because European consumers (*e.g.*, those from Italy, Spain, France, or Greece) are under no such restriction as they can seek protection from Defendants' predatory conduct in their home country and under the laws of their home country.

97.     The ARL, UCL, and CLRA are fundamental policies of the State of California that cannot be waived by contract, but that is exactly what the forum selection and choice of law clauses force Plaintiffs, the Class, and all Californian consumers to do. Additionally, claims seeking public injunctive relief cannot be waived by contract which, again, the forum selection and choice of law clauses force California consumers to do. The unconscionable forum selection clause and choice of law provision are aimed to: 1) frustrate Californian consumers' ability to seek relief for Defendants' violation of California law, 2) insulate the Defendants from being held responsible for their violation of California law, and 3) prevent any attempt by California consumers to enjoin ongoing unlawful conduct that violates California law for the benefit of the general public of California.

98.     As alleged below, Plaintiffs, as with the Class, were not provided with the ARL's required pre- and post-purchase disclosures and information for the OnlyFans Subscription, did not give their affirmative consent to the automatically renewing OnlyFans Subscription, and tried but failed to affect the cancellation of their OnlyFans Subscriptions because they were not provided a "prominently located" one-step cancellation button or an "immediately accessible" cancellation email. Defendants

simply failed to abide to the ARL's central requirements. Nevertheless, Defendants, through Fenix Internet, charged Plaintiffs' and the Class's Billing Information in direct violation of the ARL.

99.    Plaintiffs and the Class have not waived, and cannot waive, the protections afforded to them under the ARL, UCL, CLRA, and Plaintiffs' right to seek public injunctive relief for Defendants' unlawful conduct and for Defendant Fenix Internet's unlawful charging of their Billing Information. The ARL, UCL, CLRA, and right to seek public injunctive relief are fundamental policies of the State of California that cannot be waived by contract. Pursuant to the aforementioned statutes, Defendants' conduct is not to be judged in a foreign court and under foreign law, but in California courts and under California law. And, as such, the forum selection and choice of law provisions within the OnlyFans Platform Terms of Service, to the extend Defendant Fenix Internet, as a non-party and without Plaintiffs' consent or notice, is capable of enforcing either, are procedurally and substantively unconscionable and are independently unenforceable on that basis.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### A.    Plaintiff John Doe 1.

100.    John Doe 1 is an individual consumer who signed up for an OnlyFans account and purchased OnlyFans Creator Content from the OnlyFans Platform while in California in or around spring 2022. However, as discussed below, John Doe 1 did not actually learn that his purchase of OnlyFans Creator Content was an automatic renewal until after his initial purchase.

101.    John Doe 1 subscribed to follow OnlyFans Creator 1 on or around March 5, 2022 for an initial fee of $3.89, exclusive of any applicable taxes. Before John Doe 1 activated his OnlyFans account and made his initial purchase of OnlyFans Creator 1 content, products, and/or services, Defendants failed to disclose to John Doe 1 all required automatic renewal offer terms associated with the OnlyFans Subscription. Additionally, Defendants never disclosed the terms of their OnlyFans Subscription when John Doe 1 provided his Billing Information, when John Doe 1 selected to follow OnlyFans Creator 1, or when he consummated his initial purchase of OnlyFans Creator 1's content, products, and/or services. Finally, John Doe 1 did not see, nor did he affirmatively agree to the OnlyFans Platform Terms of Service.

102.    Pursuant to ARL section 17602(a)(1), Defendants were required to present the terms of their OnlyFans Subscriptions 1) clearly and conspicuously, and 2) within visual proximity of John Doe 1's initial purchase. Defendants failed on both. As shown above, the offer terms of Defendants' OnlyFans Subscription are nowhere to be found on the OnlyFans Platform sign-up page nor do they appear anywhere throughout the OnlyFans Subscription enrollment process or on the PAY Window. Additionally, John Doe 1 was never required to affirmatively agree to either the OnlyFans Platform Terms of Service or the OnlyFans Subscription offer terms by, for example, by requiring him to select or click a "checkbox" affirming his consent to either.

103.    Regardless of the consumers' experience with onlyfans.com, it is Defendants' burden to put John Doe 1, and all consumers, on notice of the OnlyFans Subscription offer terms in the manner prescribed by the ARL but Defendants failed. As such, throughout John Doe 1's entire OnlyFans account creation and activation, and purchase of an OnlyFans Subscription Defendants did not have John Doe 1's affirmative consent to an agreement containing the automatic renewal offer terms associated with the OnlyFans Subscription in violation of ARL section 17602(a)(2).

104.    After John Doe 1 completed his initial order, he received a Confirmation Email. However, his Confirmation Email failed to provide him with the complete terms of the automatic renewal offer that applied to Defendants' OnlyFans Subscription (including the mere fact that John Doe 1's purchases would automatically renew every month unless and until he chose to cancel), a description of Defendants' cancellation policy, and information regarding how John Doe 1 could cancel his OnlyFans Subscription in a manner capable of being retained by him as required under the ARL. Cal. Bus. & Prof. Code § 17602(a)(3).

105.    As a result of Defendants missing and otherwise deficient disclosures, when John Doe 1 made his initial purchase of OnlyFans Creator 1 content, products, and/or services in or around March 5, 2022, he was entirely unaware that Defendants enrolled him in an "automatic renewal" program under which the subscription would renew each month resulting in automatic charges to his Billing Information unless and until he cancelled.

106.    Nevertheless, Defendant Fenix Internet charged John Doe 1's Billing Information for OnlyFans Creator 1 for approximately four months, including his initial purchase, at $3.89 per month,

1    exclusive of any applicable taxes, without John Doe 1's knowledge or affirmative consent to the

2    automatic renewal. Because Defendants' automatically renewed John Doe 1's OnlyFans Subscription

3    to OnlyFans Creator 1, Defendant Fenix Internet charged his Billing Information approximately $15.56

4    in total, including his initial purchase and exclusive of any applicable taxes. John Doe 1 did not

5    understand that his initial OnlyFans purchase would become an "automatic renewal" for which he would

6    incur recurring charges on an ongoing, monthly basis.

7    107.   Yet, thereafter, Defendants continued to automatically renew John Doe 1's OnlyFans

8    purchase at the same rate listed for OnlyFans Creator 1 for three months, for a total of three unauthorized

9    charges to John Doe 1's Billing Information without his knowledge and affirmative consent. From April

10   through July 2022, Defendant Fenix Internet charged John Doe 1's Billing Information $3.89, exclusive

11   of any applicable taxes.

12   108.   The monthly fees that Defendant Fenix Internet charged to John Doe 1's Billing

13   Information in connection with his OnlyFans purchase came as a complete surprise to John Doe 1

14   because, up until the time he discovered the charged, John Doe 1 had believed his OnlyFans purchase

15   was a single transaction that would not automatically renew. As a result, John Doe 1 did not expect to

16   incur any charges in connection with his purchase of OnlyFans Creator 1 beyond his first, initial

17   transaction. In sum, John Doe 1 did not know and did not expect that his initial purchase of OnlyFans

18   Creator 1 would automatically convert into an automatic renewal in which his Billing Information would

19   continue to be charged on a recurring monthly basis because Defendants failed to provide the pre-

20   purchase disclosures required by the ARL.

21   109.   Once John Doe 1 learned that his initial OnlyFans purchase did, in fact, automatically

22   renew and would continue to do so without his intervention, John Doe 1 had no idea how to cancel his

23   OnlyFans Subscriptions but did not expect it to be a difficult process. John Doe 1, however, struggled

24   to cancel the OnlyFans Subscription because Defendants failed to provide John Doe 1 with the post-

25   purchase acknowledgement. Furthermore, as shown above, Defendants never provided a pre-written

26   "immediately accessible" termination email or, most egregiously, did not provide a "prominently

27   located" cancellation button or link anywhere on John Doe 1's "Home" page or account page as required

28   by the ARL. Cal. Bus. & Prof. Code §§ 17602(d)(1)(A)–(B). As such, when John Doe 1 first attempted

to cancel, he contacted OnlyFans Creator 1 to no avail. Had Defendants complied with ARL section 17602(d)(1)(A)–(B), John Doe 1 would have cancelled his subscription to OnlyFans Creator 1 before being charged, at minimum, an additional monthly fee of $3.89, exclusive of any applicable taxes. Eventually, John Doe 1 did cancel his OnlyFans Subscription, but he was never provided with a refund for any of Defendant Fenix Internet's unauthorized charges.

110.   Had John Doe 1 received clear and conspicuous disclosures in visual proximity to Defendants' request for purchase, as required under the ARL, at the time he made his initial purchase of OnlyFans Creator 1 content, products, and/or services John Doe 1 would not have consented to his initial purchase to follow OnlyFans Creator 1. In other words, John Doe 1 would not have made his purchase of OnlyFans Creator 1 had he known that his purchase was, in fact, an automatic renewal agreement. Furthermore, had Defendants provided John Doe 1 with the post-purchase acknowledgment and complied with the ARL's statutorily mandated cancellation mechanisms, John Doe 1 would have cancelled his automatic renewal to OnlyFans Creator 1 earlier than he did which caused John Doe 1 to be charged with, at minimum, an additional, and unwanted, monthly fee of $3.89, exclusive of any applicable taxes, associated with OnlyFans Creator 1.

111.   As a result of the forgoing conduct of Defendants, Plaintiff John Doe 1 was injured and incurred out-of-pocket loss of $15.56 in total, and at minimum of $3.89, exclusive of any applicable taxes, for which he now seeks relief.

112.   Apart from any individual and class relief, Plaintiff John Doe 1 seeks public injunctive relief on behalf of the general public in California. Members of the general public of California, who have not transacted with OnlyFans, but are likely to in the future, given the website's growth, should be protected from Defendants' current and ongoing violations of the ARL and other laws described herein, for which injunctive relief is necessary and appropriate to correct at this time for their protection. Such relief will create a public benefit.

**B.   Plaintiff John Doe 2.**

113.   Plaintiff John Doe 2 was subject to this same pattern of violation of the ARL when he subscribed to follow the account of OnlyFans Creator 2. On or around December 8, 2022, John Doe 2 made an initial purchase of $12.99 to OnlyFans Creator 2 content, products, and/or services. As with

John Doe 1, before John Doe 2 activated his OnlyFans account and made his initial purchase of OnlyFans Creator 2 content, products, and/or services, Defendants failed to disclose to John Doe 2 all required automatic renewal offer terms associated with the OnlyFans Subscription. Additionally, Defendants never disclosed the terms of their OnlyFans Subscription when John Doe 2 provided his Billing Information, when John Doe 2 selected to follow OnlyFans Creator 2, or when he consummated his initial purchase of OnlyFans Creator 2's content, products, and/or services. Finally, John Doe 2 did not see, nor did he affirmatively agree to the OnlyFans Platform Terms of Service.

114.    Pursuant to ARL section 17602(a)(1), Defendants were required to present the terms of their OnlyFans Subscriptions 1) clearly and conspicuously, and 2) within visual proximity of John Doe 2's initial purchase. Defendants failed on both. As shown above, the offer terms of Defendants' OnlyFans Subscription are nowhere to be found on the OnlyFans Platform sign-up page nor do they appear anywhere throughout the OnlyFans Subscription enrollment process or on the PAY Window. Additionally, John Doe 2 was never required to affirmatively agree to either the OnlyFans Platform Terms of Service or the OnlyFans Subscription offer terms by, for example, by requiring him to select or click a "checkbox" affirming his consent to either.

115.    Regardless of the consumers' experience with onlyfans.com, it is Defendants' burden to put John Doe 2, and all consumers, on notice of the OnlyFans Subscription offer terms in the manner prescribed by the ARL but Defendants failed. As such, throughout John Doe 2's entire OnlyFans account creation and activation, and purchase of an OnlyFans Subscription Defendants did not have John Doe 2's affirmative consent to an agreement containing the automatic renewal offer terms associated with the OnlyFans Subscription in violation of ARL section 17602(a)(2).

116.    After John Doe 2 completed his initial order, he received a Confirmation Email. However, his Confirmation Email failed to provide John Doe 2 with the complete terms of the automatic renewal offer that applied to Defendants' OnlyFans Subscription (including the mere fact that John Doe 2's purchase would automatically renew every month unless and until he chose to cancel), a description of Defendants' cancellation policy, and information regarding how John Doe 2 could cancel his OnlyFans Subscription in a manner capable of being retained by him as required under the ARL. Cal. Bus. & Prof. Code § 17602(a)(3).

117.    As a result of Defendants missing and otherwise deficient disclosures, when John Doe 2 made his initial purchases of OnlyFans Creator 2 content, products, and/or services in or around December 8, 2022, he was entirely unaware that Defendants enrolled him in an "automatic renewal" program under which the subscription would renew each month resulting in automatic charges to his Billing Information unless and until he cancelled.

118.    Nevertheless, Defendant Fenix Internet charged John Doe 2's Billing Information for OnlyFans Creator 2 for two months, including his initial purchase, at $12.99 per month, exclusive of any applicable taxes, without John Doe 2's knowledge or affirmative consent to the automatic renewal. Because Defendants automatically renewed John Doe 2's OnlyFans Subscription to OnlyFans Creator 2, Defendant Fenix Internet charged his Billing Information approximately $24.98 in total, including his initial purchase and exclusive of any applicable taxes. John Doe 2 became aware of Defendant Fenix Internet's unauthorized charging of his Billing Information around Defendant Fenix Internet's second withdrawal. Prior to that point, John Doe 2 did not understand that his initial OnlyFans purchase would become an "automatic renewal" for which he would incur recurring charges on an ongoing, monthly basis.

119.    Yet, thereafter, Defendants automatically renewed John Doe 2's OnlyFans purchase at the same rate listed for OnlyFans Creator 2 for another month, for a total of one unauthorized charge to John Doe 2's Billing Information without his knowledge and affirmative consent. In or around January 8, 2023, Defendant Fenix Internet charged John Doe 2's Billing Information $12.99, exclusive of any applicable taxes.

120.    The monthly fee that Defendant Fenix Internet charged to John Doe 2's Billing Information in connection with his OnlyFans purchase came as a complete surprise to John Doe 2 because, up until the time he discovered the charged, John Doe 2 believed his OnlyFans purchase was a single transaction that would not automatically renew. As a result, John Doe 2 did not expect to incur any charges in connection with his purchase of OnlyFans Creator 2 beyond his first, initial transaction. In sum, John Doe 2 did not know and did not expect that his initial purchase of OnlyFans Creator 2 would automatically convert into an automatic renewal in which his Billing Information would continue

to be charged on a recurring monthly basis because Defendants failed to provide the pre-purchase disclosures required by the ARL.

121.   Once John Doe 2 learned that his initial OnlyFans purchase of OnlyFans Creator 2 did, in fact, automatically renew and would continue to do so without his intervention, John Doe 2 had no idea how to cancel his OnlyFans Subscription but did not expect it to be a difficult process. John Doe 2, however, struggled to cancel the OnlyFans Subscription because Defendants failed to provide John Doe 2 with the post-purchase acknowledgement.

122.   Furthermore, as shown above, Defendants never provided a pre-written immediately accessible termination email or, most egregiously, did not provide a "prominently located" cancellation button or link anywhere on John Doe 2's "Home" page or account page as required by the ARL. Cal. Bus. & Prof. Code §§ 17602(d)(1)(A)–(B). As such, when John Doe 2 first attempted to cancel, he contacted OnlyFans Creator 2 to no avail. Following that, John Doe 2 notified his third-party account holder to charge back Defendants' December 2022 withdrawal and stop Defendants' January 2023 charge of which John Doe 2's third-party account holder obliged. Almost immediately thereafter, however, Defendants locked John Doe 2's OnlyFans account. In order to unlock his OnlyFans account, John Doe 2 had to go through great lengths including sending Defendants a photograph of this face and, importantly, pay Defendants at least $24.98, exclusive of all applicable taxes, for his unwanted subscription to OnlyFans Creator 2. Eventually, John Doe 2 did cancel his OnlyFans Subscription, but he was never provided with a refund for any of Defendant Fenix Internet's unauthorized charges.

123.   Had John Doe 2 received clear and conspicuous disclosures in visual proximity to Defendants' request for purchase, as required under the ARL, at the time he made his initial purchase of OnlyFans Creator 2 content, products, and/or services John Doe 2 would not have consented to that initial purchase. In other words, John Doe 2 would not have made his purchase of OnlyFans Creator 2 content, products, and/or services had he known that his purchase was, in fact, an automatic renewal agreement. Furthermore, had Defendants provided John Doe 2 with the post-purchase acknowledgment and complied with the ARL's statutorily mandated cancellation mechanisms, John Doe 2 would have cancelled his automatic renewal to OnlyFans Creator 2 earlier than he did which caused John Doe 2 to

be charged with, at minimum, an additional, and unwanted, monthly fee of $12.99, exclusive of any applicable taxes, associated with OnlyFans Creator 2.

124.   As a result of the forgoing conduct of Defendants, Plaintiff John Doe 2 was injured and incurred out-of-pocket loss of $24.98 in total, and at minimum of $12.99, exclusive of any applicable taxes, for which he now seeks relief.

125.   Apart from any individual and class relief, Plaintiff John Doe 2, as with Plaintiff John Doe 1, seeks public injunctive relief on behalf of the general public in California. Members of the general public of California, who have not transacted with Defendants, but are likely to in the future given the website's growth, should be protected from Defendants' current and ongoing violations of the ARL and other laws described herein, for which injunctive relief is necessary and appropriate to correct at this time for their protection. Such relief will create a public benefit.

## **CLASS ALLEGATIONS**

126.   Plaintiffs' experience with Defendants' deceptive and unlawful OnlyFans Subscription scheme are far from unique. Indeed, every California consumer who subscribed to any OnlyFans Creator Content within the relevant statute of limitations period failed to receive the requisite disclosures prior to their purchase and post-purchase acknowledgments as required by the ARL, Cal. Bus. & Prof. Code §§ 17602(a)(1)–(3), in exactly the same manner that Plaintiffs' failed to receive them. Because all of the automatic renewal fees Defendants assessed against Plaintiffs and California consumers were unlawful, Plaintiffs and all members of the class they seek to represent are entitled to restitution from Defendants, jointly and severally, of the fees they paid, in every successive month for which they were assess.

127.   **Class Definition**: Plaintiffs bring this action pursuant to Code of Civil Procedure § 382 and Civil Code § 1781 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals in California who subscribed to any OnlyFans Subscription in the applicable statute of limitations preceding the filing of this complaint, and who were subsequently assessed an automatic renewal fee associated with those accounts. And all individuals in California whose Billing Information was unlawfully charged as a result of Defendants' noncompliant OnlyFans Subscription cancellation mechanism.

128.    Excluded from the Class are Defendants and any entities in which Defendants have controlling interest, Defendants' officers, employees, and agents, and the judicial officers and staff.

129.    Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

130.    **Numerosity**: Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, the Class comprises at least tens of thousands of Californian consumers.[62] The precise number of the Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by email and/or publication through the distribution and billing records of Defendants. Defendants possess and/or have access to each class members' email address and/or other contact information.

131.    **Commonality and Predominance**: Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (1) whether Defendants presented all statutorily-required automatic renewal offer terms in a manner that is clear and conspicuous within the meaning of the ARL and in visual proximity to a request for consent to the offer; (2) whether Defendants provided the post-transaction acknowledgment disclosures required by section 17602(a)(3) of the ARL; (3) Defendants' policies, practices and procedures for obtaining affirmative consent from their California consumers before charging their credit or debit card; (4) whether Defendants provided a one-step online cancellation method under section 17602(d)(1)(A)–(B); and (5) the appropriate remedies for Defendants' unlawful conduct.

132.    **Typicality**: Plaintiffs' claims are typical of the claims of the class members in that they registered for OnlyFans using a common online process, received the exact same inadequate pre-transaction disclosures as received by all members of the class, and similarly received an inadequate

---

[62] Fenix Annual Report, *supra* note 1 at 2 (reporting that there were over 187,000,000 OnlyFans consumers as of November 30, 2021).

post-transaction acknowledgement that included the contents require under section 17602(a)(3). Plaintiffs' claims are further typical in that their Billing Information was charged for automatic renewal fees without Defendants having first obtaining their affirmative consent to an agreement containing clear and conspicuous disclosures of all OnlyFans Subscription offer terms and without providing a one-step immediate cancellation process.

133. **Adequacy**: Plaintiffs will fairly and adequately protect Class Members' interests. Plaintiffs have no interest antagonistic to Class Members' interest, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class-action and consumer-protection cases.

134. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecution of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserve judicial resources, and ensures uniformity of decisions; and prosecutions as a class action permits claims to be handled in an orderly and expeditious manner.

135. Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

136. Without class action, Defendants will continue a course of action that will result in further damages to Plaintiffs and members of the Class and will likely retain the benefits of their wrongdoing.

137. Based on the foregoing, Plaintiffs' claims for relief include those set forth below.

138. As noted above, apart from relief for the Class, Plaintiffs separately seek public injunctive relief on behalf of the general public of California to stop the ongoing and continuing violations of California law described above. Members of the general public in California who have not transacted with Defendants but may in the future are at risk of new harms, injuries and financial losses from the ongoing and continuing conduct complained of unless enjoined and corrected. Such claims for public injunctive relief are not required to be certified as class actions and the above elements are not required to be satisfied for such relief.

**FIRST CAUSE OF ACTION**

**For Violation of the California Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

139.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

140.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

141.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. *Id.* § 17204. Such a person may bring such action on behalf of her- or himself and other similarly situated who are affected by the unlawful and/or unfair business practice or act.

142.    At all relevant times, Defendants have violated, and continue to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of their violations of the ARL. Cal. Bus. & Prof. Code §§ 17600, *et seq*. Specifically, Defendants failed, and continue to fail, to: (a) provide the terms of Defendants' OnlyFans Subscription "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiffs and the Class to those terms before charging their Billing Information, in violation of *id.* § 17602(a)(2); (c) provide an acknowledgment that includes the OnlyFans Subscription offer terms, Defendants' cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by OnlyFans consumers, in violation of *id.* § 17602(a)(3); and (d) fail to provide a one-step method of online cancellation pursuant to ARL section 17602(d)(1)(A)–(B).

143.    Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

144.    All products received from Defendants in violation of the ARL constitute "unconditional gifts." *See* Cal. Bus. & Prof. Code § 17603. As a direct and proximate result of Defendants' unlawful

and/or unfair practices described herein, Defendants have received, and continue to hold, unlawfully obtained property and money belonging to Plaintiffs and the Class in the form of payments made by Plaintiffs and the Class for their purchase of OnlyFans Creator Content. Due to the violations of the ARL referenced above, the goods and services provided by OnlyFans were considered unconditional gifts prior to the time their Billing Information was charged by Defendant Fenix Internet and therefore, those amounts collected by Defendants should be restored to Plaintiffs and refunded in full. Defendants have greatly profited from their unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

145.    Further, as alleged below, Defendants have committed additional unlawful and/or unfair business practices under the UCL by: (a) converting to Defendants' own use and benefit money that rightfully belongs to Plaintiffs and the Class; (b) representing that Defendants' goods and services have certain characteristics that they do not have, in violation of Cal. Civ. Code § 1770(a)(5); (c) advertising goods and services with the intent not to sell them as advertised, in violation of *id.* § 1770(a)(9); (d) Defendants represented that a transaction in question conferred or involved rights, remedies, or obligations that it did not have or involve, or were otherwise prohibited by law, in violation of *id.* § 1770(a)(14); (e) the insertion of an unconscionable provision in the transaction at issue, *inter alia*, the choice of law and forum selection clauses within the OnlyFans Platform Terms of Service, in violation of *id.* § 1770(a)(19); and (f) falsely advertising that OnlyFans consumers can cancel their OnlyFans Subscription at any time, in violation of Cal. Bus. & Prof. Code § 17500. Defendants' conversion, violation of the CLRA, and violation of the FAL each serve as an additional violation of the UCL.

146.    Defendants' acts and omissions as alleged herein violate obligations imposed by the ARL, and other California statutes, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

147.    There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described herein. Defendants' acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

148.     Plaintiffs and the Class have suffered substantial injury in fact and lost money by virtue of Defendants' acts of unfair competition, which caused them to purchase OnlyFans Creator Content on the OnlyFans Platform. Had Defendants complied with their pre-transaction disclosure and post-transaction acknowledgment obligations under the ARL, neither the Plaintiffs nor the Class would have purchased their OnlyFans Creator Content or would have canceled their OnlyFans Subscriptions prior to the renewal of the subscriptions, so as not to incur additional fees. Thus, Plaintiffs and the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendants' unlawful and/or unfair business practices.

149.     Defendants' violations are continuing and there is no indication that Defendants intend to cease their unlawful conduct. The public and the Class are subject to ongoing harm wrought by the statutory violations, unlawful conduct, and/or unfair business practices associated with Defendants' ongoing and active OnlyFans Subscriptions.

150.     As a direct and proximate cause of Defendants' unlawful, unfair, and fraudulent business practices, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

151.     Plaintiffs and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendants charged or caused to be charged to Plaintiffs' and the Class's Billing Information in connection with their OnlyFans Subscription during the four years preceding the filing of this Complaint. Defendants should be required to disgorge all the profits and gains they have reaped and restore such profits and gains to Plaintiffs and the Class, from whom they were unlawfully taken. Plaintiffs and the Class also seek private injunctive relief, declaratory relief, reasonable attorneys' fees and costs, and all other relief deemed appropriate in the circumstances.

152.     Additionally, pursuant to Cal. Bus. & Prof. Code § 17203 and *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), Plaintiffs on behalf of the general public of the State of California, seek a court order for public injunctive relief, declaratory relief and all other relief deemed appropriate in the

circumstances including that enjoining Defendants from such future misconduct, and any other such orders that may be necessary to rectify Defendants' unlawful business practices and conduct. Such relief is appropriate and necessary to protect members of the general public who have not yet transacted with Defendants but may and therefore remain at risk of future harm and thus, need protection from ongoing and continuing violations of the ARL and UCL, as described above. Such relief will create a public benefit.

153.    Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

## SECOND CAUSE OF ACTION

### Conversion

154.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

155.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

156.    Due to the violations of the ARL referenced above, the goods and services provided by Defendants were considered unconditional gifts prior to the time their Billing Information was charged by Defendant Fenix Internet and therefore, those amounts collected by Defendants should be restored to Plaintiffs and the Class refunded in full.

157.    As a result of charges made by Defendant Fenix Internet to Plaintiffs' and the Class's Billing Information without authorization and in violation of California law, Defendants have taken money that belongs to Plaintiffs and the Class.

158.    The amount of money wrongfully taken by Defendants is capable of identification.

159.    Defendants engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civ. Code § 3294(c).

160.    As a direct and proximate cause of Defendants' conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to

1  recover damages, restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of

2  moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well

3  as any and all other relief that may be available at law or equity.

4      161.    Plaintiffs bring this action as private attorneys general and to vindicate and enforce an

5  important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of

6  attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this

7  action.

8                              **THIRD CAUSE OF ACTION**

9          **Violation of the California Consumer Legal Remedies Act ("CLRA")**

10                      **Cal. Civ. Code §§ 1750, *et seq.***

11      162.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the

12  preceding paragraphs.

13      163.    Plaintiffs bring this claim individually and on behalf of the members of the Class against

14  Defendants.

15      164.    Plaintiffs and the Class are "consumers" within the meaning of the CLRA, *see* Cal. Civ.

16  Code § 1761(d), in that Plaintiffs and the Class sought or acquired Defendants' goods and/or services

17  for personal, family, and/or household purposes.

18      165.    Defendants' OnlyFans Subscription offers and the products and services pertaining to the

19  OnlyFans Creator Content are "good" and/or "services" within the meaning of Cal. Civ. Code § 1761(a)

20  and (b). The purchases by Plaintiffs and the Class are "transactions" within the meaning of Cal. Civ.

21  Code § 1871(e).

22      166.    The acts and practices of Defendants as described herein were intended to deceive

23  Plaintiffs and the Class and have resulted, and will continue to result, in damages to Plaintiffs and the

24  Class. The actions violated, and continue to violate, the CLRA in at least the following respects: (a)

25  Defendants' acts and practices constitute representations or omissions deceiving that their OnlyFans

26  Subscription has characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civ. Code

27  § 1770(a)(5); (b) Defendants' acts and practices constitute the advertisement of the goods in question

28  without the intent to sell them as advertised, in violation of *id.* § 1770(a)(9); (c) Defendants represented

that a transaction in question conferred or involved rights, remedies, or obligations that it did not have or involve, or were otherwise prohibited by law, in violation of *id.* § 1770(a)(14); and (d) the insertion of an unconscionable provision in the transaction at issue, *inter alia*, the choice of law and forum selection clauses in the OnlyFans Platform Terms of Service in that those provisions effectively waive the protections afforded to Californians pursuant to the ARL, UCL, CLRA, and waive Californians' right to seek public injunctive relief all of which are substantial fundamental policies of the State of California that cannot be waived by contract, and require California consumers to engage in cost-prohibitive litigation in a foreign country, with foreign counsel, and under foreign law in violation of *id.* § 1770(a)(19).

167.   Plaintiffs and the Class suffered economic injury as a direct result of Defendants' misrepresentations and/or omissions because they were induced to purchase Defendants' OnlyFans Subscription and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendants fully and clearly disclosed the terms associated with the OnlyFans Subscription, Plaintiffs and the Class would not have subscribed to the OnlyFans creator profiles, or they would have cancelled their OnlyFans Subscription prior to the expiration of the initial purchase period.

168.   Defendants knew, or should have known, that their representations and omissions were deceptive, false, and misleading.

169.   As a direct and proximate cause of Defendants' conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them, *inter alia*, to injunctive and equitable relief, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

170.   Damages on this Count alone are not sought at this time, only injunctive and declaratory relief and all other relief available at law or equity. Plaintiffs have complied with Civil Code § 1782(a) by notifying Defendant Fenix Internet in writing, by certified mail, of the violations alleged herein and demanded that Defendant Fenix Internet remedy those violations. If Defendants fails to rectify or agree to rectify the problems detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to California Civil Code § 1782.  Plaintiffs will amend this complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA. Alternatively,

demands for actual, punitive, and statutory damages pursuant to the CLRA are held in abeyance for 30 days from the initial notice and will be asserted after that if the corrective action requested is not implemented.

171. Plaintiffs also bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs are therefore entitled to an award of attorneys' fees and costs under the CLRA, Cal. Code of Civ. P. § 1021.5 and/or other applicable law for bringing this action.

### FOURTH CAUSE OF ACTION

### Violation of California False Advertising Law ("FAL")

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

172. Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

173. Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

174. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable case should be known, to be untrue or misleading."

175. Defendants committed acts of false advertising, as defined by FAL section 17500, by intentionally making and disseminating statements to California consumers and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendants to be untrue or misleading. Defendants have also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

176.     Defendants' statements include but are not limited to representations and omissions made to Plaintiffs and California consumers before and after enrollment in the OnlyFans Subscription regarding the cancellation of the OnlyFans Subscription. For example, Defendants represent on the OnlyFans Platform, and throughout the OnlyFans Subscription pre-purchase enrollment and post-purchase checkout process, that consumers can cancel "at any time." As alleged and shown above, Defendants' statement that consumers can cancel "at any time" is contradicted by the fact that Plaintiffs, and the Class, were unable to cancel any time prior to incurring additional and unwanted charges to their Billing Information. Defendants' representations and omissions throughout the OnlyFans Subscription enrollment webpages and later on the checkout page constitute false and deceptive advertising.

177.     Plaintiffs and the Class were deceived by Defendants' statements and omissions made online when they signed up and started paying for their OnlyFans Subscription. Plaintiffs relied on Defendants' statements that they could cancel anytime to their detriment when they signed-up for an OnlyFans Subscription. Any reasonable consumer would be misled by Defendants' false and misleading statements and material omissions. Plaintiffs and the Class did not learn of Defendants' difficult, confusing, and unlawful cancellation policy and procedure until after they had already signed up and started paying for their OnlyFans Subscription. Plaintiffs and the Class lost money or property as a result of Defendants' FAL violations because they would not have purchased the OnlyFans Subscription on the same terms had Defendants represented the true facts about the OnlyFans Subscription and cancellation thereof.

178.     Defendants continue to disseminate their false and misleading advertising to California consumers and, as such, the general public continues to be deceived by Defendants' untrue statements, misrepresentations, and omissions related to the OnlyFans Subscription cancellation policy and procedure. Because any reasonable consumer would be misled by Defendants' false and deceptive statements and material omissions that their consumers can cancel the OnlyFans Subscription "at any time," the general public is likely to rely on Defendants' untrue, misleading, and deceptive advertising to their detriment just as with Plaintiffs.

179.     Plaintiffs and the Class suffered economic injury as a direct result of Defendants' misrepresentations and/or omissions because they were induced to purchase of an OnlyFans

Subscription and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendants fully and clearly disclosed that the OnlyFans Subscription cancellation process was noncompliant with the ARL and that Plaintiffs and the Class could not cancel "at any time" Plaintiffs and the Class would not have purchased an OnlyFans Subscription, or they would have cancelled their OnlyFans Subscription prior to the expiration of the initial purchase period and incurring additional and unwanted charges to the Billing Information by Defendant Fenix Internet.

180.     As a direct and proximate cause of Defendants' conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to recover damages, restitution, injunctive relief and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

181.     Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under the FAL, Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment/ Restitution

182.     Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

183.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

184.     Plaintiffs and the Class conferred benefits to Defendants by purchasing subscriptions to OnlyFans Creator Content.

185.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Class's purchase of OnlyFans Subscription. Retention of those moneys under the circumstances is unjust and inequitable because of Defendants' failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiffs and the Class to purchase the OnlyFans

FIRST AMENDED CLASS ACTION COMPLAINT

Subscription. These omissions caused injuries to Plaintiffs and the Class because they would not have purchased OnlyFans Subscription at all, or on the same terms, if the true facts were known.

186.    Because Defendants' retention of the non-gratuitous benefits conferred to them by Plaintiffs and the Class is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class for their unjust enrichment, as ordered by the Court.

187.    As a direct and proximate cause of Defendants' conduct, as herein alleged, Plaintiffs and Class members have been damaged, injured and suffered ascertainable losses, thereby entitling them to recover damages, restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this action, as well as any and all other relief that may be available at law or equity.

188.    Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request relief as follows on all counts:

1.    For an order certifying the Class and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

2.    For an order declaring that Defendants' conduct violates the statutes and common law referenced herein;

3.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury, on all counts that may allow such relief;

4.    For prejudgment interest on all amounts awarded;

5.    For an order of restitution and all other forms of equitable monetary relief;

6.    For private injunctive relief as plead or as the Court may deem proper;

7.    For public injunctive relief as plead or as the Court may deem proper;

8.      For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, expenses, and costs of suit pursuant to all applicable laws that allow such relief; and

9.      For all other relief that is just and equitable in the circumstances, whether in law or equity.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

ZIMMERMAN REED, LLP

Date: April 13, 2023        By: _____

Caleb Marker
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Fax: (877) 500-8781
caleb.marker@zimmreed.com

Hart L. Robinovitch
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Tel: (480) 348-6400
Fax: (480) 348-6415
hart.robinvotich@zimmreed.com

Zachary J. Freese
80 S. South 8th Street, Suite 1100
Minneapolis, MN 55402
(612) 341-0400
zachary.freese@zimmreed.com

*Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FENIX INTERNET LLC, a Delaware limited liability company; FENIX INTERNATIONAL, LIMITED, and DOES 1 through 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOHN DOE 1 and JOHN DOE 2, individually and on behalf of all others similarly situated

**Electronically FILED by Superior Court of California, County of Los Angeles 4/12/2023 6:12 PM David W. Slayton, Executive Officer/Clerk of Court, By M. Arellanes, Deputy Clerk**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles County Superior Court

312 North Spring Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
23STCV07094     23STCV07094

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Caleb Marker, Zimmerman Reed LLP, 6420 Wilshire Blvd, Suite 1080, Los Angeles, CA 90048, Tel: 877-500-8780

DATE:     04/12/2023     Clerk, by   David W. Slayton, Executive Officer/Clerk of Court  , Deputy
*(Fecha)*               *(Secretario)*   M. Arellanes                                  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*



## *23STCV07094, JOHN DOE 1, ET AL. vs. FENIX INTERNET LLC*

CA Superior - Los Angeles County

Los Angeles

**This case was retrieved on 04/17/2023**

## Header

**Case Number:** 23STCV07094
**Date Filed:** 04/03/2023
**Date Full Case Retrieved:** 04/17/2023
**Status:** Open
**Misc:** (1067) Other Commercial/Business Tort (not fraud/ breach of contract) (General Jurisdiction); Civil

## Summary

**District**: Central
**Case Type**: Civil

## Participants

| Litigants | Attorneys |
|---|---|
| DOE 1 JOHN | |
| **Plaintiff** | |
| DOE 2 JOHN | |
| **Plaintiff** | |
| FENIX INTERNATIONAL LIMITED | |
| **Defendant** | |
| FENIX INTERNET LLC | |
| **Defendant** | |

**--- Unassociated Attorneys ---**

MARKER CALEB

Attorney for Plaintiff

## Other Docket Proceedings

| Date | Details |
|---|---|
| 04/03/2023 | Alternate Dispute Resolution Packet Filed by Clerk |
| 04/03/2023 | Civil Case Cover Sheet Filed by John Doe 1 (Plaintiff); John Doe 2 (Plaintiff) |
| 04/03/2023 | Complaint Filed by John Doe 1 (Plaintiff); John Doe 2 (Plaintiff) |
| 04/03/2023 | First Amended General Order re: Mandatory Electronic Filing Filed by Clerk |
| 04/03/2023 | Notice of Case Assignment - Unlimited Civil Case Filed by Clerk |
| 04/03/2023 | Summons (on Complaint) Filed by John Doe 1 (Plaintiff); John Doe 2 (Plaintiff) |
| 04/03/2023 | Voluntary Efficient Litigation Stipulation Packet Filed by Clerk |

23STCV07094, JOHN DOE 1, ET AL. vs. FENIX INTERNET LLC

| Date | Details |
|------|---------|
| 04/12/2023 | First Amended Class Action Complaint Filed by John Doe 1 (Plaintiff); John Doe 2 (Plaintiff) |
| 04/12/2023 | Summons (on Complaint) Filed by John Doe 1 (Plaintiff); John Doe 2 (Plaintiff) |

# Proceedings

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/03/2023 | | Civil Case Cover Sheet | PageCount 7 |
| 04/03/2023 | | Complaint | PageCount 52 |
| 04/03/2023 | | Notice of Case Assignment - Unlimited Civil Case | PageCount 2 |
| 04/03/2023 | | Summons - SUMMONS ON COMPLAINT | PageCount 1 |
| 04/03/2023 | | Unknown - ALTERNATE DISPUTE RESOLUTION PACKET | PageCount 2 |
| 04/03/2023 | | Unknown - FIRST AMENDED GENERAL ORDER RE: MANDATORY ELECTRONIC FILING | PageCount 7 |
| 04/03/2023 | | Voluntary Efficient Litigation Stipulation Packet | PageCount 12 |
| 04/12/2023 | | Amended Complaint - FIRST AMENDED CLASS ACTION COMPLAINT | PageCount 64 |
| 04/12/2023 | | Summons - SUMMONS ON COMPLAINT | PageCount 1 |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**